# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

### CASE NO. 5:19-mc.8-oc 30 PRL

In Re Application of

AREMPA INTERNATIONAL LTD FZC,

    Applicant,

Pursuant to 28 U.S.C. § 1782 for Judicial
Assistance in Obtaining Evidence from
WELLS FARGO BANK, N.A., for use in a
Foreign Proceeding.

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S *EX PARTE*
APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

2019 MAY -1 PH 12: 24
CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

FILED

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .........................................................................................1

I.    FACTUAL BACKGROUND .................................................................................2

    A.    The Parties ...................................................................................................2

    B.    Relevant Non-Parties ..................................................................................2

    C.    The Cyber-Criminals Deceive Arempa to Transfer Funds to Barclays
           Bank .............................................................................................................3

    D.    The Cyber-Criminals Deceive Arempa To Transfer Funds To the OCBC
           Account .......................................................................................................4

    E.    Arempa Realizes It Has Been Defrauded and Scammed .............................5

    F.    The Cyber-Criminals Request That Funds Be Transferred to a Well Fargo
           Account In This District...............................................................................5

    G.    The Foreign Proceedings ............................................................................7

           1.    Criminal Investigative Proceedings ...............................................7

           2.    Contemplated Action Against Barclays Bank ................................8

           3.    Contemplated Asset Tracing Claim Against the Fraudsters .........9

           4.    The Information Sought ..................................................................9

II.    ARGUMENT .......................................................................................................10

    A.    Legal Framework ......................................................................................10

    B.    Petitioner Satisfies the Statutory Requirements of 28 U.S.C. § 1782.....................12

           1.    Petitioner is an Interest Person.....................................................12

           2.    This Application Seeks Documentary Evidence Concerning The
                  Fraudster and Its Financial Transactions ....................................13

           3.    The Evidence is For Use in Foreign Proceedings.........................13

           4.    Respondent Is "Found" in this District .........................................15

    C.    All of the Discretionary Factors Under Section 1782 Weigh in Favor of
           Permitting the Discovery Petitioner Seeks. ..............................................16

           1.    The First *Intel* Factor Favors Granting Discovery.....................16

           2.    The Second *Intel* Factor Favors Granting Discovery. ...............17

            3.    The Third *Intel* Factor Favors Granting Discovery. ..................18

            4.    The Fourth *Intel* Factor Favors Granting Discovery..................19

III.    CONCLUSION....................................................................................................20

## **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Al-Ghanim v. IAP Worldwide, Servs., Inc.,*
  2012 WL 13102517 (M.D. Fla. Jan. 18, 2012) .................................................... 19

*In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery,*
  121 F.3d 77 (2d Cir. 1997) .................................................................... 18, 19

*In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.,*
  2011 WL 181311 (S.D. Fla. Jan. 19, 2011) ...................................................... 19

*In re Application of N. Am. Potash, Inc.,*
  2012 WL 12877816 (S.D. Fla. Nov. 19, 2012) .................................................. 18

*In re Application of Setraco Nigeria Ltd.,*
  2013 WL 3153902 (M.D. Fla. June 19, 2013) ................................................ 14, 15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG,*
  673 F.3d 76 (2d Cir. 2012) ...................................................................... 11

*In re Chevron Corp.,*
  2012 WL 3636925 (S.D. Fla. June 12, 2012) .................................................... 19

*In re Clerici,*
  481 F.3d 1324 (11th Cir. 2007) ......................................................... 10, 11, 13

*Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.,*
  747 F.3d 1262 (11th Cir. 2014) .................................................................. 14

*Euromepa S.A. v. R. Esmerian, Inc.,*
  51 F.3d 1095 (2d Cir. 1995) .................................................................... 17

*In re Ex Parte Application of Petro Welt Trading Ges.m.b.H for Order to Obtain Discovery for Use in Foreign Proceeding,*
  2018 WL 3020205 (M.D. Fla. June 18, 2018) ............................................... 10, 11

*In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation pour le Traitement du Mais,*
  2013 WL 6141655 (N.D. Cal. Nov. 21, 2013) .................................................... 12

*In re Ferrer,*
  2018 WL 3240010 (S.D. Fla. July 3, 2018) ...................................................... 15

*In re Ferrer,*
    2018 WL 3240010 (S.D. Fla. July 3, 2018) .............................................................. 15

*Application of Furstenberg Fin. SAS v. Litai Assets LLC,*
    877 F.3d 1031 (11th Cir. 2017) ....................................................................... 11

*In re Furstenberg Fin. SAS,*
    2016 WL 10707012 (S.D. Fla. July 27, 2016) ............................................... 11, 12

*In re Gianoli Aldunate,*
    3 F.3d 54 (2d Cir. 1993) ............................................................................. 12

*Gyptec, S.A. v. Hakim-Daccach,*
    No. 16-20810-CIV, 2017 WL 6557425 (S.D. Fla. Sept. 27, 2017) .................... 10, 19

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004) .......................................................................... **passim**

*In re Kreke Immobilien KG,*
    2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) .......................................... 17

*In re Meydan Grp. LLC,*
    No. CIV.A. 15-02141 JLL, 2015 WL 2453757 (D.N.J. May 21, 2015) ............... 13, 18

*Minatec Fin. S.A.R.L. v. SI Group Inc.,*
    2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) ......................................... 19

*In re MTS Bank,*
    2017 WL 3155362 (S.D. Fla. July 25, 2017) ........................................ 15, 16

*In re MTS Bank,*
    2018 WL 3145806 (S.D. Fla. June 27, 2018) ........................................... 17

*In re NRC Holding, Ltd.,*
    2015 WL 541770 (S.D. Fla. Feb. 10, 2015) ........................................... 14

*In re O'Keeffe,*
    660 F. App'x 871 (11th Cir. 2016) .................................................... 13

*In re O'Keeffe,*
    660 F. App'x 871 (11th Cir. 2016) .................................................... 18

*In re Samsung Elecs., S.A. de C.V.,*
    2006 WL 8433576 (S.D. Fla. Apr. 12, 2006) ...................................... 18

*Weber v. Finker,*
    554 F.3d 1379 (11th Cir. 2009) ...................................................... 13

## **Rules / Statutes**

28 U.S.C. § 1782.................................................................................................................. passim

Petitioner Arempa International Ltd FZC ("Arempa" or "Petitioner"), respectfully submits this Memorandum of Law in support of their Application and Petition pursuant to 28 U.S.C. § 1782 ("Section 1782") for an order authorizing them to obtain limited discovery from Wells Fargo Bank ("Respondent"), in the form of the attached subpoena *duces tecum* (the "Subpoena") (the "Application").[1]

## PRELIMINARY STATEMENT

This Application arises from a cyber-fraud scheme that caused Arempa to transfer over $1,816,500 to individuals who impersonated directors and employees of an Arempa creditor, Rapiscan Systems Limited ("Rapiscan"). On or around the same date, attempts were also made to deceive Arempa to transfer $87,125 to a Wells Fargo Bank account in this District ("Wells Fargo Account"). As the Petitioner, Arempa seeks information relating to the Wells Fargo Bank Account holder for use in criminal investigations in the United Arab Emirates ("UAE Investigation") and Hong Kong ("Hong Kong Investigation") and in anticipated lawsuits in the United Kingdom ("UK Actions", and together with UAE Investigation and Hong Kong Investigation, "Foreign Proceedings").

Petitioner's Application meets all of the requirements of Section 1782. The Respondent is found in this District. The discovery sought by Petitioner is highly relevant to issues at stake in the Foreign Proceedings, particularly since it seeks to identify the fraudsters, their modus operandi, and financial transactions. Moreover, each of the discretionary factors laid down by the Supreme Court in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–56 (2004) favors granting the discovery sought by Petitioner. Accordingly, the Petitioner respectfully requests that the Court grant Petitioner's Application and permit Petitioner to serve the Subpoena on the Respondent.

---

[1] The Subpoena is attached as Exhibit 2.

## I.    FACTUAL BACKGROUND

### A.    The Parties

*Arempa.* Arempa is a general trading company registered in the Saif Zone of the United Arab Emirates ("UAE") and maintains its principal place of business in Dubai, UAE. Established in 1998, Arempa is a major supplier of security goods to the Commonwealth of Independent States ("CIS") region, acting as the exclusive distributor of Rapiscan in the CIS region as well as in Turkey. At the end of 2018, Arempa fell victim of a "phishing email scam"[2] that caused it to transfer $1,816,500 to individuals who impersonated directors and employees of Rapiscan to a Barclays Bank account ("Barclays Account") in the United Kingdom ("Barclays Account Fraud") and $202,000 to a OCBC Bank account ("OCBC Account") in Hong Kong ("OCBC Account Fraud").[3]

*Well Fargo Bank.* Wells Fargo is a Delaware company with offices in this District located at 9488 SW 80th Avenue, Ocala, FL 34481, USA. The fraudsters maintain or maintained the Wells Fargo Account at the Well Fargo branch in Ocala, Florida.[4]

### B.    Relevant Non-Parties

*Barclays Bank PLC.* Barclays is a London-based global financial services provider engaged in retail banking, credit cards, wholesale banking, investment banking, wealth management, and investment management services. Upon information and belief, Barclays authorized the incoming $1,816,500 transaction as well as outgoing transactions that dissipated Petitioner's funds outside of the Barclays Account.[5]

---

[2]    A phishing email scam, also known as "authorized push payment fraud" happens when fraudsters deceive consumers or individuals at a business to send them a payment under false pretenses to a bank account controlled by the fraudster. *See* https://www.fico.com/blogs/fraud-security/what-is-authorised-push-payment-fraud/.

[3]    Badar Khan Declaration, ¶ 5-6, attached hereto as Exhibit 3.

[4]    Khan Declaration, ¶ 7.

[5]    Khan Declaration, ¶ 8.

*OCBC Bank.*  Oversea-Chinese Banking Corporation Limited ("<u>OCBC Bank</u>") is a Singapore-based provider of financial services in Singapore, Malaysia, Indonesia, Greater China, and other parts of the world.  One of the fraudster's bank accounts was maintained at OCBC Bank.  Upon learning of the fraudulent transaction, OCBC immediately reversed the transaction and returned the funds back to Arempa.[6]

### C.   The Cyber-Criminals Deceive Arempa to Transfer Funds to Barclays Bank

Arempa is the exclusive distributor of Rapiscan goods and services in the CIS region and in Turkey.[7]  Arempa purchases various security goods from Rapiscan suppliers worldwide and resells them in the region.[8]  As such, Arempa regularly makes payments to these suppliers, many of whom have decades-long business relationships with Arempa.[9]

On October 13, 2018, Arempa received an email from individuals impersonating directors and officers of Rapiscan Systems Limited requesting that payment for a pending invoice ("<u>Rapiscan Invoice</u>") totaling $1,816,500 be made to different bank account with Barclays Bank.[10]  The individuals impersonated Alan Mixer, Eric A Luiz, and others at Rapiscan by using the email addresses AMixer@rapiscansyst<u>erns</u>.com and ELuiz@rapiscansyst<u>ens</u>.com, instead of AMixer@rapiscansyste<u>m</u>s.com and ELuiz@rapiscansyste<u>m</u>s.com – replacing only one or two letters of the domain name in an attempt to deceive the reader.[11]  Further, as the fraudster listed Rapiscan Systems Limited (the real creditor) as the bank account holder, Arempa

---

[6]  Khan Declaration, ¶ 9.
[7]  Khan Declaration, ¶ 10.
[8]  Khan Declaration, ¶ 10.
[9]  Khan Declaration, ¶ 10.
[10]  Khan Declaration, ¶ 11.
[11]  Khan Declaration, ¶ 11 (emphasis added).  In an effort to uncover the identity of the owner of the fraudulent email address, Petitioner will also initiate a Section 1782 proceeding in Pennsylvania to obtain information from the domain registrar.

3

employees did not suspect anything improper.[12]  Accordingly, on October 15, 2018, Arempa instructed its bank, Habib Bank, to wire the funds to the Barclays Account.[13]

On 16 October 2018, Habib Bank executed Arempa's payment instructions via outward SWIFT to Deutsche Bank Trust Company Americas in New York.[14]  The funds were then transferred to Barclays' New York branch, which transferred them to Barclays in the United Kingdom and deposited them into the fraudster's Barclays Account.[15]

### D.      The Cyber-Criminals Deceive Arempa To Transfer Funds To the OCBC Account

On October 31, 2018, Arempa received another email from individuals impersonating directors and officers of Rapiscan Systems Limited requesting an advance payment of $ 202,000 to the OCBC Account for "an urgent shipment."[16]  The email further explained that the payment was intended to pay a "Rapiscan agent" in Hong Kong, and that Rapiscan would repay Arempa in due course.[17]  As these types of transactions are not unusual, Arempa did not suspect any fraudulent or otherwise improper activity.  On or around November 1, 2018, Arempa wired the funds to the OCBC Account.[18]

---

[12]  Khan Declaration ¶ 11.  Of course, it surprising that Barclays Bank proceeded with the transaction despite the fact that the bank account holder could not have been Rapiscan Systems Limited (the real company).  Petitioner has grave concerns over Barclays' handling of the transaction and its dealings with Petitioner since.  Accordingly, and as explained in more detail below, Petitioner contemplates initiating an action in the United Kingdom against Barclays for, inter alia, unjust enrichment and/or negligence.  *See infra* Section G.2.

[13]  Khan Declaration, ¶ 12.

[14]  Khan Declaration, ¶ 13.

[15]  Khan Declaration, ¶ 13.

[16]  The individuals impersonated Alan Mixer, Eric A Luiz, and others at Rapiscan by using the email addresses AMixer@rapiscansterns.com and ELuiz@rapiscansystens.com instead of AMixer@rapiscansystems.com and <ELuiz@rapiscansystems.com>.  Khan Declaration, ¶ 14, Exhibit 2.

[17]  Khan Declaration, ¶ 14.

[18]  Khan Declaration, ¶ 14.

### E.    Arempa Realizes It Has Been Defrauded and Scammed

On November 5, 2018, Rapiscan verbally communication with Arempa to enquire about the payment status of the Rapiscan Invoice.[19]  Upon learning that the payment had not been cleared in Rapiscan's accounts and that Rapiscan had not changed its bank account details in the UK nor requested  any payment to be made to a Hong Kong agent, Arempa realized that it had become the victim of a fraudulent scheme and sought to immediately put a stop to the payments to the Barclays Account and OCBC Account.[20]  Arempa immediately reported the fraud to the UK Metropolitan Police and the Hong Kong Police.[21]

Arempa, through its banking representatives and others, sent numerous communications to Barclays Bank and OCBC requesting that the funds be recalled with immediate effect.[22] OCBC Bank was able to reclaim the funds from the OCBC Account before the fraudsters were able to liquidate the account.[23]  Barclays, however, only responded to Arempa over 65 days after it was notified of the issue with a vague and conclusory statement that the funds were no longer in the account when it was "made aware of the situation".[24]

### F.    The Cyber-Criminals Request That Funds Be Transferred to a Well Fargo Account In This District

On November 7, 2018, before Arempa realized it had been defrauded, an individual impersonating Alan Mixer—the same Rapiscan employee name used by the fraudsters in the Barclays and OCBC transactions—emailed Ms. Meilarni Guiala, an Arempa Accounts Head, requesting that Ms. Guiala transfer $87,125 to the Well Fargo Account to a Well Fargo branch

---

[19]  Khan Declaration, ¶ 15.
[20]  Khan Declaration, ¶ 15.
[21]  Khan Declaration, ¶ 15.  The UK Investigation File Number is NFRC178110261365 and the Hong Kong Investigate File Number is LM (1554/18) in HK/C 54/6(COM). Khan Declaration, ¶ 20.
[22]  Khan Declaration, ¶ 16.
[23]  Khan Declaration, ¶ 16.
[24]  Khan Declaration, ¶ 16.

located in this District.[25]   Again, the individual impersonated Mr. Mixer, a Rapiscan Finance

Director, by using an email address that was deceptively similar to Mr. Mixer's real email

address.[26] The wiring details provided by the fraudster included the following details:

| Bank | Wire routing number | SWIFT Code | Account number | Account name |
|---|---|---|---|---|
| Wells Fargo Bank, 9488 SW 80th Ave Ocala, FL 34481, USA | 121000248 | WFBIUS6S | XXXXX7424[27] | Mayra Arriaga Consultants, 14591 SW 38th Terrace Road, Ocala, FL. 34481, USA |

By then, however, Arempa had already discovered the fraudulent transactions related to

the Barclays Account and OCBC Account and so did not execute the transfer to the Wells Fargo

Account.[28]  Given the similar modus operandi and same time period, it is highly likely that the

individual(s) who sought to defraud Arempa in wiring funds to the Barclays Account, OCBC

Account, and Wells Fargo Account are the same or connected to each other.[29]  The individual(s)

was clearly able to identify the Arempa employees who are responsible for processing payments,

and copied those individuals in all emails in an effort to add an additional layer of authenticity to

the communications.[30]  In at least the Barclays Account Fraud, the fraudster(s) was also able to

highjack an existing email communication chain to continue pre-existing correspondence

---

[25]  Khan Declaration, ¶ 17.

[26]  The individual corresponded with Arempa using amixer@rapiscansystens.com, instead of Mr. Mixer's real email address which is amixer@rapiscansystems.com, the only difference being the "n" and "m" in the second level domain name. Khan Declaration ¶ 17.

[27]  The full account number has been redacted pursuant to Fed. R. Civ. P. 5.2(a)(4).  The account numbers in the accompanying declarations and exhibits have also been redacted accordingly.  Petitioner is prepared to share the account numbers with the Court for in camera review if necessary.  If this Court grants the Application, Petitioner shall disclose the full account number in the Subpoena to aid Wells Fargo locate the relevant information.

[28]  Khan Declaration, ¶ 18.

[29]  Khan Declaration, ¶ 18.

[30]  Khan Declaration, ¶ 18.

between Arempa and real employees of Rapiscan without raising any suspicions on the part of Arempa.[31]

### G.    The Foreign Proceedings

Having lost over $1.8 million as a result of the fraud, Arempa has initiated criminal investigative proceedings in Dubai and Hong Kong and reasonably contemplates bringing a civil action against Barclays Bank and the fraudsters (once identified) in the United Kingdom.[32]

#### 1.    Criminal Investigative Proceedings

On November 5, 2018, upon learning of the fraud, Arempa immediately notified the authorities in the United Kingdom and Hong Kong.[33]   The Hong Kong police is currently investigating the fraud under Case No. ERC1811051017086 ("Hong Kong Criminal Proceedings").[34]   The UK Metropolitan Police also opened an investigation but later recommended that the investigation be handled in the first instance by the Dubai authorities since Arempa is based in Dubai.[35]

Accordingly, on November 28, 2018, Arempa notified the Dubai authorities of the fraud. Consequently, the Al Barsha Police opened an investigation into the fraud, classifying it as "E Crime" (for Electronic Crime) ("Dubai Criminal Proceedings", and together with the Hong Kong Criminal Proceedings, the "Criminal Investigative Proceedings").[36]   On December 19, 2018, the Investigative Officer of the Al Barsha Police met with Arempa director Badar Khan to discuss the investigation and collect any further evidence.[37]

---

[31]  Khan Declaration, ¶ 18.
[32]  Khan Declaration, ¶ 19.
[33]  Khan Declaration, ¶ 20.
[34]  Khan Declaration, ¶ 20.
[35]  Khan Declaration, ¶ 20-21.
[36]  Khan Declaration, ¶ 21.
[37]  Khan Declaration, ¶ 21.

### 2.   Contemplated Action Against Barclays Bank

On November 5, 2018, Arempa, through its banking representatives Habib Bank, notified Barclays of the Barclays Account Fraud and subsequently sent Barclays multiple SWIFT messages[38] requesting that the funds be recalled with immediate effect.[39]   Barclays only responded to Arempa and Habib Bank on January 10, 2019, over 65 days after it was notified of the fraud, claiming that "at the time it became aware of the issue the account was closed," and provided no further information.[40]   Subsequently, Arempa's English lawyers have requested further information about the fraud, including the identity of the fraudster and the account(s) to which Arempa's funds were transferred out to, but have been stonewalled by Barclays at every turn.[41]

Arempa is currently preparing a pre-action lawsuit against Barclays to obtain information relating to, inter alia, the fraudster's Barclays Account and Barclays' internal checks relating to the fraudulent transaction.[42]   Arempa contemplates using the information to bring an action against Barclays on a theory of unjust enrichment and negligence ("Barclays Proceedings").[43] To that end, on April 9, 2019, Arempa sent Barclays a pre-action letter providing it with notice that Arempa will be seeking judicial relief in the English courts.[44]

---

[38]   A SWIFT message is a message sent by a bank through the SWIFT payment system to communicate with other banks about SWIFT transactions.   *See* https://www.investopedia.com/articles/personal-finance/050515/how-swift-system-works.asp.
[39]   Khan Declaration, ¶ 22.
[40]   On February 18, 2019, Arempa received a letter dated November 23, 2018 from Barclays informing Arempa of the same.   It is unclear why it took almost 3 months for the letter to arrive at Arempa's address.  Khan Declaration, ¶ 22.
[41]   Khan Declaration, ¶ 23.
[42]   Khan Declaration, ¶ 24; Khalid Khatoun Declaration ¶ 6-12, attached hereto as Exhibit 4.
[43]   Khan Declaration, ¶ 24; Khatoun Declaration ¶ 6-12.
[44]   An English barrister has also been retained to assist with the contemplated court proceedings.   Khan Declaration ¶ 25.

### 3.    Contemplated Asset Tracing Claim Against the Fraudsters

Arempa contemplates pursuing asset tracing claims against the fraudster(s) once their identities and location are uncovered pursuant to, inter alia, this Section 1782 proceeding ("Asset Tracing Proceedings," and together with the Barclays Proceedings, the "UK Proceedings"). Such asset tracing claims would, subject to applicable law, seek the recovery of Arempa's funds as well as damages and costs.[45]  English counsel have been retained to pursue these claims should the fraudsters and/or their assets be subject to English jurisdiction.[46]

### 4.    The Information Sought

Given the same domain names used to impersonate the Rapiscan employees and the same time period of the fraudulent acts, the identity and details regarding the financial transactions of the Wells Fargo Account holder are directly relevant to the Dubai and Hong Kong investigations and the mechanics of the Barclays Account Fraud.[47] This information would show not only who the fraudsters are but also where they are based, and thus potentially where their assets, including Arempa's misappropriated funds, can be found.[48]

In light of the fact that the fraudsters sought to further defraud Arempa into transferring funds in a Wells Fargo bank account in this District using the same email addresses seeking to impersonate Rapiscan employees, it is highly likely that Respondent possesses information that may be critical to the Foreign Proceedings.[49]  As such, Petitioner respectfully seeks limited documents from Respondent for use in those Proceedings.[50]

---

[45]   Khan Declaration, ¶ 25; Khatoun Declaration ¶ 6-12.
[46]   Khan Declaration, ¶ 25.
[47]   The fraudster has used real names of Arempa creditors to deceive Arempa to make the transfers.  Thus, it is unlikely that the real name of the payee, i.e. the account holder, is the one fraudster communicated to Arempa—e.g., Rapiscan Systems Limited, Marya Arriaga Consultants).  Those are simply cover names used to deceive Arempa that payments are being made to real creditors.  Khan Declaration ¶ 26.
[48]   Khan Declaration, ¶ 26.
[49]   Khan Declaration, ¶ 27.
[50]   Khan Declaration, ¶ 27.

9

## II.    ARGUMENT

### A.    Legal Framework

Section 1782 of Title 28 of the United States Code permits United States District Courts

to grant discovery for use in a foreign proceeding.  The statute, in relevant part, states:

> The district court of the district in which a person resides or is found may order
> him to give his testimony or statement or to produce a document or other thing for
> use in a proceeding in a foreign or international tribunal . . . .  The order may be
> made . . . upon the application of any interested person.

28 U.S.C. § 1782.

Courts are permitted to grant Section 1782 applications on an ex parte basis.  *Gyptec, S.A.*

*v. Hakim-Daccach*, No. 16-20810-CIV, 2017 WL 6557425, at *2 (S.D. Fla. Sept. 27, 2017*), aff'd*

*sub nom.  In re Gyptec S.A. for an Order to Take Discovery Under 28 U.S.C. § 1782*, No. 16-

CV-20810, 2017 WL 6559792 (S.D. Fla. Oct. 19, 2017) ("Ex Parte applications under Section

1782 are proper"); *see also Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is

neither uncommon nor improper for district courts to grant applications made pursuant to § 1782

*ex parte*.").  In any event, "the [respondent] from who discovery is sought may still object to

requests after an ex parte application is granted."  *Gyptec, S.A. v. Hakim-Daccach*, No. 16-

20810-CIV, 2017 WL 6557425, at *2, n. 1 (S.D. Fla. Sept. 27, 2017), *aff'd sub nom. In re Gyptec*

*S.A. for an Order to Take Discovery Under 28 U.S.C. §1782*, No. 16-CV-20810, 2017 WL

6559792 (S.D. Fla. Oct. 19, 2017).

A district court is authorized to grant a request under § 1782 if the following

requirements are met: (1) the request must be made by a foreign or international tribunal or by

any interested person; (2) the request must seek evidence, whether it be the testimony or

statement of a person or the production of a document or other thing; (3) the evidence must be

for use in a proceeding in a foreign or international tribunal; and (4) the person from whom

discovery is sought must reside or be found in the district of the district court ruling on the application for assistance. *In re Clerici*, 481 F.3d 1324, 1331-32 (11th Cir. 2007) (internal quotation marks omitted) (citing § 1782(a)); *see also In re Ex Parte Application of Petro Welt Trading Ges.m.b.H for Order to Obtain Discovery for Use in Foreign Proceeding*, No. 2:18-MC-5-FTM-38CM, 2018 WL 3020205, at \*2 (M.D. Fla. June 18, 2018) (granting application).

After determining that the three statutory requirements are satisfied, courts may then consider four discretionary factors in deciding whether to grant a Section 1782 application, namely: (i) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent Section 1782's aid; (ii) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (iii) whether the Section 1782 request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (iv) whether the subpoenas contain unduly intrusive or burdensome requests. *See Intel*, 542 U.S. at 264–65; *In re Clerici*, at 1334 (same); *In re Ex Parte Application of Petro Welt Trading Ges.m.b.H for Order to Obtain Discovery for Use in Foreign Proceeding*, No. 2:18-MC-5-FTM-38CM, 2018 WL 3020205, at \*3 (M.D. Fla. June 18, 2018) (same).

Moreover, the Court should consider these discretionary factors in light of the statute's "twin aims [of] providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Furstenberg Fin. SAS*, No. 16-MC-60266, 2016 WL 10707012, at \*2 (S.D. Fla. July 27, 2016), *aff'd sub nom. Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031 (11th Cir. 2017) (citing *Application of Esses*, 101 F.3d 873, 876 (2d Cir.

1996)). The Supreme Court and courts in other circuits have acknowledged a congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247–48; *In re Clerici*, at 1333 ("the Supreme Court has recognized the 'broad range of discovery' authorized under § 1782"); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability." (quoting *In re Gianoli Aldunate*, 3 F.3d 54, 57 (2d Cir. 1993))).

**B.      Petitioner Satisfies the Statutory Requirements of 28 U.S.C. § 1782.**

Petitioner satisfies the three statutory requirements of Section 1782: (1) Petitioner is an "interested person"; (2) this application seeks evidence, namely the production of documents; (3) the evidence is for use in foreign proceedings; and (4) the Respondent is found in this district.

**1.      Petitioner is an Interest Person**

Section 1782 requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, there is "[n]o doubt litigants are included among, and may be the most common example of, the interested person[s] who may invoke § 1782." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004). As the aggrieved party, victim, criminal complainant, and prospective plaintiff in the Foreign Proceedings, Petitioner is clearly an "interested person" under Section 1782. *In re Furstenberg Fin. SAS*, No. 16-MC-60266, 2016 WL 10707012, at *3 (S.D. Fla. July 27, 2016) (putative plaintiffs in contemplated foreign proceedings qualify as "interested persons"); *In re Ex Parte Application of Societe d'Etude de Realisation et d'Exploitation pour le Traitement du Mais*, 2013 WL 6141655, at *1 (N.D. Cal. Nov. 21, 2013) ("As the alleged victim, [the applicant] is an "interested person.").

12

### 2.     This Application Seeks Documentary Evidence Concerning The Fraudster and Its Financial Transactions

This Application seeks information relating to the identity and financial transactions of the account holder(s) of the Wells Fargo Account.  This will entail exclusively of very limited and narrowly tailored documentary evidence as set out in the Subpoena.[51]

### 3.     The Evidence is For Use in Foreign Proceedings

The Criminal Investigative Proceedings and the UK Proceedings qualify as foreign proceedings for purposes of Section 1782.    With regards to the Criminal Investigative Proceedings, Section 1782 explicitly provides that the statute can be used to obtain discovery for use in "criminal investigations conducted before formal accusation", and the Eleventh Circuit has confirmed the availability of Section 1782 discovery for criminal investigations.  28 U.S.C. §1782(a); *Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009) ("Congress clearly intended for § 1782 to facilitate discovery by individuals for use in foreign criminal actions. Here, Weber sought judicial assistance prior to formal accusation by the Swiss government. Section 1782 is expressly applicable to her request."); *In re Clerici*, 481 F.3d 1324, 1333 (11th Cir. 2007) ("nothing in the plain language of § 1782 requires that the proceeding be adjudicative in nature. In fact, the statute specifically provides that the evidence obtained through § 1782 can be used in "'criminal investigations conducted *before* formal accusation,' even though such investigations are not adjudicative proceedings."); *In re Meydan Grp. LLC*, No. CIV.A. 15-02141 JLL, 2015 WL 2453757, at *3 (D.N.J. May 21, 2015) (granting Section 1782 application for use in proceedings in Dubai); *In re O'Keeffe*, 660 F. App'x 871, 872 (11th Cir. 2016) (granting Section 1782 application for use in Hong Kong).  Thus, the Criminal Investigative Proceedings plainly qualify as foreign proceedings under Section 1782.

---

[51] *See* Exhibit 2.

13

With regards to the UK Proceedings, the Supreme Court, the Eleventh Circuit, and courts in this District have held that a Section 1782 request can be used to obtain information before the foreign proceeding is commenced as long as it is within "reasonable contemplation." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 259 (2004); *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014) (affirming grant of Section 1782 application and holding that "[t]he future proceedings must be more than speculative . . . and a district court must insist on reliable indications of the likelihood that proceedings will be instituted within a reasonable time."); *In re Application of Setraco Nigeria Ltd.*, No. 3:13-MC-16-32MCR, 2013 WL 3153902, at *2 (M.D. Fla. June 19, 2013) ("Section 1782 is designed to support such contemplated claims, including civil and criminal proceedings to be initiated by a private party in a foreign tribunal, even when said proceedings are contemplated but have not yet commenced."). Here, the Petitioner and English counsel have both affirmed their intention to initiate proceedings against Barclays and the fraudsters in England. In fact, English counsel have already sent Barclays a pre-action letter notifying it of claims and seeking further information.

Petitioner is not required to show that the information sought would be discoverable or admissible in the Foreign Proceedings. *Intel*, 542 U.S. at 260 ("[N]othing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."); *In re NRC Holding, Ltd.*, No. 14-MC-61962, 2015 WL 541770, at *2 (S.D. Fla. Feb. 10, 2015) (holding that Section 1782 "does not impose a foreign discoverability requirement"). Rather, Petitioner only needs to show that it has the ability "to inject the requested information into a foreign proceeding" and the "requested discovery is 'something that will be employed with some advantage or serve some use in the

14

proceeding.'" *In re Ferrer*, 2018 WL 3240010, at \*5 (S.D. Fla. July 3, 2018) (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 132 (2d Cir. 2017)).

Here, Petitioner plainly satisfies this requirement. The information sought in the Subpoena is highly material to the Foreign Proceedings because it relates to, among other things, (i) the identity and location of the fraudster(s); and (ii) the financial transactions of the fraudster(s), including potentially any interactions with the OCBC Account and Barclays Account as well as other third-party accounts where Petitioner's funds may have been transferred to.[52]

Petitioner will be able to introduce evidence obtained via this Application to the Dubai and Hong Kong investigations and as plaintiffs in the UK Proceedings.[53]

### 4.    Respondent Is "Found" in this District

As per the fraudster(s)'s wiring instructions, the Wells Fargo Account is maintained in a Wells Fargo branch located in Ocala, Florida. Accordingly, the Respondent is found in this District for purposes of Section 1782. *In re Application of Setraco Nigeria Ltd.*, No. 3:13-MC-16-32MCR, 2013 WL 3153902, at \*2 (M.D. Fla. June 19, 2013) ("Upon information and belief, Petitioner certifies that a Bank of America branch at which at least one known account maintained by the U.S. Setraco Entity, is located in Jacksonville, Florida. Accordingly, Bank of America is found within the District in which Petitioner seeks evidence as set forth by the requirements of Section 1782."); *In re Ferrer*, No. 18-20226-CIV, 2018 WL 3240010, at \*2 (S.D. Fla. July 3, 2018) (permitting applicant to serve Section 1782 subpoenas on, inter alia, a Wells Fargo branch in Florida); *In re MTS Bank*, No. 17-21545-MC, 2017 WL 3155362, at \*11

---

[52]  Khan Declaration ¶ 26-27; Khatoun Declaration ¶ 13-16.
[53]  Khan Declaration ¶ 21-26; Khatoun Declaration ¶ 13-16, 17.

(S.D. Fla. July 25, 2017) (denying motion to quash subpoenas served on, inter alia, Wells Fargo branch in Florida).

**C.     All of the Discretionary Factors Under Section 1782 Weigh in Favor of Permitting the Discovery Petitioner Seeks.**

Once the threshold requirements under Section 1782 are met, the Court considers the four discretionary "*Intel* factors." Each of these factors weighs in favor of granting the requested discovery here. *First*, Respondent is not a party to the Foreign Proceedings. *Second*, there is no reason to believe that the Foreign Proceedings would be unreceptive to evidence obtained through Section 1782 discovery, and indeed, the discovery sought is directly relevant to those proceedings. *Third*, Petitioner are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence.   *Fourth*, the discovery request—literally one document request—is carefully circumscribed to avoid any undue burden.

**1.     The First *Intel* Factor Favors Granting Discovery.**

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264; *In re MTS Bank*, No. 17-21545-MC, 2017 WL 3155362, at *5 (S.D. Fla. July 25, 2017) (holding that "the first factor favors the use of section 1782 because the Florida banks and A.K. are certainly nonparticipants in the Russian bankruptcy proceedings.").

Here, Respondent is not a party to any of the Foreign Proceedings.   The Foreign Proceedings seek to target the fraudsters and Barclays Bank.  Respondent is a non-participant in the Foreign Proceedings and beyond the jurisdiction of the UK courts, Hong Kong authorities, and Dubai authorities.  Accordingly, the UK courts or Hong Kong and/or Dubai authorities

cannot compel Respondent to produce any documents.  The first *Intel* factor therefore weighs in favor of discovery.

**2.     The Second *Intel* Factor Favors Granting Discovery.**

Under the second *Intel* factor, this Court should look to whether the foreign forum would be receptive to evidence obtained through Section 1782.  A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *In re MTS Bank*, No. 17-21545-MC, 2018 WL 3145806, at *6 (S.D. Fla. June 27, 2018) (quoting *In re Kreke Immobilien KG*, 2013 WL 5966916, at *5 (S.D.N.Y. Nov. 8, 2013)).  "Such proof, as embodied in a forum country's judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures . . . provide helpful and appropriate guidance to a district court in the exercise of its discretion." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) (footnotes omitted).  Here, there is no such judicial, executive, or legislative declarations in the UK, U.A.E., or Hong Kong that indicate an intention to reject any evidence obtained pursuant to Section 1782.  As the victim and complainant in the Criminal Investigative Proceedings, the Petitioner will be able to submit any evidence obtained in this proceeding until the investigations are completed.  As the Declaration of Mr. Khan notes, the Criminal Investigative Proceedings are still pending and Petitioner has already provided evidence to the Hong Kong and Dubai authorities.  Further, UK courts, including the UK's highest court, have previously indicated receptivity to Section 1782 evidence.[54]  Accordingly, the foreign forums will be receptive to any evidence obtained pursuant to this Application.

---

[54]     For example, in *South Carolina Co v Assurantie N V.*, the House of Lords (now known as the UK Supreme Court) *rejected* a finding by the English Court of Appeal that use of information obtained from a Section 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure. *See South Carolina Co v Assurantie N V.* [1987] AC 24; Khatoun Decl. ¶17-20.

### 3. The Third *Intel* Factor Favors Granting Discovery.

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. In *Intel*, the Supreme Court expressly rejected the notion that Section 1782 requires the evidence be discoverable in the foreign proceeding itself, and other district courts have added that an applicant need not show the specific documents sought would be admissible abroad. *Intel*, 542 U.S. at 260; *In re Application of N. Am. Potash, Inc.*, No. 12-20637-CV, 2012 WL 12877816, at *8 (S.D. Fla. Nov. 19, 2012), *report and recommendation adopted*, No. 12-20637, 2013 WL 12113190 (S.D. Fla. Mar. 13, 2013) ("[F]or purposes of § 1782, district courts should consider neither discoverability or admissibility in the foreign proceeding. Instead, courts should err on the side on ordering discovery, since foreign courts can easily disregard any material that they do not wish to consider.") (internal citations omitted). Nor is a Section 1782 applicant required to first exhaust its remedies in the foreign court. *In re Samsung Elecs., S.A. de C.V.*, No. 06-20639-CIV, 2006 WL 8433576, at *2 (S.D. Fla. Apr. 12, 2006) ("Section 1782 does not include an exhaustion requirement and the Court will not read one into the statute."); *In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of [Section 1782] and runs counter to its express purposes.").

Here, there is no reason to believe that any of the discovery sought violates public policy or any privilege. Petitioner merely seeks documents relating to an actual and attempted fraud. There is no evidence that this Application implicates, let alone contravenes, English, Hong Kong, or U.A.E. laws or public policies. *See In re Meydan Grp. LLC*, No. CIV.A. 15-02141 JLL, 2015 WL 2453757, at *3 (D.N.J. May 21, 2015) (granting Section 1782 application for use in proceedings in Dubai); *In re O'Keeffe*, 660 F. App'x 871, 872 (11th Cir. 2016) (granting

18

Section 1782 application for use in Hong Kong); *Ex rel Application of Winning (HK) Shipping Co. Ltd.*, No. 09-22659-MC, 2010 WL 1796579, at *13 (S.D. Fla. Apr. 30, 2010) (denying motion to quash Section 1782 subpoena seeking information for use in English proceedings); Khatoun Declaration ¶20. Moreover, if Respondent reasonably believes that any individual documents present any legitimate concerns, Petitioner is willing to consider accommodating such concerns, such as by stipulating to a protective order. *See, e.g. Minatec Fin. S.A.R.L. v. SI Group Inc.*, 2008 WL 3884374, at *1 (N.D.N.Y. Aug. 18, 2008) ("[T]he beauty of § 1782 is that it permits this Court to impose a protective order that would extinguish any concern that privileged, confidential, or proprietary information would be indecorously revealed.").

### 4. The Fourth *Intel* Factor Favors Granting Discovery.

The fourth *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. *In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, No. 08-20378-MC, 2011 WL 181311, at *13 (S.D. Fla. Jan. 19, 2011) ("the Court must also determine whether the subpoena complies with the requirements of the Federal Rules of Civil Procedure."). As courts in this and sister districts have held "[i]f the discovery requests are properly tailored, then this factor weighs in favor of granting assistance under section 1782. *Al-Ghanim v. IAP Worldwide, Servs., Inc.*, No. 611CV467ORL19DAB, 2012 WL 13102517, at *11 (M.D. Fla. Jan. 18, 2012); *see also In re Chevron Corp.*, No. 11-24599-CV, 2012 WL 3636925, at *15 (S.D. Fla. June 12, 2012) (weigh fourth *Intel* factor in favor of discovery because the subpoenas were "narrowly tailored towards obtaining information relevant to the both the BIT arbitration"); *Gyptec, S.A. v. Hakim-Daccach*, No. 16-20810-CIV, 2017 WL 6557425, at *8 (S.D. Fla. Sept. 27, 2017) ("Based upon the limited

nature of the subpoena, and the fact that Hakim-Daccach has not demonstrated how the discovery is burdensome, the fourth factor weighs in favor of Gyptec.").

Here, the single request in the Subpoena is narrowly tailored, temporally limited, and directly relevant to questions at issue in the Foreign Proceedings.  Specifically, the discovery sought by Petitioner is relevant and highly material to identifying the identity and location of the fraudsters, their modus operandi, including any transactions with the Barclays Account and OCBC Account.  Whatever burden Respondent may incur by producing the requested discovery, it is both modest and proportionate given the circumstances.

## III.  CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court (a) grant the *Ex Parte* Application And Petition For An Order To Conduct Discovery; (b) enter the Proposed Order attached hereto as Exhibit 1; (c) authorize Petitioner, pursuant to 28 U.S.C. § 1782, to serve the Subpoena upon Respondent, which is attached as Exhibit 2; and (d) grant any and all other relief to Petitioner as is deemed just and proper.

Dated:  April 30, 2019

Respectfully submitted,

/s/ Andrew Vitali, III

Andrew Vitali, III
Florida Bar No. 0057828
Homer Bonner Jacobs
1200 Four Seasons Tower  1441 Brickell
Avenue  Miami Florida 33131
Telephone: (305) 350-5146
Facsimile: (305) 982-0067
avitali@homerbonner.com

Peter E. Calamari (*pro hac vice* forthcoming)
Lucas V.M. Bento (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, Floor 22
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
petercalamari@quinnemanuel.com
lucasbento@quinnemanuel.com

*Attorneys for Petitioner*

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

### CASE NO._____

IN RE APPLICATION OF AREMPA
INTERNATIONAL LTD FZC FOR AN
ORDER TO TAKE DISCOVERY FOR USE
IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1782

### [PROPOSED] ORDER AUTHORIZING DISCOVERY

Upon consideration of the *Ex Parte* Application And Petition For An Order To Conduct

Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 (the "Application"),

submitted by Arempa International Ltd FZC ("Petitioner") and all papers submitted in support

thereof, this Court finds that (1) the statutory requirements of 28 U.S.C. § 1782 are satisfied, and

(2) the factors identified by the United States Supreme Court in *Intel Corp. v. Advanced Micro

Devices, Inc.*, 542 U.S. 241 (2004), weigh in favor of granting the Application. Being Fully

advised, it is

ORDERED AND ADJUDGED as follows:

(a)     the Application is granted;

(b)     Petitioner is authorized to serve the subpoena annexed as Exhibit 2 to the

        Petitioner's Memorandum of Law upon Wells Fargo Bank (the "Respondent");

        and

(c)     Respondent is directed to respond to such subpoenas pursuant to the Federal

        Rules of Civil Procedure and the Local Civil Rules of this Court.

DONE AND ORDERED this _____ day of May 2019, in Chambers at Ocala Florida.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT 2

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida ▼

In re Application of Arempa International Ltd FZE )
_____ )
*Plaintiff* )
v. ) Civil Action No.
_____ )
*Defendant* )

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

Wells Fargo Bank, N.A.

To: _____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A.

| Place: Andrew Vitali, Homer Bonner Jacobs, 1441 Brickell Ave., Ste1200, Miami, FL 33131; avitali@homerbonner.com | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

OR

_____         _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* ___Arempa FZE___ International Ltd FZE _____ , who issues or requests this subpoena, are:
Andrew Vitali, III, Homer Bonner Jacobs, 1441 Brickell Ave., Ste. 1200, Miami, FL 33131; avitali@ homerbonner.com; 305-350-5146          .

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____     on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____     _____  .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                    *Server's signature*

                               _____
                                    *Printed name and title*

                               _____
                                    *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| In Re Application of<br><br>AREMPA INTERNATIONAL LTD FZC,<br><br>    Applicant,<br><br>Pursuant to 28 U.S.C. § 1782 for Judicial<br>Assistance in Obtaining Evidence from<br>WELLS FARGO BANK, N.A., for use in a<br>Foreign Proceeding. | Case No. _____ |

**ATTACHMENT A**

The United States District Court for the Middle District of Florida has authorized Petitioner to serve this subpoena on you in support of foreign proceedings in the United Arab Emirates, Hong Kong, and the United Kingdom.

**DOCUMENT REQUEST**

**DOCUMENT REQUEST NO. 1.**

Any and all Documents and Communications in your possession, custody or control relating to the Wells Fargo Account, including any Documents sufficient to show (a) the identity of the Wells Fargo Account Holder (including any Documents or information used by the Wells Fargo Account Holder to open the Wells Fargo Account), (b) the location where the Wells Fargo Account was opened, (c) the location of the Wells Fargo Account Holder, and (d) the bank statements of the Wells Fargo Account.

1

**INSTRUCTIONS**

1.  Each Request extends to all Documents in your possession, custody, or control or in the possession, custody, or control of anyone acting on your behalf.  A Document is in your possession, custody, or control if it is in your physical custody or if it is in the physical custody of any person and you (i) own such Document in whole or in part; (ii) have a right (by contract, statute, or otherwise) to use, inspect, examine, or copy such Document on any terms; (iii) have an understanding, express or implied, that you may use, inspect, examine, or copy such Document on any terms; or (iv) have, as a practical matter, been able to use, inspect, examine or copy such Document when you sought to do so.

2.  If you know the location of any requested Document and do not produce the Document on the ground that the Document is not in your possession, custody, or control, you shall identify the Document and identify the person who you believe has possession, custody, or control of the Document.

3.  If you are unaware of the existence of any Documents responsive to a particular Request, your response should expressly indicate so.

4.  The original of each Document requested herein shall be produced together with any drafts, revisions, or copies of the same that bear any mark or notation not present in the original or that otherwise differ from the original.

5.  All Documents shall be produced in their entirety without redaction (other than redactions for privilege) and should include all attachments and enclosures. Documents that are attached to each other or are in the same family should not be separated.

6.  You must state whether you will produce Documents as they are kept in the usual course of business or organized and labeled to correspond with the categories in the Request.

7. The response to each Request shall state, with respect to each item or category, that production will be made or inspection will be permitted as requested, unless the Request is objected to, in which event the reason(s) for objection shall be stated. If objection is made to part of a Request, the part shall be specified; Documents responsive to the remainder of the Request shall be produced. Any such objection shall not extend the time within which you must otherwise respond to a Request to which no specific objection has been made.

8. With respect to any Documents or information withheld on a claim of attorney-client privilege, the work product doctrine, or any other applicable privilege, you shall provide an express statement of the asserted privilege that includes the following information: (i) the applicable date; (ii) the identity of the author(s), including (but not limited to) the business or legal title(s) or position(s); (iii) the identity of the recipient(s), including (but not limited to) business or legal title(s) or position(s); (iv) the subject matter of the Document; (v) the identity of all other persons who received copies; and (vi) the specific factual basis of the claimed privilege or other protection from discovery.

9. The use of the singular form of a noun includes the plural form, and vice versa.

10. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

11. The terms "each," "any," and "all" shall be construed to mean "each and every."

12. Each Request shall operate and be construed independently and, unless otherwise stated, no request limits the scope of any other Request.

13. In responding to any of these Requests, if you encounter any ambiguity in construing

either the Requests or a definition or instruction, set forth the matter deemed ambiguous and the construction used in answering the Request. These requests are to be liberally construed, and you should resolve any doubts about whether a Document is responsive to these Requests in favor of production.

14. These Requests shall be deemed continuing in nature, and supplemental responses and Document production are required if you, directly or indirectly, obtain further information after its initial responses and Document production.

15. Unless the Request explicitly states otherwise, the date range for each Request shall be the period beginning the account opening of the Wells Fargo Account and continuing through the present.

## DEFINITIONS

1. **"Communication"** means any conveyance of information by any means, including but not limited to in writing, via email, via instant messaging software, or via telephone. Where a Communication is via telephone, you should produce Documents such as telephone records sufficient to show the occurrence of the Communication.

2. **"Document"** shall have the full meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and in particular includes (but is not limited to) every writing or record of every type and description, including letters, correspondence, diaries, memoranda, tapes, electronic data or storage, stenographic or handwritten notes, studies, publications, books, data, pamphlets, pictures, films, video recordings, reports, financial statements, ledgers, applications, emails, instant messages, and text messages, or however produced or reproduced, in your possession, custody, or control. "Document" also includes all copies and drafts of every writing or record when the copy or draft is not

4

identical to the original. "Document" includes electronically-stored information.

3.    **"Petitioner"** shall mean Arempa International Ltd FZC.

4.    **"Wells Fargo Account"** is the bank account maintained by Wells Fargo Bank bearing the account number XXXXXX7424,[1] wire routing number 121000248, and SWIFT Code WFBIUS6S.

5.    **"Wells Fargo Account Holder"** is the account holder of the Wells Fargo Account.

---

[1]    The full account number cannot be disclosed in this filing under Federal Rule of Civil Procedure 5.2(a)(4). Petitioner is prepared to disclose the full account number in camera for the Court's review and to Wells Fargo and/or its counsel if the Court authorizes issuance of the Subpoena.

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| IN RE APPLICATION OF AREMPA INTERNATIONAL LTD FZC FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. _____ |

## DECLARATION OF BADAR KHAN

Pursuant to 28 U.S.C. § 1746, I, Badar Khan, hereby declare under penalty of perjury under the laws of the United States, as follows:

1.      I am a Director of Arempa International FZE ("Arempa") with overall responsibility for the general management of the company.

2.      I respectfully submit this declaration in support of Petitioner Arempa International Ltd FZC ("Petitioner") *Ex Parte* Application And Petition For An Order To Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 ("Application"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application and accompanying memorandum of law.

3.      Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoena; and (c) information supplied to me by the Petitioner or its officers, directors, and employees, or professionals retained by them.

4.      All exhibits attached hereto are true and accurate copies, or true and accurate excerpts of those copies.

1

## I.   FACTUAL BACKGROUND

### A.   The Parties

5.   *Arempa.* Arempa is a general trading company registered in the Saif Zone of the United Arab Emirates ("UAE") and maintains its principal place of business in Dubai, UAE. Established in 1998, Arempa is a major supplier of security goods to the Commonwealth of Independent States ("CIS") region, acting as the exclusive distributor of Rapiscan in the CIS region as well as in Turkey.

6.   As I described below, at the end of 2018, Arempa fell victim of a "phishing email scam" that caused it to transfer USD 1,816,500 to individuals who impersonated directors and employees of Rapiscan to a Barclays Bank account ("Barclays Account") in the United Kingdom ("Barclays Account Fraud")[1] and USD 202,000 to a OCBC Bank account ("OCBC Account") in Hong Kong ("OCBC Account Fraud").[2]

7.   *Well Fargo Bank.* Wells Fargo is a Delaware company with offices in this District located at 9488 SW 80th Ave Ocala, FL 34481, USA.  The fraudsters maintain or maintained the Wells Fargo Account at the Well Fargo branch in Ocala, Florida.

### B.   Relevant Non-Parties

8.   *Barclays Bank PLC.* Barclays is a London-based global financial services provider engaged in retail banking, credit cards, wholesale banking, investment banking, wealth management, and investment management services.  Upon information and belief, Barclays authorized the USD 1,816,500 transaction as well as transactions to dissipate Petitioner's funds outside of the Barclays Account.

---

[1]   *See* **Exhibit 1**.
[2]   *See* **Exhibit 2**.

2

9. **OCBC Bank**. Oversea-Chinese Banking Corporation Limited ("OCBC Bank") is a Singapore-based provider of financial services in Singapore, Malaysia, Indonesia, Greater China, and other parts of the world. One of the fraudster's bank accounts was maintained at OCBC Bank. Upon learning of the fraudulent transaction, OCBC immediately reversed the transaction and returned the funds back to Arempa.

### C.   The Cyber-Criminals Deceive Arempa to Transfer Funds to Barclays Bank

10.   Arempa is the exclusive distributor of Rapiscan goods and services in the CIS region and in Turkey. Arempa purchases various security goods from Rapiscan suppliers worldwide and resells them in the region As such, Arempa regularly makes payments to these suppliers many of whom have decades-long business relationships with Arempa.

11.   On October 13, 2018, Arempa received an email from individuals impersonating directors and officers of Rapiscan Systems Limited requesting that payment for a pending invoice ("Rapiscan Invoice") totaling USD 1,816,500 be made to different bank account with Barclays Bank. *See* **Exhibit 1**. The individuals impersonated Alan Mixer, Eric A Luiz, and others at Rapiscan by using the email addresses AMixer@rapiscansysterns.com and ELuiz@rapiscansystens.com, instead of AMixer@rapiscansystems.com and ELuiz@rapiscansystems.com – replacing only one or two letters of the domain name in an attempt to deceive the reader. *See id.* Further, as the fraudster listed Rapiscan Systems Limited (the real creditor) as the bank account holder, Arempa employees did not suspect anything improper.

12.   Accordingly, on October 15, 2018, Arempa instructed its bank, Habib Bank, to wire the funds to the Barclays Account. *See* **Exhibit 3.**

13.   On 16 October 2018, Habib Bank executed Arempa's payment instructions via outward SWIFT to Deutsche Bank Trust Company Americas in New York. *See* **Exhibit 3.** The

3

funds were then transferred to Barclays' New York branch, which transferred them to Barclays in the United Kingdom and deposited them into the fraudster's Barclays Account. *See id.*

**D.      The Cyber-Criminals Deceive Arempa To Transfer Funds To the OCBC Account**

14.      On October 31, 2018, Arempa received another email from individuals impersonating directors and officers of Rapiscan Systems Limited requesting an advance payment of USD 202,000 to the OCBC Account for "an urgent shipment." *See* **Exhibit 2.** The email further explained that the payment was intended to pay a "Rapiscan agent" in Hong Kong, and that Rapiscan would repay Arempa in due course. *Id.* As these types of transactions are not unusual, Arempa did not suspect any fraudulent or otherwise improper activity. On or around November 1, 2018, Arempa wired the funds to the OCBC Account. *See* **Exhibit 4.**

**E.      Arempa Realizes It Has Been Defrauded and Scammed**

15.      On November 5, 2018, Rapiscan verbally communication with Arempa to enquire about the payment status of the Rapiscan Invoice. Upon learning that the payment had not been cleared in Rapiscan's accounts and that Rapiscan had not changed its bank account details in the UK nor requested any payment to be made to a Hong Kong agent, Arempa realized that it had become the victim of a fraudulent scheme and sought to immediately put a stop to the payments to the Barclays Account and OCBC Account. Arempa immediately reported the fraud to the UK Metropolitan Police and the Hong Kong Police. *See* **Exhibits 5, 6.**

16.      Arempa, through its banking representatives and others, sent numerous communications to Barclays Bank and OCBC requesting that the funds be recalled with immediate effect. *See* **Exhibit 7**. OCBC Bank was able to reclaim the funds from the OCBC Account before the fraudsters were able to liquidate the account. Barclays, however, only responded to Arempa

over 65 days after it was notified of the issue with a statement that the funds were no longer in the account when it was "made aware of the situation". *See* **Exhibit 8.**

**F.  The Cyber-Criminals Request That Funds Be Transferred to a Well Fargo Account In This District**

17.  On November 7, 2018, before Arempa realized it had been defrauded, an individual impersonating Alan Mixer—the same Rapiscan employee name used by the fraudsters in the Barclays and OCBC transactions—emailed Ms. Meilarni Guiala, an Arempa Accounts Head, requesting that Ms. Guiala transfer $87,125 to the Well Fargo Account to a Well Fargo branch located in this District. *See* **Exhibit 9**. Again, the individual impersonated Mr. Mixer, a Rapiscan Finance Director, by using an email address that was deceptively similar to Mr. Mixer's real email address.[3] The wiring details provided by the fraudster included the following details:

| Bank | Wire routing number | SWIFT Code | Account number | Account name |
|---|---|---|---|---|
| Wells Fargo Bank, 9488 SW 80th Ave Ocala, FL 34481, USA | 121000248 | WFBIUS6S | ▮▮▮7424 | Mayra Arriaga Consultants, 14591 SW 38th Terrace Road, Ocala, FL. 34481, USA |

Source: **Exhibit 9** ("Debit Note" attachment)

18.  By then, however, Arempa had already discovered the fraudulent transactions related to the Barclays Account and OCBC Account and so did not execute the transfer to the Wells Fargo Account.  Given the similar modus operandi and same time period, it is highly likely that the individual(s) who sought to defraud Arempa in wiring funds to the Barclays Account, OCBC Account, and Wells Fargo Account are the same or connected to each other.  The

---

[3]  The individual corresponded with Arempa using amixer@rapiscansystens.com, instead of Mr. Mixer's real email address which is amixer@rapiscansystems.com, the only difference being the "n" and "m" in the second level domain name. *See* **Exhibits 9, 10**.

5

individual(s) was clearly able to identify the Arempa employees who are responsible for processing payments, and copied those individuals in all emails in an effort to add an additional layer of authenticity to the communications. In at least the Barclays Account Fraud, the fraudster(s) was also able to highjack an existing email communication chain to continue pre-existing correspondence between Arempa and real employees of Rapiscan without raising any suspicions on the part of Arempa.

### G.    The Foreign Proceedings

19.    Having lost over USD 1.8 million as a result of the fraud, Arempa has initiated criminal investigative proceedings in Dubai and Hong Kong and reasonably contemplates bringing a civil action against Barclays Bank and the fraudsters (once identified) in the United Kingdom.

### 1.    Criminal Investigative Proceedings

20.    On November 5, 2018, upon learning of the fraud, Arempa immediately notified the authorities in the United Kingdom and Hong Kong. The Hong Kong police is currently investigating the fraud under Case No. ERC1811051017086 ("Hong Kong Criminal Proceedings"). *See* **Exhibit 6**. The UK police investigation file number is NFRC181102613165 CRIS 3835611/18. *See* **Exhibit 5**.

21.    Upon the recommendation of the UK police, on November 28, 2018, Arempa notified the Dubai authorities of the fraud. Consequently, the Al Barsha Police opened an investigation into the fraud, classifying it as "E Crime" (for Electronic Crime) ("Dubai Criminal Proceedings", and together with the Hong Kong Criminal Proceedings, the "Criminal Investigative Proceedings"). *See* **Exhibit 11.** On December 19, 2018, I met with the Investigative Officer of the Al Barsha Police to discuss the investigation and the collection of further evidence.

6

### 2.     Contemplated Action Against Barclays Bank

22.     On November 5, 2018, Arempa, through its banking representatives Habib Bank, notified Barclays of the Barclays Account Fraud and subsequently sent Barclays multiple SWIFT messages requesting that the funds be recalled with immediate effect. *See* **Exhibit 7.** Barclays only responded to Arempa and Habib Bank on January 10, 2019, over 65 days after it was notified of the fraud, claiming that "at the time it became aware of the issue the account was closed", and provided no further information. *See* **Exhibit 8.** On February 18, 2019, Arempa received a latter dated November 23, 2018 from Barclays informing Arempa of the same. *See* **Exhibit 12.**

23.     Subsequently, Arempa's English lawyers requested on multiple occasions further information about the fraud, including the identity of the fraudster and the account(s) to which Arempa's funds were transferred out to.  Barclays has refused to provide this information. *See* **Exhibits 13-18.**

24.     Arempa is currently preparing a pre-action lawsuit against Barclays to obtain information relating to, inter alia, the fraudster's Barclays Account and Barclays' internal checks relating to the fraudulent transaction.  Arempa contemplates using the information, inter alia, to bring an action against Barclays on a theory of unjust enrichment and negligence.  To that end, on April 9, 2019, Arempa sent Barclays a pre-action letter providing it with notice that Arempa will be seeking judicial relief in the English courts. *See* **Exhibit 17.**

### 3.     Contemplated Asset Tracing Claim Against the Fraudsters

25.     Arempa contemplates pursuing asset tracing claims against the fraudster(s) once their identities and location are uncovered pursuant to, inter alia, this Section 1782 proceeding. Such asset tracing claims would, subject to applicable law, seek the recovery of Arempa's funds as well as damages and costs.  English counsel have been retained to pursue these claims should the fraudsters and/or their assets be subject to English jurisdiction.

7

as well as damages and costs.  English counsel have been retained to pursue these claims should the fraudsters and/or their assets be subject to English jurisdiction.

## II.   THE INFORMATION SOUGHT

26.     Given the same domain names used to impersonate the Rapiscan employees and the same time period of the fraudulent acts, the identity and details regarding the financial transactions of the Wells Fargo Account holder are directly relevant to the Dubai and Hong Kong investigations and the mechanics of the Barclays Account Fraud.[4]  This information would show not only who the fraudsters are but also where they are based, and thus potentially where their assets, including Arempa's misappropriated funds, can be found.

27.     In light of the fact that the fraudsters sought to further defraud Arempa into transferring funds in a Wells Fargo bank account in this District using the same email addresses seeking to impersonate Rapiscan employees, it is highly likely that Respondent possesses information that will be critical to the Foreign Proceedings.

28.     No prior application for similar relief has been made by Petitioners.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Dubai, U.A.E. on April 14, 2019.



_____
Badar Khan

---

[4]   The fraudster has used real names of Arempa creditors, such as Rapiscan Systems Ltd., to deceive Arempa to make the transfers.  Thus, it is unlikely that the real name of the payee i.e. the account holder is the one the fraudster communicated to Arempa e.g. Rapiscan Systems Limited, Marya Arriaga Consultants.  Upon information and belief, those are simply cover names used to deceive Arempa that payments are being made to real creditors.

8

# EXHIBIT 1

**Patricia Mooneyham**

| | |
|---|---|
| **From:** | Hasmik D <hasmik.d@arempa.com> |
| **Sent:** | Wednesday, October 17, 2018 6:10 AM |
| **To:** | Meilarni Guiala; Alan Mixer; Eric A Luiz |
| **Cc:** | Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano |
| **Subject:** | Re: Turkey Assan Port P60 |

You all are welcome.

Regards,

Hasmik

---

**From:** Eric A Luiz <ELuiz@rapiscansystems.com>
**Sent:** Tuesday, October 16, 2018 3:22:10 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Hasmik Danielyan; Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Re: Turkey Assan Port P60

## Meilarni & Hasmik

## Thank you very much

Rgds

> On Tue, Oct 16, 2018 at 1:02 PM Meilarni Guiala <meilarni.g@arempa.com> wrote:
> Dear Alan,
>
> Here is the swift copy.
>
> Thanks & regards,
> Lhye
>
> **From:** Meilarni Guiala
> **Sent:** Monday, October 15, 2018 12:16 PM
> **To:** 'Alan Mixer'
> **Cc:** 'Hasmik Danielyan'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
> **Subject:** RE: Turkey Assan Port P60
>
> Dear Alan,
>
> Thanks. Today I will send the payment instruction to our bank against PO# APO/AIS0218-0128 ($1,816,500.00).
> Swift copy will follow once available.
>
> Thanks & regards,
> Lhye

1

**From:** Alan Mixer
**Sent:** Monday, October 15, 2018 12:09 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik Danielyan'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Turkey Assan Port P60

Hi Lhye,

There you go...

Can you please confirm account name is correct and please provide swift code. Yes!

Also, going forward should we use below account in sending payments to RS instead of the existing account in our record? **Yes!**

A/C Name     : Rapiscan Systems Ltd
A/C No.      : ███8500
IBAN         : GB66BARC███████08500
Bank         : Barclays Bank Plc
Bank address   : Leicester, Leicestershire United Kingdom LE87 2BB
Sort code    : 20-24-61
Swift code   : BARCGB22

Alan Mixer
Phone (UK) +44 (0)1293 778 207
Cell +44 (0)7342 949 239

On 2018-10-15 09:58, Meilarni Guiala wrote:

Dear Alan,

Can you please confirm account name is correct and please provide swift code.

**Also, going forward should we use below account in sending payments to RS instead of the existing account in our record?**

NEW BANK ACCOUNT
Beneficiary Particulars
A/C Name     : Rapiscan Systems Ltd
A/C No.      : ███8500
IBAN         : GB66BARC███████8500
Bank         : Barclays Bank Plc
Bank address  : Leicester, Leicestershire United Kingdom LE87 2BB
Sort code    : 20-24-61
Swift code   : BARCGB22

OLD BANK ACCOUNT
Beneficiary Particulars
A/CName      : Rapiscan Systems Ltd
A/C No.      : ███4851
IBAN         : GB46MIDL███████4851
Bank         : HSBC Bank
Bank address  : 9 The Boulevard Crawley, West Sussex RH10 1UT United Kingdom
Sort code    : 40-05-15
Swift code   : MID-LGB-22

2

Thanks & regards,
Lhye

**From:** Alan Mixer [mailto:amixer@rapiscansysterns.com]
**Sent:** Monday, October 15, 2018 11:30 AM
**To:** Hasmik Danielyan; Eric A Luiz
**Cc:** Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano; Lhye Guiala
**Subject:** Fwd: RE: Turkey Assan Port P60
**Importance:** High

Hi Hasmik,

Can I get a response to this mail
Alan Mixer
Phone (UK) +44 (0)1293 778 207
Cell +44 (0)7342 949 239

On 2018-10-13 09:30, Alan Mixer wrote:
Hi Hasmik,

Find attached our updated Bank Account Details.  Please help ensure the payment is settled into this Bank account.

Alan Mixer
Phone (UK) +44 (0)1293 778 207
Cell +44 (0)7342 949 239
On Wed, Oct 10, 2018 at 10:49 AM Hasmik Danielyan <hasmik.d@arempa.com> wrote:

Dear Alan,

Sorry for the late response... anyway, next week the payment will be done.


Regards,

Hasmik.

**From:** Hasmik Danielyan [mailto:hasmik.d@arempa.com]
**Sent:** Wednesday, October 3, 2018 5:42 PM
**To:** 'Alan Mixer' <AMixer@rapiscansystems.com>; 'Eric A Luiz'
<ELuiz@rapiscansystems.com>
**Cc:** 'Vahe Papazyn' <vahep@emirates.net.ae>; 'Angus Fowlie'
<AFowlie@rapiscansystems.com>; 'Paul Diamond'
<PDiamond@rapiscansystems.com>; 'Kieran Kent' <KKent@rapiscansystems.com>;
'Mike Tropeano' <mtropeano@as-e.com>
**Subject:** RE: Turkey Assan Port P60

Dear Alan,

Please give a day to respond.

3

Regards,

Hasmik.

**From:** Alan Mixer [mailto:AMixer@rapiscansystems.com]
**Sent:** Tuesday, October 2, 2018 1:15 AM
**To:** Hasmik Danielyan <hasmik.d@arempa.com>; Eric A Luiz
<ELuiz@rapiscansystems.com>
**Cc:** Vahe Papazyn <vahep@emirates.net.ae>; Angus Fowlie
<AFowlie@rapiscansystems.com>; Paul Diamond
<PDiamond@rapiscansystems.com>; Kieran Kent <KKent@rapiscansystems.com>;
Mike Tropeano <mtropeano@as-e.com>
**Subject:** RE: Turkey Assan Port P60

Hi Hasmik,

One other item to mention with Turkey.  The enclosed PO from Arempa for $1.8M has
also not been paid.  The PO terms are 60 days from collection from Malaysia, which
occurred in June.  Meilarni today confirmed it is not being paid due to collection issues
from the end customer.  However, the terms on the PO are not based upon receipt of
payment from the end customer and so the order should have been paid more than a
month ago.  Can you please help ensure the bill is settled this week?

Alan Mixer
Phone (UK) +44 (0)1293 778 207
Cell +44 (0)7342 949 239

**From:** Hasmik Danielyan [mailto:hasmik.d@arempa.com]
**Sent:** 01 October 2018 09:34
**To:** Eric A Luiz
**Cc:** Alan Mixer; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** RE: Turkey Assan Port P60

Dear Eric,

As long as we have clarity on how to approach any specific project especially when it
comes to lead-time/delivery/installation and payments, I have no issues since we try
to have the same consistency in our contract (s) with the customer.

Anyway, your observations are well note and I wait for Angus to approach me, which
I believe he will do tomorrow since today he is in the hospital.

We have another PO that should go out for 3xG60s for Turkey based on same terms
and conditions as for P60 for Assan port, and this PO for time being I will put on hold
until I have discussion with Angus.

Regards,

Hasmik.

**From:** Eric A Luiz [mailto:ELuiz@rapiscansystems.com]
**Sent:** Friday, September 28, 2018 6:49 PM
**To:** Hasmik Danielyan <hasmik.d@arempa.com>; Paul Diamond
<PDiamond@rapiscansystems.com>; Kieran Kent <KKent@rapiscansystems.com>;
Mike Tropeano <mtropeano@as-e.com>; Angus Fowlie
<AFowlie@rapiscansystems.com>
**Cc:** Alan Mixer <AMixer@rapiscansystems.com>; Vahe Papazyn
<vahep@emirates.net.ae>
**Subject:** RE: Turkey Assan Port P60

Hasmik

Your point is taken – however the full 80% is due as the system arrived at Assan on
July 23rd and the 60 day period has elapsed. I included the POD from Serhat Sert of
SBB ATLANTIC the shipping agent in my last mail to you

PO i.e. 20% advance, 60% against delivery/handover @ Assan Port, 20% against SAT
or within 60 days after delivery if site is not ready.

The reason Nargis did not want the containers opened without a Rap representative
being present is because our experience has been that small items such as hoses,
cables, bolts etc get lost and end up being claimed as parts short shipped when in fact
they are not.

So my recommendation is that Rapiscan make it a requirement that an Arempa
representative attend the factory inventory FAT prior to shipment and sign off at that
point. As this represents a change in commercial terms for future orders, I will leave
this to Angus and Mike to negotiate with Arempa

Look forward to payment soon

Regards

**From:** Hasmik Danielyan [mailto:hasmik.d@arempa.com]
**Sent:** Friday, September 28, 2018 4:05 AM
**To:** Eric A Luiz
**Cc:** Angus Fowlie; Alan Mixer; Vahe Papazyn; Paul Diamond; Kieran Kent
**Subject:** RE: Turkey Assan Port P60

Dear Eric,

Sorry for the delay but I had to go back and speak with Turkey and go through our
records before I answer you.

Having said that, Arempa position remains the same as advised earlier in my email.

Now, please consider by making sure point 5 FCA collection terms under Remarks in our PO is not mixed or is misunderstood with Payment Terms in our PO i.e. 20% advance, 60% against delivery/handover @ Assan Port, 20% against SAT or within 60 days after delivery if site is not ready.

We all knew the site would not be ready by the time the system will be delivered and keeping that in mind, from the beginning we insisted Assan Port to revise and successfully negotiated 60/20 by splitting 2nd part of the payment (80% against SAT), which they insisted before placing the order with Arempa.

The plan was, get the system delivered to the customer (Assan Port), do the hand-over/inventory check, get main chunk of the money and leave 20% for later whenever the site will be ready.

Nargis asked us on September 13 for the feedback on installation date and we advised her the next day tentative date should be around October 1. However, from her email dated same day, she preferred not to do the hand-over separately and do it at the time of start of install which went contrary to our agreed payment terms with Rapiscan. In any case, we advised the customer same and now we wait from to confirm the start of installation date which as we speak they are working on it with Turkish Customs who need to the final inspection of the site.

Next week, I am expecting follow up communication from Turkey.

Pls see attached email chain from Nargis for your reference.

Regards,

Hasmik.

**From:** Eric A Luiz [mailto:ELuiz@rapiscansystems.com]
**Sent:** Thursday, September 27, 2018 7:43 PM
**To:** Hasmik Danielyan <hasmik.d@arempa.com>; Vahe Papazyn <vahep@emirates.net.ae>; Paul Diamond <PDiamond@rapiscansystems.com>; Kieran Kent <KKent@rapiscansystems.com>; Angus Fowlie <AFowlie@rapiscansystems.com>; Alan Mixer <AMixer@rapiscansystems.com>
**Subject:** FW: Turkey Assan Port P60

Hasmik

Can I get a response to this mail

Thanks

6

**From:** Eric A Luiz
**Sent:** Tuesday, September 25, 2018 3:01 PM
**To:** Hasmik Danielyan; vahep@emirates.net.ae; Paul Diamond; Kieran Kent; Angus Fowlie; Alan Mixer
**Subject:** Turkey Assan Port P60

Hasmik

For the Assan Port P60, Rapiscan's  position is that the $1,037,274 is now past due and we would appreciate settlement before Sep 30.  In addition the final 20%  of $1,698,790  or $339,758  will also be due on September 30; we would appreciate settlement of this amount as well.

Arempa had two points of contention on the Turkey P60 both of which are responded to in detail below:

1)   Due amount 60% as per our records is $1,037,274.00 (not $1,019,000.00).-
Rapiscan Response PO Value  $1,728,790 x 60% =  $1,037,274.- However the PO includes Training $30,000 which Rapiscan treats as a separate performance obligation payable after the training is completed, so 60% of $1,698,790 is $1,019,274.

2)   This amount is not paid yet is due to mainly 2 factors and they are:

a)    Our PO to RS states, 60% due against delivery/hand-over of complete system to Assan Port (this as per RS docs seems to confirm delivery part only).

b)    Pls see attached email from Nargis concerning hand-over.  Here in this email you will see, she specifically is instructing us to ensure delivered containers are not unsealed and should be unsealed and opened in presence of ATL (RS sub-contractor) and Arempa Turkey before the actual hand-over.  Tentatively the customer has advised mid-October availability of his people to be present for the hand-over, which will be reconfirmed next week, and accordingly Nargis will be updated.

c)    On a side note, it must be noted, walkie-talkies were left out, they are being shipment with G60s, and Murat will try to manage this part, which the port authorities will definitely notice.

**Rapiscan Response:**
-       The Term Handover is defined in Point 5 on Page 4 of the PO terms as  "Handover terms should be against receipt of SRA from Arempa".  Arempa issued the SRA on June 28

-       Kieran spoke at length with Nargis and the reason for the delay opening the containers and checking inventory against SRA is down to the end users site not being ready.
The exact position where the P60 at Assan will be located has not been finalised and there is still a considerable amount of construction of the seaport to be concluded. Also

-   Nargis & ATL can still be in Turkey for the unsealing of the containers before 30th Sept. Attempts have been made but the containers have not been made available to conclude this.

-   An offer to ship the walkie-talkies separately (meaning they'd be on site now), was rejected by Arempa, who requested that they be sent in the G60 containers. Nargis has this communications on this, so this should not be a future reason to withhold payment.

The P60 arrived at the Assan port on July 23rd and Serhat Sert of SBB ATLANTIC the shipping agent has sent their POD signed by the broker of the consignee, on 31/07/2018- See attached E Mail "EXW UK Rate Inquiry" . The payment terms state   "or within 60 days after delivery, if any delays due to site readiness or local licensing.  "

Appreciate your response & settlement of the amounts due

Thanks

## EXTRACTS FROM ATTACHED Arempa PO

| Payment terms with Rapiscan Systems | : | 20% against readiness for collection,<br>60% at delivery at Assan Port against receipt of complete system / handover,<br>20% at completion of installation and commissioning or within 60 days after delivery, if any delays due to site readiness or local licensing. |
|---|---|---|

5.Hand over terms should be against receipt of SRA from Arempa and kindly ensure that the forwarder will sign the Collection note and don't release or load the order until the forwarder signs the Collection Note.

# EXHIBIT 2

## Patricia Mooneyham

| | |
|---|---|
| **From:** | Alan Mixer <amixer@rapiscansystens.com> |
| **Sent:** | Wednesday, November 07, 2018 5:54 AM |
| **To:** | Meilarni Guiala |
| **Cc:** | 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano' |
| **Subject:** | Re: Swift RE: Onward Payment Request |
| **Importance:** | High |

Hi Lhye,

‚

I will await your confirmation. And please follow up with the Hong Kong wire to find out why it is delayed.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 12:50, Meilarni Guiala wrote:

Dear Alan,

I will check for approval and get back to you.

Thanks & regards,

Lhye

1

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 1:14 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Here you are.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 11:08, Meilarni Guiala wrote:

Dear Alan,

Please send the details so I can send to Management for approval.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:31 PM

**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request

Hi Lhye,

Thank you for your help.

We have another payment to be sent out. Kindly help us process it and issue us a statement.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 10:27, Meilarni Guiala wrote:

Dear Alan,

We have asked our bank to send a reminder. New York will  open in the evening and by then we can advise you.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:10 PM
**To:** Meilarni Guiala

**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Lhye,

Sorry to bother you again, do you have news from your Bank? Our agent in Hong Kong haven't seen the funds yet!

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-06 09:46, Meilarni Guiala wrote:

Dear Alan,

Let me check with the bank and I will update you as soon as possible.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Tuesday, November 06, 2018 11:40 AM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'

4

**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High


Hi Hasmik & Lhye,


Kindly help to track the payment.


Thank you


Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239



On 2018-11-05 13:16, Alan Mixer wrote:

Hi Meilarni,


Can you please confirm if the wire did go?  Our agent have not seen the funds yet.



Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239



On 2018-11-02 12:53, Meilarni Guiala wrote:

Dear Alan,

Here is the swift copy. The bank charges = $45.74

Thanks & regards,

Lhye

**From:** Meilarni Guiala
**Sent:** Thursday, November 01, 2018 11:17 AM
**To:** 'Alan Mixer'; 'Hasmik D'
**Cc:** 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** RE: Onward Payment Request

Dear Alan,

Payment instruction already sent to our bank. Swift copy will follow once available.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Thursday, November 01, 2018 8:22 AM
**To:** Hasmik D
**Cc:** Meilarni Guiala; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Here you are.

Thank you

6

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-10-31 23:51, Hasmik D wrote:

Dear Alan,

Just be mindful... Thursday is a half day for banks and any payment request needs to be send to bank before 12 noon for same day transfer. Any request after 12 noon is not done until Sunday evening.

Regards,

Hasmik

_____

**From:** Alan Mixer
**Sent:** Wednesday, October 31, 2018 7:59:20 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Onward Payment Request

Hi Lhye,

I have asked them to prepare an invoice. Will send it to you ASAP.

Thank you.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-10-31 15:17, Meilarni Guiala wrote:

Dear Alan,

Please send the invoice + complete bank details of beneficiary.

Thanks & regards,

Lhye

**From:** Hasmik D [mailto:hasmik.d@arempa.com]
**Sent:** Wednesday, October 31, 2018 5:14 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano; Hasmik Danielyan
**Subject:** Re: Onward Payment Request

Dear Alan,

Pls make sure you send Lhye the invoice as well.

She will use the reference of that invoice in payment details in the transfer request.

Regards,

Hasmik

**From:** Hasmik D <hasmik.d@arempa.com>
**Sent:** Wednesday, October 31, 2018 5:09:33 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Re: Onward Payment Request

Sure Alan... no problem.

8

Dear Lhye,

Pls do.

Regards,

Hasmik

_____

**From:** Alan Mixer
**Sent:** Wednesday, October 31, 2018 4:10:41 PM
**To:** Hasmik D; Meilarni Guiala
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Onward Payment Request

Hi Hasmik,

Due to ongoing audit on our bank account, we urgently need your help, could Arempa help us transfer some funds to our agent in the Hong Kong for an urgent shipment?

We promise to refund you ASAP and we will cover any transfer/handling charges you may incur.

Kindly confirm what you can do for us so i that i could send their bank details due to the urgency.

Please acknowledge my email.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

# EXHIBIT 3

Sharjah Airport Int'l Free Zone, P.O. Box 7975, Sharjah, UAE
Telephone: + 971 4 4541301.......... Fax: + 971 4 4541300

**Arempa International Ltd FZC**

# Fax

+
7018.10.16

| To: | Remittance (Out) Department Habib Bank AG Zurich, Deira Dubai | From: | Badar Khan |
|-----|------|------|------|
| Fax: | + 971 4 228 4211 | Pages: | 1 |
| Sub: | T.T. (Out) Request | Date: | 15/10/2018 (1st) |
| Re: | 0209UA/8571/HB-$TT-RAP/10-18 | CC: | Mr. Hakimuddin Rangoonwala |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Sir,

Kindly transfer the following funds as per the details provided and <u>fax me the acknowledgement</u>, thank you.

1.  Debit A/C No.          : 20311-333-248474
    Amount              : USD1,816,500.00 (One Million Eight Hundred Sixteen Thousand
    Five Hundred Dollars Only)

    **Beneficiary Particulars**
    A/C Name      : Rapiscan Systems Ltd
    A/C No.        : ███8500
    IBAN         : GB66BARC20246152908500
    Bank         : Barclays Bank Plc
    Bank address   : Leicester, Leicestershire United Kingdom LE87 2BB
    Sort code     : 20-24-61
    Swift code    : BARCGB22

## Note: Bank charges related to beneficiary's bank and intermediate bank to be covered by Remitter.

Payment Purpose : Equipment purchase (PO# APO/AIS0218-0128 / SO21560)

Sincerely yours,

Mobile Phone # +971 50 6532548

FAXED
DATE: 2018·10·15

File ref: #AR-361A

15/10 2018 3:47PM  FAX  044541300          AREMPA INTERNATIONAL FZE                    ☑0001

```
                    ****************************
                    ***  TX Result Report   ***
                    ****************************

                          Sending is complete.

         Job Number                    2715
         Address                       2212053
         Name
         Start Time                    15/10 03:46 PM
         Call Length                   00'24
         Sheets                        1
         Result                        OK
```

Sharjah Airport Int'l Free Zone, P.O. Box 7975, Sharjah, UAE
Telephone: + 971 4 4541301.......... Fax: + 971 4 4541300

**Arempa International Ltd FZC**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Remittance (Out) Department<br>Habib Bank AG Zurich, Deira Dubai | **From:** | Badar Khan |
| **Fax:** | + 971 4 228 4211 | **Pages:** | 1 |
| **Sub:** | T.T. (Out) Request | **Date:** | 15/10/2018 (1st) |
| **Re:** | 0209UA/8571/HB-$TT-RAP/10-18 | **CC:** | Mr. Hakimuddin Rangoonwala |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Sir,

Kindly transfer the following funds as per the details provided and <u>fax me the acknowledgement</u>, thank you.

1.  Debit A/C No.          : 20311-333-248474
    Amount                 : USD1,816,500.00 (One Million Eight Hundred Sixteen Thousand
    Five Hundred Dollars Only)

    **Beneficiary Particulars**
    A/C Name      : Rapiscan Systems Ltd
    A/C No.       : 8500
    IBAN          : GB66BARC20246152908500
    Bank          : Barclays Bank Plc
    Bank address  : Leicester, Leicestershire United Kingdom LE87 2BB
    Sort code     : 20-24-61
    Swift code    : BARCGB22

## Note: Bank charges related to beneficiary's bank and intermediate bank to be covered by Remitter.

Payment Purpose : Equipment purchase (PO# APO/AIS0218-0128 / SO21560)

#7418

## Outward SWIFT Details

ACKnowledged copy of SWIFT message for DER2976883  (MT103)

```
        Serial Number                :     2976883
        Date                         :     16-Oct-2018
        Reference                    :     DER2976883
        Amount                       :     USD 1,816,500.00
        Beneficiary Name             :     RAPISCAN SYSTEMS LIMITED
-------------------- Instance Type and Transmission --------------
```

Notification (Transmission) of Original sent to SWIFT (ACK)

Network Delivery Status   : Network Ack

Priority/Delivery         : Normal

Message Input Reference   : 1352 181016HBZUAEADAXXX3797499364

-------------------------- Message Header ------------------------

Swift Input               : FIN 103 Single Customer Credt
Transfer

Sender    : HBZUAEADXXX

            HABIB BANK AG ZURICH

            DUBAI AE

Receiver : BKTRUS33XXX

            DEUTSCHE BANK TRUST COMPANY AMERICAS

            NEW YORK,NY US

MUR : 7460213

-------------------------- Message Text --------------------------

20: Sender's Reference

    DER2976883

23B: Bank Operation Code

    CRED

32A: Val Dte/Curr/Interbnk Settld Amt

    Date          : 16 October 2018

    Currency      : USD (US DOLLAR)

    Amount        :           #1,816,500.#

33B: Currency/Instructed Amount

    Currency      : USD (US DOLLAR)

```
         Amount        :            #1,816,500.#
    50K: Ordering Customer-Name & Address
         /AE270290120311333248474
         AREMPA INTERNATIONAL LTD FZC, (Govt
         Business Id)00352, 250 M2
         WAREHOUSE NO A3 029 POBOX 7975
         SHARJAH United Arab Emirates
    56A: Intermediary Institution - FI BIC
         BARCUS33XXX
         BARCLAYS BANK PLC
         NEW YORK,NY  US
    57A: Account With Institution - FI BIC
         BARCGB22XXX
         BARCLAYS BANK PLC
         (ALL U.K. OFFICES)
         LONDON  GB
     59: Beneficiary Customer-Name & Addr
         /GB66BARC        ▮500
         RAPISCAN SYSTEMS LIMITED
     70: Remittance Information
         EQUIPMENT PURCHASE PO APO AS0218
         0128 SO 21560
    71A: Details of Charges          .    .
         OUR
```

# EXHIBIT 4

Sharjah Airport Int'l Free Zone, P.O. Box 7975, Sharjah, UAE
Telephone: + 971 4 4541301 .......... Fax: + 971 4 4541300

**Arempa International Ltd FZC**

# Fax



| | | | |
|---|---|---|---|
| **To:** | Remittance (Out) Department<br>Habib Bank AG Zurich, Deira Dubai | **From:** | Badar Khan |
| **Fax:** | + 971 4 228 4211 | **Pages:** | 1 |
| **Sub:** | T.T. (Out) Request | **Date:** | 01/11/2018 (1st) |
| **Re:** | 0209UA/8594/HB-$TT-AP/11-18 | **CC:** | Mr. Hakimuddin Rangoonwala |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

Dear Sir,

Kindly transfer the following funds as per the details provided and <u>fax me the acknowledgement</u>, thank you.

1.  **Debit account number** : 20311-333-248474
    **Amount** : USD202,000.00 (Two Hundred Two Thousand Dollars Only)

    **Beneficiary Particulars**
    **Beneficiary name** : HONG KONG YUN LAI TRADE LTD
    **Bank name** : OCBC WING HANG
    **Address** : 159-169 QUEEN'S ROAD, CENTRAL. CITY HONG KONG
    **Account number** : ████-831
    **Swift** : WIHBHKHH

    **Payment Purpose** : Payment against Invoice S371

## ALL bank charges including intermediate banks to be covered by REMITTER

Sincerely yours,

Mobile Phone # +971 506532548

File ref.: # MISE PAY-RS

01/11 2018 10:26AM FAX  044541300          AREMPA INTERNATIONAL FZE                ☑0001

```
*****************************
***   TX Result Report   ***
*****************************

        Sending is complete.

Job Number             2756
Address                2212053
Name
Start Time             01/11 10:26 AM
Call Length            00'24
Sheets                 1
Result                 OK
```

Sharjah Airport Int'l Free Zone, P.O. Box 7975, Sharjah, UAE
Telephone: + 971 4 4541301 ......... Fax: + 971 4 4541300

**Arempa International Ltd FZC**

# Fax

| To: | Remittance (Out) Department<br>Habib Bank AG Zurich, Deira Dubai | From: | Badar Khan |
|---|---|---|---|
| Fax: | + 971 4 228 4211 | Pages: | 1 |
| Sub: | T.T. (Out) Request | Date: | 01/11/2018 (1st) |
| Re: | 0209UA/8594/HB-$TT-AP/11-18 | CC: | Mr. Hakimuddin Rangoonwala |

□ Urgent       □ For Review       □ Please Comment       □ Please Reply       □ Please Recycle

Dear Sir,

Kindly transfer the following funds as per the details provided and <u>fax me the acknowledgement</u>, thank you.

1. **Debit account number**    : 20311-333-248474
   **Amount**                  : USD202,000.00 (Two Hundred Two Thousand Dollars Only)

   **Beneficiary Particulars**
   **Beneficiary name**    : HONG KONG YUN LAI TRADE LTD
   **Bank name**           : OCBC WING HANG
   **Address**             : 159-169 QUEEN'S ROAD, CENTRAL. CITY HONG KONG
   **Account number**      : ███████-831
   **Swift**               : WIHBHKHH

   **Payment Purpose**     : Payment against Invoice S371

## ALL bank charges including intermediate banks to be covered by REMITTER

#1474

## Outward SWIFT Details

```
ACKnowledged copy of SWIFT message for DER2985402  (MT103)
        Serial Number               :       2985402
        Date                        :       01-Nov-2018
        Reference                   :       DER2985402
        Amount                      :       USD 202,000.00
        Beneficiary Name            :       HONG KONG YUN LAI TRADE LTD
-------------------- Instance Type and Transmission --------------

        Notification (Transmission) of Original sent to SWIFT (ACK)

        Network Delivery Status   : Network Ack

        Priority/Delivery         : Normal

        Message Input Reference   : 1759 181101HBZUAEADAXXX3800511850

        -------------------------- Message Header ------------------------
```

```
        Swift Input                     : FIN 103 Single Customer Credit
Transfer

        Sender   : HBZUAEADXXX

                   HABIB BANK AG ZURICH

                   DUBAI AE

        Receiver : CITIUS33XXX

                   CITIBANK N.A.

                   NEW YORK,NY US

        MUR : 7498794

        -------------------------- Message Text --------------------------

        20: Sender`s Reference

            DER2985402

        23B: Bank Operation Code

            CRED

        32A: Val Dte/Curr/Interbnk Settld Amt

            Date           : 02 November 2018

            Currency       : USD (US DOLLAR)

            Amount         :                    #202,000.#

        33B: Currency/Instructed Amount

            Currency       : USD (US DOLLAR)
```

```
Amount            :              #202,000.#
```

50K: Ordering Customer-Name & Address

/AE270290120311333248474

AREMPA INTERNATIONAL LTD FZC, (Govt

Business Id)00352, 250 M2

WAREHOUSE NO A3 029 POBOX 7975

SHARJAH United Arab Emirates

57A: Account With Institution - FI BIC

WIHBHKHHXXX

OCBC WING HANG BANK LIMITED

HONG KONG   HK

59: Beneficiary Customer-Name & Addr

 831

HONG KONG YUN LAI TRADE LTD

70: Remittance Information

PAYMENT AGAINST INVOICE S371

71A: Details of Charges

OUR

**Meilarni Guiala**

| | |
|---|---|
| **From:** | Meilarni Guiala <meilarni.g@arempa.com> |
| **Sent:** | 2018년 11월 5일 월요일 오후 5:42 |
| **To:** | Jawed Haroon (j.haroon@habibbank.com) |
| **Cc:** | n.ullahkhan@habibbank.com; Badar Khan (b.khan@arempa.com) |
| **Subject:** | RE: Recall of outward remittance $202K |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Jawed Haroon (j.haroon@habibbank.com) | |
| | n.ullahkhan@habibbank.com | |
| | Badar Khan (b.khan@arempa.com) | Read: 2018-11-05 오후 6:11 |

Dear Mr. Jawed,

Please note HK police E-report reference number: ERC1811051017086.

Thanks & regards,
Lhye

**From:** Meilarni Guiala [mailto:meilarni.g@arempa.com]
**Sent:** Monday, November 05, 2018 4:19 PM
**To:** Jawed Haroon (j.haroon@habibbank.com)
**Cc:** n.ullahkhan@habibbank.com
**Subject:** Recall of outward remittance $202K

Dear Mr. Jawed,

Good afternoon. Kindly see attached request letter for recall of outward remittance $202K along with outward swift generated from online banking.

Kind regards,
*Meilarni Guiala*
**DEPARTMENT HEAD**
(Accounts & Human Resources)

Arempa International Limited FZC.
Sharjah Airport Free Zone
P.O. Box 7975
Sharjah, United Arab Emirates
Telephone: + 971 4 454 1301 ext. 105
Fax: + 971 4 454 1300
Direct Fax: +971 4 454 1275
Skype: meilarni.guiala
Email: meilarni.g@arempa.com
Web: www.arempa.com

Information in this email and any attachments is confidential and intended solely for the use of the individual(s) to whom it is addressed or otherwise directed. Any use of the information contained herein in any way (including, but not limited to, total or partial disclosure, reproduction, or dissemination) by persons other than the intended recipient(s) is prohibited. If you receive this e-mail in error, please notify the sender by phone or email immediately and



**AREMPA**
*International Ltd FZC*

Sharjah Int'l Airport Free Zone
P.O. Box 7975
Sharjah, United Arab Emirates

Tel.: + 971 4 4541301
Fax: + 971 4 4541300

**Habib Bank AG Zurich**
**Dubai, United Arab Emirates**

**Attention: Mr. Jawed Haroon**
**Vice President (Business Development)**

**Subject: Recall of outward remittance USD202,000.00**

Dear Sir,

With reference to **MT103 (DER2985402) outward remittance of $202,000.00 to beneficiary HONG KONG YUN LAI TRADE LTD** debited from our account number ███████8474 dd. 2018.11.01.

We kindly request you to **RECALL the funds and return the amount to our bank account** number ███████8474.

Appreciate your prompt action. Thank you.

Thanks & regards,

Badar Khan
0506532548

AREMPA INTERNATIONAL LTD.
FREE ZONE CO.
P.O.Box 7975, Sharjah-UAE

## Badar Khan

| | |
|---|---|
| **From:** | erc@police.gov.hk |
| **Sent:** | Monday, November 5, 2018 5:44 PM |
| **To:** | b.khan@arempa.com |
| **Subject:** | Acknowledgement of Receipt (e-Reference Number: ERC1811051017086 ) |

Dear Sir / Madam,

Your e-Report has been submitted
Acknowledgement of Receipt
RE: Crime Information Report
e-Reference Number: ERC1811051017086

Thank you for your e-mail. The matter is now receiving attention by the Hong Kong Police. The responsible officer handling the matter will contact you when necessary.

This is an auto response. Please do not reply to this mail.

Time/Date of Submission of e-Report: 2018-11-05 21:38
e-Report Centre
Hong Kong Police Force

**Meilarni Guiala**

| | |
|---|---|
| **From:** | Jawed Haroon <j.haroon@habibbank.com> |
| **Sent:** | 2018년 11월 6일 화요일 오전 10:39 |
| **To:** | Meilarni Guiala; Badar Khan |
| **Subject:** | Fwd: HACK PAYMENT MSGS |
| **Attachments:** | DER170166.pdf; DER951520.pdf; MT192.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**Dear Badar Sb,**

Attached messages sent Yesterday and have nominated one of our expert to investigate the matter at TOP most priority by way of getting these funds back at any cost.

Keep in touch and put us in complete loop of your communications with your suppliers and their Bankers.

I  )ards

---

---------- Forwarded message ----------
From: **Raheel Mazhar** <r.mazhar@habibbank.com>
Date: Tue, Nov 6, 2018 at 8:46 AM
Subject: HACK PAYMENT MSGS
To: Jawed Haroon <j.haroon@habibbank.com>
Cc: Ahmed Hasan Mufti <a.hasanmufti@habibbank.com>, Saleh M Abubaker <s.abubaker@habibbank.com>

Dear Sir,

Please find attached swift messages sent for recalling the funds.

P ~ards,
)

--



**Raheel Mazhar**
**Remittance Deptt.**
**HBZ-Dubai**
~971 4 2607999 **EXT-1435**

--

DER951520

```
-------------------- Instance Type and Transmission --------------

        Notification (Transmission) of Original sent to SWIFT (ACK)
        Network Delivery Status  : Network Ack
        Priority/Delivery        : Normal
        Message Input Reference  : 1713 181105HBZUAEADAXXX3801513885
------------------------- Message Header ------------------------
        Swift Input              : FIN 999 Free Format Message
        Sender   : HBZUAEADXXX
                   HABIB BANK AG ZURICH
                   DUBAI AE
        Receiver : WIHBHKHHXXX
                   OCBC WING HANG BANK LIMITED
                   HONG KONG HK
        MUR : 7505545
------------------------- Message Text --------------------------
      20: Transaction Reference Number
          DER951520
      21: Related Reference
          HACKED PAYMENT
      79: Narrative
          PLEASE QUOTE DER2985402
          FOR ALL CORRESPONDENCE
          ATTN - INVESTIGATIONS DEPARTMENT
          .
          URGENT URGENT URGENT URGENT
          .
          BENE- HONG KONG YUN LAI TRADE LTD
          ACC NO- 243780 831
          BY ORDER- AREMPA INTERNATIONAL LTD FZC
          ACTUAL REM AMOUNT- USD 202,000/- VIA CITIUS33
          OUR REMITTANCE REF DER2985402 VALUE DATE 02NOV2018
          .
          WE REFER TO OUR MT103 WHICH WAS TO BE CREDITED TO
          YOUR ABOVE CLIENTS ACCOUNT HELD WITH YOUR BANK.
          REMITTER INFORMS US THAT THIS HAS BEEN A
          FRAUDULENT TRANSACTION AS THE BENEFICIARY DETAILS
          HAVE BEEN CHANGED BY MEANS OF HACKING.
          .
          PLEASE CHECK AUTHENTICITY OF YOUR CLIENT AND AS
          PER REQUEST OF REMITTER WE HEREBY REQUEST YOU TO
          URGENTLY RECALL/RETURN THE FUNDS AND CREDIT OUR
          ACCOUNT WITH CITIUS33 UNDER AUTHENTICATED ADVISE
          TO US.
          .
          YOUR PROMPT ACTION IS HIGHLY APPRECIATED.
          .
          REGARDS,
          REMITTANCES,
          AHMED MUFTI
-------------------------- Message Trailer -----------------------
```

```
{CHK:BEECB60C5ACC}
-------------------------- Interventions ------------------------      DER951520
      Category       : Network Report
      Creation Time  : Nov 05 2018 17:12:26
      Application    : SWIFT Interface
      Operator       : SYSTEM
      Text                                  .
      {1:F21HBZUAEADAXXX3801513885}{4:{177:1811051713}{451:0}{108:7505545}}
```

DER2985402

```
------------------- Instance Type and Transmission --------------
          Notification (Transmission) of Original sent to SWIFT (ACK)
          Network Delivery Status  : Network Ack
          Priority/Delivery        : Normal
          Message Input Reference  : 1713 181105HBZUAEADAXXX3801513882
------------------------- Message Header ---------------------------
          Swift Input              : FIN 192 Request for Cancellation
          Sender   : HBZUABADXXX
                     HABIB BANK AG ZURICH
                     DUBAI AE
          Receiver : CITIUS33XXX
                     CITIBANK N.A.
                     NEW YORK,NY US
          MUR : 7505484
------------------------- Message Text ----------------------------
          20: Transaction Reference Number
              DER2985402
          21: Related Reference
              DER2985402
          11S: MT and Date of the Original Msg
              103
              181102
          79: Narrative Descrp of Original Msg
              WE REQUEST YOU TO CANCEL/RETURN PAYMENT FOR ABOVE
              MENTIONED MT103 AND CONFIRM THE SAME BY
              AUTHENTICATED SWIFT ADVICE TO US. AN URGENT ACTION
              IS NEEDED AS REMITTER INFORMS US THAT THIS HAS
              BEEN A FRAUDULENT TRANSACTION AS THE BENE ACCOUNT
              HAS BEEN HACKED. THANKING IN ANTICIPATION FOR
              YOUR KIND AND PROMPT ACTION. REGARDS
------------------------- Message Trailer -------------------------
          {CHK:5001D09D21FE}
          PKI Signature: MAC-Equivalent
------------------------- Interventions ---------------------------
          Category     : Network Report
          Creation Time : Nov 05 2018 17:12:26
          Application  : SWIFT Interface
          Operator     : SYSTEM
          Text
          {1:F21HBZUAEADAXXX3801513882}{4:{177:1811051713}{451:0}{108:7505484}}

...................
```

DVT# 1489
INT# 1095



## Habib Bank AG Zurich
(Incorporated in Switzerland 1967)

**Main Branch**
Post Box: 3306, Deira, Dubai, U.A.E.
Phone: 971-4-2607999 Fax: 971-4-2284211
SWIFT: HBZUAEADXXX

**Statement Of Account**
Demand Deposits

M/s AREMPA INTERNATIONAL LTD FZC
PO Box 7975, SHARJAH

| Account | 8474 |
|---|---|
| Type | Demand Deposits |
| Currency | United States Dollar |

**Statement For The Period: 2018-11-11 To 2018-11-11**

IBAN - ████████████3248 474

| Date | Particulars | Debit | Credit |
|---|---|---|---|
| | Previous Balance | | 193,776.67 |
| 11-Nov-2018 | Reference: 2-1-1-5695/10(11-Nov-2018) VAT @5.00 % Miscellaneous Income SWIFT (Value date: 13-Nov-2018) | 2.18 | |
| | Reference: 2-1-1-5695/4(11-Nov-2018) Charges For TT No. 2988942 (Value date: 13-Nov-2018) | 43.56 | |
| | Reference: 2-1-1-5695/5(11-Nov-2018) TT #DER2988942 USD 600.00 To EMIRATES LOGISTICS LLC (Value date: 13-Nov-2018) | 600.00 | |
| | Reference: 2-1-1-5379/11(11-Nov-2018) VAT @5.00 % Miscellaneous Income SWIFT (Value date: 13-Nov-2018) | 2.18 | |
| | Reference: 2-1-1-5379/4(11-Nov-2018) Charges For TT No. 2988920 (Value date: 13-Nov-2018) | 43.56 | |
| | Reference: 2-1-1-5379/5(11-Nov-2018) TT #DER2988920 USD 5,000.00 To ICC UKRAINE KIEV UKRAINE (Value date: 13-Nov-2018) | 5,000.00 | |
| | Reference: 2-1-1-14490/3(11-Nov-2018) TT REF DER2985402 RTN AS PER RECALL MT199 350202 | | 201,965.72 |
| | Closing Balance | | 390,050.91 |

Please examine this account statement. It shall be deemed correct in all respects unless we hear from you within 15 days from the date of dispatch. Please bring any discrepancies to the attention of the management in writing.

This account statement is computer generated and does not carry any signature.

Important Announcement:

E-Statements : We request you to please update your email address to receive statement of accounts/advices at the frequency subscribed. We will shortly be discontinuing statements/advices by postal mail.

We have recently launched the 'HBZ Authenticator' (as a replacement for Secure Key) for secure login to access HBZ web-services. This requires users to download the HBZ mobile App and follow the necessary instructions to register for HBZ Authenticator. As 'Secure Key' usage will be discontinued shortly; we request users to upgrade to HBZ Authenticator for easier and secure transaction option capability.

Please visit our website for updates on the Schedule of Charges governing your relationship.

We strongly recommend that you keep your records like passport, residence visa, emirates ID, trade license, address and phone numbers updated at all times for smooth banking services.

*This is a duplicate statement generated from HBZweb*

# EXHIBIT 5

**Patricia Mooneyham**

| | |
|---|---|
| **From:** | The Action Fraud Team <no_reply@actionfraud.police.uk> |
| **Sent:** | Tuesday, November 06, 2018 3:52 AM |
| **To:** | Badar Khan |
| **Subject:** | Action Fraud Report Confirmation |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Mr Badar Khan
Saif Zone
P.O. Box 7975
Saif Zone
Sharjah
Sharjah
7975
United_Arab_Emirates

RE: NFRC181102613165

Dear Mr Khan,

I am sorry to hear you have been a victim of crime. Thank you for taking the time to report to Action Fraud. Your report has been sent to the National Fraud Intelligence Bureau (NFIB) for review.

Experts at the NFIB will examine the information you provide. Where possible, the information is also matched against other available data in order to enrich and corroborate the details of the fraud. An assessment will be made as to whether there are viable lines of enquiry that would enable a law enforcement body, such as the police service, to investigate. The NFIB aim to provide you with an update on your report within 28 days.

Please be assured that by contacting us you are giving the police vital information they need to protect you and others. The information you have provided may be used to disrupt criminal activity and inform prevention advice and campaigns.

You should keep safe any evidence which you feel may be important. We continuously assess the content of individual and linked crime reports, if you set up an online account, you can use this to add additional information.

If you have any queries regarding this letter please visit www.actionfraud.police.uk/FAQ. If you would like more information on how to protect yourself from fraud and cyber crime, please see the guidance at www.actionfraud.police.uk/support_for_you.

We value your feedback, please visit this link and complete the survey:
www.surveymonkey.co.uk/r/CSATREP

Yours sincerely,

1

**Pauline Smith**
**Director of Action Fraud**

*For real-time alerts and prevention advice follow Action Fraud*  *"actionfraud" or*  *"actionfrauduk"*

2

**Patricia Mooneyham**

| | |
|---|---|
| **From:** | Diane.Cowan@met.police.uk |
| **Sent:** | Friday, December 21, 2018 8:11 AM |
| **To:** | b.khan@arempa.com |
| **Subject:** | NFRC181102613165  CRIS 3835611/18 |

In relation to the allegation of Mandate Fraud that you made to Action Fraud.
I have assessed the above request. In internet fraud cases where the loss is funds remitted to an account with its origins in the UK, this is not proof that the suspect is in the UK. Nor, on the balance of probabilities can the assumption be made that they are.  UK accounts, together with British names are often used to provide an air of credibility to the suspect's story.

Further, if monies are transferred to a UK account there is every chance that the suspect is not in the UK either and uses internet banking to move the funds. Also, international fraudsters will typically have people in numerous jurisdictions - someone to set up an account, someone to create web address/emails, someone to withdraw the cash and someone to ultimately take the funds.

I understand that you reported this matter to your local Police and should they identify that the offence occurred in the UK or the perpetrator of that offence, has been identified on the balance of probabilities to have been in England or Wales at the time the offence is alleged to have been committed, and where that Jurisdiction outside of England and Wales has been unable to further investigate the allegation, then they should apply to transfer those proceedings under Article 21 of the 1959 Convention on Mutual Legal Assistance in Criminal Matters.

Should the UAE authorities request assistance in ascertaining the origin and questioning of the accountholder we will be able to undertake these measures in furtherance of the investigation. Please not that Police are not able to recover monies from bank accounts.  This is done by your Bank communicating with the receiving Bank.
Please quote NFRC181102613165  CRIS 3835611/18 in any further communication regarding this matter.

Should it be established that the suspect and/or the offence under investigation <u>has</u> origins in the UK then the investigation can continue in our jurisdiction.

Regards,

## Diane Cowan | Detective Constable

## Metropolitan Police Service

## SC&O7 ı Operation Falcon - Fraud and Linked Crime Online
**Email:** <u>diane.cowan@met.pnn.police.uk</u>

For useful fraud prevention advice click on these links:

  

Consider our environment - please do not print this email unless absolutely necessary.

NOTICE - This email and any attachments may be confidential, subject to copyright and/or legal privilege and are intended solely for the use of the intended recipient. If you have received this email in error, please notify the sender and delete it from your system.  To avoid incurring legal liabilities, you must not distribute or copy the information in this email without the permission of the sender. MPS communication systems are monitored to the extent permitted by law.  Consequently, any email and/or attachments may be read by monitoring staff. Only specified personnel are authorised to conclude any binding agreement on behalf of the MPS by email. The MPS accepts no responsibility for unauthorised agreements reached with other employees or agents.  The security of this email and any attachments cannot be guaranteed. Email messages are routinely scanned but malicious software infection and corruption of content can still occur during transmission over the Internet. Any views or opinions expressed in this communication are solely those of the author and do not necessarily represent those of the Metropolitan Police Service (MPS).

Find us at:

Facebook: https://m.facebook.com/metpoliceuk

Twitter: @metpoliceuk

# EXHIBIT 6

**Lucas Bento**

| | |
|---|---|
| **From:** | Badar Khan <b.khan@arempa.com> |
| **Sent:** | Tuesday, April 16, 2019 7:43 AM |
| **To:** | Lucas Bento |
| **Subject:** | FW: LM (1554/18) in HK/C 54/6 (COM) (IO: 16462) |
| **Attachments:** | $202,000.00 - Correspondence.pdf; $202,000.00 - TT request + swift.pdf; Emirates ID Card _ BK 2019.04.01.pdf |

[EXTERNAL EMAIL]

Regards,

Badar.

-----Original Message-----
From: Badar Khan [mailto:b.khan@arempa.com]
Sent: Thursday, November 22, 2018 12:56 PM
To: 'cdist-crm@police.gov.hk' <cdist-crm@police.gov.hk>
Subject: RE: LM (1554/18) in HK/C 54/6 (COM) (IO: 16462)

Dear Mr. Fung,

Thank you for the follow up.

Good news is I was able to recover the funds $202,000.00 after we notified our bank who in turn notified their corresponding bank to take immediate action and the funds were returned back to us.

Same people incidentally using same modus operandi i.e. communicating with us using fake email ID of Rapiscan pretending to be legitimate people in Rapiscan with who use usually communicate, successfully managed to make us transfer $1,816,500.00 to Barclays Bank in UK to Rapiscan Systems Limited who in reality do not have an account w/ Barclays. We have filled a report with National Fraud Intelligence Bureau (NFIB) of UK under file number NFRC181102613165.

So, in short, despite the fact I have recovered $202,000.00 send fraudulently to Hong Kong, I would still like you to pursue this case and hold the persons responsible for this fraud.

Attached for your reference is the set of email correspondences between us (Arempa) and these fake people pretending to be Rapiscan people and also attached is the scan copies of our request to the bank to transfer $202,000.

1

00 plus the swift message acknowledgement.

My full name: Badar Alam Khan
DOB: July 19, 1964
Nationality: Pakistan
Current residence status: United Arab Emirates (pls see attached scan copy
of Emirates ID Card) Address (official): Arempa International Limited,
Office # 2505, Marina Plaza, Dubai Marina, P.O. Box 31582, Dubai, United
Arab Emirates

Regards,

Badar KHAN
Managing Director
Arempa International Limited
Tel.: +971 4 454 1301
Mob: +971 50 65 32 548
Email: b.khan@arempa.com
Web: www.arempa.com

Information in this email and any attachments is confidential and intended
solely for the use of the individual(s) to whom it is addressed or otherwise
directed. Any use of the information contained herein in any way (including,
but not limited to, total or partial disclosure, reproduction, or
dissemination) by persons other than the intended recipient(s) is
prohibited. If you receive this e-mail in error, please notify the sender by
phone or email immediately and delete it! Finally, the recipient should
check this email and any attachments for the presence of viruses. The
Company accepts no liability for any damage caused by any virus transmitted
by this email.

-----Original Message-----
From: cdist-crm@police.gov.hk [mailto:cdist-crm@police.gov.hk]
Sent: Wednesday, November 14, 2018 3:48 PM
To: b.khan@arempa.com
Subject: LM (1554/18) in HK/C 54/6 (COM) (IO: 16462)

Dear Khan Badar,

Officers of District Intelligence Section, Central Police District of Hong
Kong Police are currently investigating your report under reference LM
(1554/18) in HK/C 54/6 (COM). We are waiting for your reply the information.

2

Please report the case to police in your country and provide
the police report number and full victim statement to us.   In order to
facility the investigation and ascertain your report, please reply the
details of this case by answering the questions below:

1 |Could you provide your personal details? (Including your name, date of
  |birth, identity card number, address & your nationality)
--+--------------------------------------------------------------------
2 |Could  you  describe more details/ What nature of this case? (What are
  |the date, time and the exact location of the incident concerned?)
--+--------------------------------------------------------------------
3 |Who was involved in this case? (i.e. suspect's details)
--+--------------------------------------------------------------------
4 |How  much of your loss in this case? (if yes, please provide the clear
  |bank transaction document or other relevant document.)
--+--------------------------------------------------------------------
5 |Any business relation before this case?
--+--------------------------------------------------------------------
6 |Do  you  want to continue pursuing this case? If yes, please provide a
  |report number if you reported in your country and a formally statement
  |to us?

Details included (reference Q.3)

| Date of remittance : | Amount : USD / HKD | Remittance Bank : Personal Name : | Beneficiary Company / | Beneficiary Account Number : |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

Please reply us through e-mail attached with all the correspondence,
SUSPECTED COMPANY / SUSPECT as well as CLEAR bank statement(s) & Bank
remittance slip showing the money transfer.

Please reply this e-mail to cdist-crm@police.gov.hk. Your assistance in this
investigation is much appreciated.

Best Regards

Mr. FUNG
DPC 16462

3

Tel: 3660 1172
District Intelligence Section
Central Police District
Hong Kong Police

*** This e-mail message (together with any attachments) is for the
designated recipient only. It may contain information that is privileged.
If you are not the intended recipient, you are hereby notified that any use,
retention, disclosure, copying, printing, forwarding or dissemination of the
message is strictly prohibited. If you have received the message in error,
please erase all copies of the message (including attachments) from your
system and notify the sender immediately. ***


*** 此電郵訊息(連同任何附件)只發送給指定收件人。訊息可能包含享有特權資
料。謹此通知,如你並非預定收件人,嚴禁使用、保留、披露、複製、列印、轉發或
發布此訊息。如收到誤發的訊息,請把訊息的所有副本(包括附件)從系統內消除,並
立即通知發件人。***

# EXHIBIT 7

DER170166

```
-------------------- Instance Type and Transmission --------------
       Notification (Transmission) of Original sent to SWIFT (ACK)
       Network Delivery Status   : Network Ack
       Priority/Delivery         : Normal
       Message Input Reference   : 1802 181105HBZUAEADAXXX3801513919
-------------------------- Message Header ----------------------
       Swift Input                : FIN 199 Free Format Message
       Sender   : HBZUAEADXXX
                  HABIB BANK AG ZURICH
                  DUBAI AE
       Receiver : BARCGB22XXX
                  BARCLAYS BANK PLC
                  (ALL U.K. OFFICES)
                  LONDON GB
       MUR : 7505660
-------------------------- Message Text ----------------------
       20: Transaction Reference Number
           DER170166
       21: Related Reference
           HACK PAYMENT
       79: Narrative
           PLEASE QUOTE DER2976883
           FOR ALL CORRESPONDENCE
           ATTN - PAYMENTS / REMITTANCES DEPT
           .
           URGENT URGENT URGENT URGENT
           .
           BENE - RAPISCAN SYSTEMS LIMITED
           ACC NO - ███████████8500
           BY ORDER - AREMPA INTERNATIONAL LIMITED
           ACTUAL REM AMOUNT - USD 1,816,500/- VIA BKTRUS33
           VIA BARCUS33
           OUR REMITTANCE REF DER2976883 VALUE DATE 16OCT2018
           .
           WE REFER TO OUR MT103 WHICH WAS TO BE CREDITED TO
           YOUR ABOVE CLIENTS ACCOUNT HELD WITH YOUR BANK.
           REMITTER INFORMS US THAT THIS HAS BEEN A
           FRAUDULENT TRANSACTION AS THE BENEFICIARY DETAILS
           HAVE BEEN CHANGED BY MEANS OF HACKING.
           .
           PLEASE CHECK AUTHENTICITY OF YOUR CLIENT AND AS
           PER REQUEST OF REMITTER WE HEREBY REQUEST YOU TO
           URGENTLY RECALL/RETURN THE FUNDS AND CREDIT OUR
           ACCOUNT WITH BKTRUS33 UNDER AUTHENTICATED ADVISE
           TO US.
           .
           YOUR PROMPT ACTION IS HIGHLY APPRECIATED.
           .
           REGARDS,
           REMITTANCES,
           HBZ-S, DUBAI
-------------------------- Message Trailer ----------------------
       {CHK:188403AD4926}
       PKI Signature: MAC-Equivalent
-------------------------- Interventions ----------------------
       Category     : Network Report
       Creation Time : Nov 05 2018 18:01:17
       Application  : SWIFT Interface
       Operator     : SYSTEM
       Text
       {1:F21HBZUAEADAXXX3801513919}{4:{177:1811051802}{451:0}{108:7505660}}
```

**DER170293**

```
-------------------- Instance Type and Transmission --------------

Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status   : Network Ack
Priority/Delivery         : Normal
Message Input Reference   : 1416 181107HBZUAEADAXXX3301513327
-------------------------- Message Header --------------------------
Swift Input                          : FIN 199 Free Format Message
Sender   : HBZUAEADXXX
           HABIB BANK AG ZURICH
           DUBAI AE
Receiver : BARCGB22XXX
           BARCLAYS BANK PLC
           (ALL U.K. OFFICES)
           LONDON GB
MUR : 7811290
-------------------------- Message Text --------------------------
20: Transaction Reference Number
    DER170293
21: Related Reference
    BACK PYMT
79: Narrative
    PLEASE QUOTE DER2976683
    FOR ALL CORRESPONDENCE
    ATTN - PAYMENTS / REMITTANCES DEPT
    .
    URGENT URGENT URGENT URGENT
    .
    BENE - RAPISCAN SYSTEMS LIMITED
    A/C NO - ████████████
    BY ORDER - ARENFA INTERNATIONAL LIMITED
    ACTUAL REM AMOUNT - USD 1,015,500/- VIA BKTRUS33
    VIA BARCUS33
    OUR REMITTANCE REF DER2976683 VALUE DATE 16OCT2018
    .
    WE REFER TO OUR MT103 WHICH WAS TO BE CREDITED TO
    YOUR ABOVE CLIENTS ACCOUNT HELD WITH YOUR BANK.
    REMITTER INFORMS US THAT THIS HAS BEEN A
    FRAUDULENT TRANSACTION AS THE BENEFICIARY DETAILS
    HAVE BEEN CHANGED BY MEANS OF HACKING. FURTHER TO
    OUR MT199 SENT TO YOUR GOOD BANK ON 2. .2018
    REGARDING THE RECALL OF THE FUNDS PLEASE NOTE THAT
    OUR CUSTOMER HAS LODGED THE COMPLAINT WITH THE UK
    POLICE ACTION FRAUD DIVISION  THEIR REF
    NFRC181104613165 WHO FORWARDED THE CASE TO BETH
    FOR FURTHER ACTION.
    .
    YOU ARE REQUESTED TO UPDATE US THE STATUS OF OUR
    RECALL REQUEST SENT VIA MT199 UNDER OUR REF
    DER.79166 AND ALSO PROVIDE CLARIFICATION ABOUT HOW
    THE FUNDS CREDITED WHEN THE BENEFICIARY ACCOUNT
    NUMBER AND NAME MISMATCHED. AWAITING FOR YOUR
    RESPONSE.
    REGARDS
    REMITTANCE DEPTT
    HBZ-DUBAI
-------------------------- Message Trailer --------------------------
{CHK:X6404788A3D0}
{DLM:[Unclear]MAC-Equivalent}
-------------------------- Interventions --------------------------
Category     : Network Report
Creation Date : Nov 07 2018 14:15:31
Application    : SWIFT Interface
Operator       : SYSTEM
Text
{1:F21HBZUAEADAXXX3301513327}{4:{177:1811071416}{451:0}{108:7811290}}
```

**DER170295**

```
------------------- Instance Type and Transaction ---------------
    Notification (Transmission) of Original sent to SWIFT (ACK)
    Network Delivery Status    : Network Ack
    Priority/Delivery          : Normal
    Message Input Reference    : 1114 181107HBZUAEADAXXX3801515350
--------------------------- Message Header ----------------------
    Swift Input                : FIN 199 Free Format Message
    Sender  : HBZUAEADXXX
              HABIB BANK AG ZURICH
              DUBAI AE
    Receiver : BKTRUS33XXX
               DEUTSCHE BANK TRUST COMPANY AMERICAS
               NEW YORK,NY US
    MUR : 7511367
--------------------------- Message Text ------------------------
    20: Transaction Reference Number
        DER170295
    21: Related Reference
        181105 604345
    79: Narrative
        PLEASE QUOTE DER2976883
        FOR ALL CORRESPONDENCE
        ATTN - PAYMENTS / REMITTANCES DEPT

        WE REFER OUR MT103 VALUE DTD 16.10.2018 FOR USD
        1,816,500/- BY ORDER AREMPA INTERNATIONAL LTD IN
        FAVOUR OF MAPINCAN SYSTEMS LIMITED UNDER OUR ABOVE
        MENTIONED REFERENCE AND FURTHER REFER TO OUR
        MT199 DTD 5.11.2018.

        KINDLY UPDATE US ON THE STATUS OF THE RECALL OF
        FUNDS FOR THIS FRAUDULENTTRANSACTION SINCE THE
        REMITTER IS PRESSING FOR UPDATE AND PROMPT RETURN
        FOR THIS PAYMENT. THEREFORE CONTACT THE
        BENEFICIARY BANK AND SEEK FOR UPDATE AND EARLY
        RESOLVMENT OF THIS CASE AND RETURN THIS PAYMENT
        ACCORDINGLY. ALSO NOTE THAT OUR CUSTOMER HAS
        LODGED THE COMPLAINT WITH THE UK POLICE THEIR REF
        NO NFRC181105411165. YOU ARE ALSO REQUESTED TO
        SEEK CLARIFICATION FROM THE BBK ABOUT HOW THE
        FUNDS ARE CREDITED WHEN THE BNF ACCOUNT NO AND
        TITLE MISMATCHED. WE AWAIT YOUR RESPONSE.

        REGARDS,
        REMITTANCES,
        HBZ-S.
        DUBAI.
--------------------------- Message Trailer ---------------------
    {CHK:BCDB51597FD9}
    PKI Signature: MAC-Equivalent
--------------------------- Interventions -----------------------
    Category      : Network Report
    Creation Time : Nov 07 2018 14:11:51
    Application   : SWIFT Interface
    Operator      : SYSTEM
    Text
    {1:F21HBZUAEADAXXX3801515350}{4:{177:1811071434}{451:0}{108:7511367}}
```

DER170404

```
-------------------- Instance Type and Transmission --------------
           Notification (Transmission) of Original sent to SWIFT (ACK)
           Network Delivery Status  : Network Ack
           Priority/Delivery        : Normal
           Message Input Reference  : 0921 181112HBZUAEADAXXX3804517646
----------------------- Message Header -----------------------
           Swift Input              : FIN 199 Free Format Message
           Sender  : HBZUAEADXXX
                     HABIB BANK AG ZURICH
                     DUBAI AE
           Receiver : BARCGB22XXX
                     BARCLAYS BANK PLC
                     (ALL U.K. OFFICES)
                     LONDON GB
           MUR : 7518843
-------------------------- Message Text -------------------------
           20: Transaction Reference Number
               DER170404
           21: Related Reference
               QMS181105-004109
           79: Narrative
               PLEASE QUOTE DER2976883
               FOR ALL CORRESPONDENCE
               ATTN - PAYMENTS / REMITTANCES DEPT
               .
               URGENT URGENT URGENT URGENT
               .
               BENE - RAPISCAN SYSTEMS LIMITED ACC NO -
               ████████8500
               BY ORDER - AREMPA INTERNATIONAL LIMITED
               ACTUAL REM AMOUNT - USD 1,816,500/- VIA BKTRUS33
               VIA BARCUS33
               OUR REMITTANCE REF DER2976883 VALUE DATE 16OCT2018
               .
               IN RELATION TO OUR MT103 UNDER ABOVE MENTIONED
               DETAILS AND YOUR REPLY VIA MT199 UNDER ABOVE REF
               DTD 9.11.2018. OUR CLIENT HAS FILED A CASE WITH
               LEGAL AUTHORITIES THERE DETAILS OF WHICH HAVE
               ALREADY BEEN SHARED WITH YOUR BANK. THEY WILL BE
               FURTHER TAKING UP THE MATTER THROUGH LAWYERS AND
               OTHER LEGAL CHANELS. WE ALSO REQUEST YOU TO
               CONFIRM IF THE ACCOUNT TITLE WHERE FUNDS WERE
               EFFECTED WAS AS PER OUR MT103. WE FIND YOUR
               RESPONSE TO BE VERY CASUAL FOR A HIGH VALUE FRAUD
               PAYMENT FOR USD1.8MILLION, THEREFORE WE REQUEST
               YOUR GOOD BANK TO CONDUCT THOROUGH INVESTIGATION
               TO ASCERTAIN THE GENUINETY OF THIS PAYMENT. KINDLY
               ASK YOUR CLIENT TO PRODUCE DOCUMENTARY EVIDENCE
               LIKE INVOICE COPIES ETC IF THIS IS A CLEAN
               PAYMENT. PLEASE REVERT WITH YOUR FINDINGS.
               .
               REGARDS
----------------------- Message Trailer ----------------------
           {CHK:933B9B711E9D}
           PKI Signature: MAC-Equivalent
----------------------- Interventions ----------------------
           Category     : Network Report
           Creation Time : Nov 12 2018 09:20:59
           Application  : SWIFT Interface
           Operator     : SYSTEM
           Text
           {1:F21HBZUAEADAXXX3804517646}{4:{177:1811120921}{451:0}{108:7518843}}

......................
```

DER170803

```
-------------------- Instance Type and Transmission --------------
        Notification (Transmission) of Original sent to SWIFT (ACK)
        Network Delivery Status  : Network Ack
        Priority/Delivery        : Normal
        Message Input Reference  : 1649 181121HBZUAEADAXXX3808525177
------------------------- Message Header ------------------------
        Swift Input              : FIN 199 Free Format Message
        Sender   : HBZUAEADXXX
                   HABIB BANK AG ZURICH
                   DUBAI AE
        Receiver : BARCGB22XXX
                   BARCLAYS BANK PLC
                   (ALL U.K. OFFICES)
                   LONDON GB
        MUR : 7543308
------------------------- Message Text --------------------------
        20: Transaction Reference Number
            DER170803
        21: Related Reference
            QMS181105-004109
        79: Narrative
            PLEASE QUOTE DER2976883
            FOR ALL CORRESPONDENCE
            ATTN FRAUD INVESTIGATION UNIT
            PLEASE REFER TO VARIOUS SWIFT MESSAGE REGARDING A
            FRAUDULENT PAYMENT UNDER OUR REF DER2976883 FOR
            USD1,816,500.00 FAVORING IBAN
            ████████████8500. AS WE HAVE MENTIONED IN
            OUR EARLIER MESSAGES THAT THE REMITTER IS A VICTIM
            OF HACKED EMAIL. OUR CUSTOMER WAS PROVIDED WITH
            FAKE INFORMATION WHICH RESULTED IN THIS PAYMENT.
            WE NOW UNDERSTAND THAT THE IBAN MENTIONED ON OUR
            MT103 IS INVALID. SAME INFORMATION WAS CONFIRMED
            TO US BY ONE YOUR AGENTS. WE ALSO UNDERSTAND THAT
            BENE IS A LARGE SECURITY SYSTEMS COMPANY WHICH IS
            ALSO LEGALLY PURSUING THIS MATTER TO RECOVER
            FUNDS. SINCE THE IBAN IS INVALID AND BENE HAS NOT
            RECEIVED FUNDS WE FAIL TO UNDERSTAND WHY BARCLAYS
            BANK IS STILL HOLDING FUNDS. WHAT IS EVEN MORE
            SURPRISING IS LACK OF RESPONSE ON SUCH AN URGENT
            MATTER WHERE SIGNIFICANT AMOUNT IS INVOLVED. WE
            THEREFORE REQUEST YOU TO IMMEDIATELY RETURN THE
            FUNDS WITHOUT FURTHER DELAY AS THERE IS NO REASON
            FOR BARCLAYS BANK TO HOLD THIS PAYMENT ANY LONGER
            SINCE IBAN IS INVALID.
            REGARDS
            PAYMENTS DEPT
------------------------- Message Trailer -----------------------
        {CHK:B449DA44DC12}
        PKI Signature: MAC-Equivalent
------------------------- Interventions -------------------------
        Category      : Network Report
        Creation Time : Nov 21 2018 16:49:50
        Application   : SWIFT Interface
        Operator      : SYSTEM
        Text
        {1:F21HBZUAEADAXXX3808525177}{4:{177:1811211649}{451:0}{108:7543308}}


--------------------
```

```
--------------------- Instance Type and Transmission --------------

       Notification (Transmission) of Original sent to SWIFT (ACK)
       Network Delivery Status   : Network Ack
       Priority/Delivery         : Normal
       Message Input Reference   : 0952 181128HBZUAEADAXXX3809529648
-------------------------- Message Header -----------------------
       Swift Input                      : FIN 199 Free Format Message
       Sender   : HBZUAEADXXX
                  HABIB BANK AG ZURICH
                  DUBAI AE
       Receiver : BARCGB22XXX
                  BARCLAYS BANK PLC
                  (ALL U.K. OFFICES)
                  LONDON GB
       MUR : 7557722
-------------------------- Message Text -------------------------
       20: Transaction Reference Number
           DER171026
       21: Related Reference
           QMS181105-004109
       79: Narrative
           PLEASE QUOTE DER2976883
           FOR ALL CORRESPONDENCE
           HEAD OF FRAUD INVESTIGATION UNIT
           PLEASE REFER TO OUR LAST SWIFT DATED 181121
           REGARDING ONE FRAUDULENT PAYMENT FAVORING ACCOUNT
           OF BARCLAYS BANK FOR USD 1,816,500/- DESPITE OF
           REPEATED MESSAGES AND HIGH URGENCY INVOLVING LARGE
           VALUE FRAUD WE HAVE NOT YET RECEIVED ANY CONCRETE
           RESPONSE FROM BARCLAY BANK OTHER THAN USUAL
           RESPONSE.
           AS PER OUR UNDERSTANDING IBAN IS VALID AND BENE IS
           NOT MAINTAINING ACCOUNT WITH BARCLAYS THEREFORE
           YOUR HOLDING OF FUNDS WITHOUT ANY VALID REASON IS
           INCORRECT. IT HAS BEEN 18 DAYS SINCE WE FIRST
           REPORTED THIS FRAUDULENT TRANSACTION TO BARCLAYS.
           IN THESE  DAYS THERE IS NO SUBSTANTIAL MESSAGE
           FROM BARCLAYS WHICH WE FIND EXTREMELY DISTURBING.
           WE THEREFORE REQUEST YOU TO IMMEDIATELY RETURN THE
           FUNDS OR PROVIDE A VALID REASON FOR HOLDING THE
           FUNDS SO THAT WE CAN FORWARD THIS TO OUR CLIENT
           WHO HAS ALSO PILLED A REPORT WITH NATIONAL FRAUD
           INTELLIGENCE BUREAU (NFIB) UNDER FILE NUMBER
           NFRC181102613165
           REGARDS
           FUNDS TRANSFER INVESTIGATIONS DEPT
-------------------------- Message Trailer ----------------------
       {CHK:35656BA03F6F}
       PKI Signature: MAC-Equivalent
-------------------------- Interventions ------------------------
       Category     : Network Report
       Creation Time : Nov 28 2018 09:52:18
       Application  : SWIFT Interface
       Operator     : SYSTEM
       Text
       {1:F21HBZUAEADAXXX3809529648}{4:{177:1811280952}{451:0}{108:7557722}}

--------------------
```

# EXHIBIT 8

### SWIFT MESSAGE ASSIGNED
-----------------------

```
Message #    : 353675  Message Type : 199  Date Received : Jan 10 2019
Remarks     :
Assigned To : raheelmazhar
----------------------------------------- Instance Type and Transmission
-------------------------------------------------
 Original received from SWIPT
 Priority                          : Normal
 Message Output Reference : 2354   190110HBZUAEADAXXX3812019865
 Correspondent Input Reference : 1954   190110BARCGB22CXXX6879816251


-------------------------------------------- Message Header
-----------------------------------------------------------------
 Swift Output   :   FIN 199  Free Format Message
 Sender         :   BARCGB22XXX
  BARCLAYS BANK PLC
  LONDON GB
 Receiver       :   HBZUAEADXXX
  HABIB BANK AG ZURICH
  DUBAI AE


-------------------------------------------- Message Text
-------------------------------------------------------------------------
```

{1:F01HBZUAEADAXXX3812019865}{2:O1991954190110BARCGB22CXXX6879816251190110235 4N}{3:{108:QMS181105--004109}}{4:
```
20    : Transaction Reference Number
        QMS181105-004109
21    : Related Reference
        DER172718
79    : Narrative
        RE YOUR SWIFT 199 DD 190110
        PLEASE BE ADVISED THAT WE CAN CONFIRM THAT THE
        ACCOUNT INTO WHICH YOU TRANSFERRED MONEY HAS NOW
        BEEN CLOSED, NO FUNDS WERE REMAINING AT THE TIME
        THAT WE WERE MADE AWARE OF YOUR SITUATION. FOR
        THIS REASON WE ARE UNABLE TO RETURN ANY MONEY TO
        YOUR GOOD BANK
        PLEASE QUOTE OUR REF QMS181105-004109 IN FIELD 21
        OF ANY FUTURE CORRESPONDENCE CONCERNING THIS ITEM.
        REGARDS,
        GANESH KUMAR S.
```
-}{5:{MAC:00000000}{CHK:0240028C9870}}{S:{SAC:}{COP:S}}

                          *** END OF SWIFT MESSAGE ***

# EXHIBIT 9

**Patricia Mooneyham**

| | |
|---|---|
| **From:** | Alan Mixer <amixer@rapiscansystens.com> |
| **Sent:** | Wednesday, November 07, 2018 4:14 AM |
| **To:** | Meilarni Guiala |
| **Cc:** | 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano' |
| **Subject:** | Re: Swift RE: Onward Payment Request |
| **Attachments:** | DEBIT NOTE-RPSYSTEMS.pdf |
| | |
| **Importance:** | High |

Hi Hasmik & Lhye,

Here you are.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 11:08, Meilarni Guiala wrote:

Dear Alan,

Please send the details so I can send to Management for approval.

Thanks & regards,

Lhye

1

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:31 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request

Hi Lhye,

Thank you for your help.

We have another payment to be sent out. Kindly help us process it and issue us a statement.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207                                    .

Cell +44 (0)7342 949 239

On 2018-11-07 10:27, Meilarni Guiala wrote:

Dear Alan,

We have asked our bank to send a reminder. New York will  open in the evening and by then we can advise you.

Thanks & regards,

Lhye

2

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:10 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Lhye,

Sorry to bother you again, do you have news from your Bank? Our agent in Hong Kong haven't seen the funds yet!

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-06 09:46, Meilarni Guiala wrote:

Dear Alan,

Let me check with the bank and I will update you as soon as possible.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Tuesday, November 06, 2018 11:40 AM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Kindly help to track the payment.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-05 13:16, Alan Mixer wrote:

Hi Meilarni,

Can you please confirm if the wire did go?  Our agent have not seen the funds yet.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-02 12:53, Meilarni Guiala wrote:

4

Dear Alan,

Here is the swift copy. The bank charges = $45.74

Thanks & regards,

Lhye

**From:** Meilarni Guiala
**Sent:** Thursday, November 01, 2018 11:17 AM
**To:** 'Alan Mixer'; 'Hasmik D'
**Cc:** 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** RE: Onward Payment Request

Dear Alan,

Payment instruction already sent to our bank. Swift copy will follow once available.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Thursday, November 01, 2018 8:22 AM
**To:** Hasmik D
**Cc:** Meilarni Guiala; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Here you are.

5

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-10-31 23:51, Hasmik D wrote:

Dear Alan,

Just be mindful... Thursday is a half day for banks and any payment request needs to be send to bank before 12 noon for same day transfer.  Any request after 12 noon is not done until Sunday evening.

Regards,

Hasmik

_____

**From:** Alan Mixer
**Sent:** Wednesday, October 31, 2018 7:59:20 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Onward Payment Request

Hi Lhye,

I have asked them to prepare an invoice. Will send it to you ASAP.

Thank you.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-10-31 15:17, Meilarni Guiala wrote:

Dear Alan,

Please send the invoice + complete bank details of beneficiary.

Thanks & regards,

Lhye

**From:** Hasmik D [mailto:hasmik.d@arempa.com]
**Sent:** Wednesday, October 31, 2018 5:14 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano; Hasmik Danielyan
**Subject:** Re: Onward Payment Request

Dear Alan,

Pls make sure you send Lhye the invoice as well.

She will use the reference of that invoice in payment details in the transfer request.

Regards,

Hasmik

---

**From:** Hasmik D <hasmik.d@arempa.com>
**Sent:** Wednesday, October 31, 2018 5:09:33 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Re: Onward Payment Request

Sure Alan... no problem.

Dear Lhye,

Pls do.


Regards,

Hasmik

---

**From:** Alan Mixer
**Sent:** Wednesday, October 31, 2018 4:10:41 PM
**To:** Hasmik D; Meilarni Guiala
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Onward Payment Request


Hi Hasmik,

Due to ongoing audit on our bank account, we urgently need your help, could Arempa help us transfer some funds to our agent in the Hong Kong for an urgent shipment?

We promise to refund you ASAP and we will cover any transfer/handling charges you may incur.

Kindly confirm what you can do for us so i that i could send their bank details due to the urgency.

Please acknowledge my email.




Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

# DEBIT NOTE

**Ref:- RAPIS-DENOTE**
**NOV  02, 2018**

**RAPISCAN SYSTEMS LIMITED**
**X-RAY HOUSE, BONEHURST ROAD**
**SALFORDS, SURREY.**
**RH1 5GG**
**UK**

| DESCRIPTION | QTY | RATE PER IND | TOTAL IN USD |
|---|---|---|---|
| Management & Consultancy services rendered to Rapiscan Staffs. | 17 | $5125 | $87125 |

Total charges                    USD: $87,125

**OUR BANK DETAILS :**

**MAYRA ARRIAGA CONSULTANTS**
**14591 SW 38TH TERRACE ROAD, OCALA, FL**
**34481. USA**
**BANK NAME: WELLS FARGO BANK**
**BANK ADDRESS: 9488 SW 80TH AVE OCALA,**
**FL 34481. USA**
**ACCOUNT NO:** ▉▉▉7424
**WIRE ROUTING NUMBER: 121000248**
**SWIFT CODE:WFBIUS6S**

THANKING YOU,

YOURS FAITHFULLY
FOR:MAYRA ARRIAGA CONSULTANTS

**AUTHORIZED SIGNATORY**

# EXHIBIT 10

**Patricia Mooneyham**

| | |
|---|---|
| **From:** | Alan Mixer <amixer@rapiscansystens.com> |
| **Sent:** | Thursday, November 08, 2018 4:02 AM |
| **To:** | Meilarni Guiala |
| **Cc:** | 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano' |
| **Subject:** | Re: Swift RE: Onward Payment Request |
| | |
| **Importance:** | High |

Hi Hasmik & Lhye,

Can I get a response to this mail

Thanks

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 12:50, Meilarni Guiala wrote:

Dear Alan,

I will check for approval and get back to you.

Thanks & regards,

Lhye

1

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 1:14 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Here you are.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 11:08, Meilarni Guiala wrote:

Dear Alan,

Please send the details so I can send to Management for approval.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:31 PM
**To:** Meilarni Guiala

2

**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Swift RE: Onward Payment Request

Hi Lhye,

Thank you for your help.

We have another payment to be sent out. Kindly help us process it and issue us a statement.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-07 10:27, Meilarni Guiala wrote:

Dear Alan,

We have asked our bank to send a reminder. New York will open in the evening and by then we can advise you.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Wednesday, November 07, 2018 12:10 PM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'

**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Lhye,

Sorry to bother you again, do you have news from your Bank? Our agent in Hong Kong haven't seen the funds yet!

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-06 09:46, Meilarni Guiala wrote:

Dear Alan,

Let me check with the bank and I will update you as soon as possible.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Tuesday, November 06, 2018 11:40 AM
**To:** Meilarni Guiala
**Cc:** 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'

4

**Subject:** Re: Swift RE: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Kindly help to track the payment.

Thank you

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-05 13:16, Alan Mixer wrote:

Hi Meilarni,

Can you please confirm if the wire did go? Our agent have not seen the funds yet.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-11-02 12:53, Meilarni Guiala wrote:

Dear Alan,

5

Here is the swift copy. The bank charges = $45.74

Thanks & regards,

Lhye

**From:** Meilarni Guiala
**Sent:** Thursday, November 01, 2018 11:17 AM
**To:** 'Alan Mixer'; 'Hasmik D'
**Cc:** 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** RE: Onward Payment Request

Dear Alan,

Payment instruction already sent to our bank. Swift copy will follow once available.

Thanks & regards,

Lhye

**From:** Alan Mixer
**Sent:** Thursday, November 01, 2018 8:22 AM
**To:** Hasmik D
**Cc:** Meilarni Guiala; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
**Subject:** Re: Onward Payment Request
**Importance:** High

Hi Hasmik & Lhye,

Here you are.

Thank you

6

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

On 2018-10-31 23:51, Hasmik D wrote:

Dear Alan,

Just be mindful... Thursday is a half day for banks and any payment request needs to be send to bank before 12 noon for same day transfer.  Any request after 12 noon is not done until.Sunday evening.

Regards,

Hasmik

---

From: Alan Mixer
Sent: Wednesday, October 31, 2018 7:59:20 PM
To: Meilarni Guiala
Cc: 'Hasmik D'; 'Eric A Luiz'; 'Vahe Papazyn'; 'Angus Fowlie'; 'Paul Diamond'; 'Kieran Kent'; 'Mike Tropeano'
Subject: Re: Onward Payment Request

Hi Lhye,

I have asked them to prepare an invoice. Will send it to you ASAP.

Thank you.

Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

7

On 2018-10-31 15:17, Meilarni Guiala wrote:

Dear Alan,

Please send the invoice + complete bank details of beneficiary.

Thanks & regards,

Lhye

**From:** Hasmik D [mailto:hasmik.d@arempa.com]
**Sent:** Wednesday, October 31, 2018 5:14 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano; Hasmik Danielyan
**Subject:** Re: Onward Payment Request

Dear Alan,

Pls make sure you send Lhye the invoice as well.

She will use the reference of that invoice in payment details in the transfer request.

Regards,

Hasmik

_____

**From:** Hasmik D <hasmik.d@arempa.com>
**Sent:** Wednesday, October 31, 2018 5:09:33 PM
**To:** Meilarni Guiala; Alan Mixer
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Re: Onward Payment Request

Sure Alan... no problem.

Dear Lhye,

Pls do.


Regards,

Hasmik

---

**From:** Alan Mixer
**Sent:** Wednesday, October 31, 2018 4:10:41 PM
**To:** Hasmik D; Meilarni Guiala
**Cc:** Eric A Luiz; Vahe Papazyn; Angus Fowlie; Paul Diamond; Kieran Kent; Mike Tropeano
**Subject:** Onward Payment Request


Hi Hasmik,

Due to ongoing audit on our bank account, we urgently need your help, could Arempa help us transfer some funds to our agent in the Hong Kong for an urgent shipment?

We promise to refund you ASAP and we will cover any transfer/handling charges you may incur.

Kindly confirm what you can do for us so i that i could send their bank details due to the urgency.

Please acknowledge my email.




Alan Mixer

Phone (UK) +44 (0)1293 778 207

Cell +44 (0)7342 949 239

# EXHIBIT 11

 

# Application Status



| | |
|---|---|
| **Reference Number** | **218100011317** |
| **Service Name** | **E Crime** |
| **Status** | **In Progress** |
| **Modified Date** | **28/11/2018** |
| **Police Station** | **Al Barsha Police Station** |



For more information please call 901

**Your Rate For Service :**  ☆☆☆☆☆ ⓪

**Your Comment :**

512characters remaining

# EXHIBIT 12

 **BARCLAYS**

Barclays Bank UK PLC
Investigations BSD
Swift House, Ground Floor, East Wing
Longwood Close
Westwood Business Park
Coventry
CV4 8JN

The Senior Manager
Arempa International Ltd Fzc Govt
Business Id 00352 250 M2
Warehouse No A3 029
PO Box 7975, Sharjah
United Arab Emirates

23rd November 2018

Our Ref: 11/NS/23/01

Dear Sir/Madam

**ABOUT YOUR RECENT FRAUD ENQUIRY**

We're sorry that you've had to contact us about a transfer made to a Barclays account. We apologise for the delay in responding however we have now completed our investigation and so can provide you with our full response. We take any allegation of fraud very seriously, and where fraud is confirmed or highly suspected on the part of our account holders, the relevant accounts are subject to immediate closure and funds removal.

**What this means for you**

At the time your funds were received into this account, we had no knowledge or suspicions that this was anything other than a legitimate account. Although we can confirm that the account into which you transferred money has now been closed, no funds were remaining at the time that we were made aware of your situation. For this reason Barclays is unable to return any money to you.

We appreciate that this is not the outcome which you will have wanted. We can confirm that in opening and managing accounts, Barclays complies with all regulatory requirements including in respect of identification and verification. However, we have no way of knowing that an account holder will be using the account for fraudulent purposes. Barclays does regularly review and adapt its processes in order to minimise these risks in the future.

Please accept this as our final findings based on all the information we have relating to your claim

**We're here to help**

Some useful tips on protecting yourself from fraud can be accessed from our website www.barclays.co.uk/security. Also you can raise any concerns about transactions you may have been asked to make in any of our branches. Finally, if there is anything further we can do to help you, then please e-mail us at reportascam@barclays.com.

Yours sincerely,

C Watkins

Barclays Bank UK PLC. Authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority (Financial Services Register No. 759676). Registered in England. Registered No. 9740322. Registered Office: 1 Churchill Place, London E14 5HP.

# EXHIBIT 13

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom   TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
+44 20 7653 2040
+1 212 849 7552

WRITER'S INTERNET ADDRESS
lieslfichardt@quinnemanuel.com
lucasbento@quinnemanuel.com

25 February 2019

BY COURIER

Barclays Bank PLC
1 Churchill Place, London,
United Kingdom, E14 5H

Attention: Mr. Bob Hoyt, Group General Counsel

Your ref: QMS 181105-004109
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC: Request for Information under The Payment Services Regulations 2017**

We are instructed by Arempa International Limited, FZC ("**Arempa**") to pursue legal claims in respect of a misappropriated sum of USD 1,816,500, which it was deceived into transferring into a bank account with Barclays Bank PLC ("**Barclays**") that was operated by fraudsters.

We write to request that Barclays, as the payee's payment service provider, urgently provide information pursuant to Reg. 90 of The Payment Services Regulations 2017 ("**PSRs**") to assist, *inter alia*, in the identification of those responsible for the fraud and/or recovery of the funds.  We request that Barclays treat this letter as it would a complaint to Barclays under Reg. 101 of the PSRs.[1]

*Background*

In October 2018, Arempa became the victim of an elaborate fraud in which persons purportedly acting on behalf of an Arempa creditor, Rapiscan Systems Limited ("**Rapiscan**"), instructed Arempa that the bank account to which it paid invoices had changed from an HSBC account to a Barclays account, and that Rapiscan's outstanding invoice of USD 1,816,500 should be paid into that Barclays account.[2]

---

[1]     Arempa does not waive its rights to pursue any other avenue of recovery.
[2]     The fraudsters also deceived Arempa into paying other invoices to another bank, which acted promptly to successfully recover the funds for Arempa.

**quinn emanuel urquhart & sullivan uk llp**

LOS ANGELES  NEW YORK  SAN FRANCISCO  SILICON VALLEY  CHICAGO  WASHINGTON DC  HOUSTON  SEATTLE  BOSTON  SALT LAKE CITY
LONDON  TOKYO  MANNHEIM  HAMBURG  PARIS  MUNICH  SYDNEY  HONG KONG  BRUSSELS  ZURICH  SHANGHAI  PERTH  STUTTGART

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales with registered number OC337928 and is authorised and regulated by the Solicitors Regulation Authority.  A list of members and their professional qualifications is open to inspection at our registered office at 90 High Holborn, London WC1V 6LJ, United Kingdom.

The account information provided to Arempa by the fraudsters was as follows ("**Barclays Account**"):

| | |
|---|---|
| **Account Name:** | Rapiscan Systems Limited |
| **Currency:** | USD |
| **Account Number:** | ▮▮8500 |
| **Sort Code:** | 20-24-61 |
| **IBAN:** | GB66BARC▮▮▮▮▮8500 |
| **SWIFT:** | BARCGB22 |
| **Bank:** | Barclays Bank PLC |
| **Bank Address:** | Leicester, Leicestershire, United Kingdom, LE87 2BB |

On 16 October 2018, Arempa, through its bank Habib Bank AG Zurich ("**Habib**"), executed a SWIFT transfer of USD 1,816,500 to the Barclays Account (the "**Transfer**") via its correspondent bank in New York, Deutsche Bank Trust Company Americas (enclosed at <u>Annex A</u>).

On or around 5 November 2018, Arempa discovered that the transfer had been procured by fraud.  It then immediately instructed Habib to urgently seek to recover the funds from the payee.  Habib sought Barclays' assistance.  Between 5 November 2018 and 10 January 2019, Habib sent six SWIFT messages to Barclays seeking return of the funds and confirmation of the account details of the payee, including an explanation as to how the funds were credited to the payee if the account was not opened in the name of Rapiscan Systems Limited.

Barclays sent one substantive SWIFT message to Habib in response on 10 January 2019, over 65 days after it was notified of the fraud by Habib and almost 90 days after the fraud occurred.[3]  That message stated, in relevant part, as follows (enclosed at <u>Annex B</u>):

> *Please be advised that we can confirm that the account into which you transferred money has now been closed, no funds were remaining at the time that we were made aware of your situation.  For this reason we are unable to return any money to your good bank ...*

We are advised that Barclays has not provided Habib with any further information regarding the identity of the payee or the status of the funds.  We are further advised that Habib approached Barclays by email and through its call centre in the United Kingdom, but that no other substantive assistance or information was provided, other than cursory statements that the matter is being "investigated".

On 18 February, 2019, Arempa belatedly received a letter from Barclays dated 23 November, 2018 reiterating, in cursory terms, the SWIFT message sent to Habib dated 10 January 2019 (enclosed as <u>Annex C</u>).

*Request for Information under the PSRs*

Regulation 90 of the PSRs is applicable in this case because Arempa was deceived into transferring the funds into the fraudsters' Barclays Account, instead of the account of the intended recipient, Rapiscan Systems Limited.  The Financial Conduct Authority ("FCA") has stated that such circumstances should

---

[3]     Arempa also reported the fraud to the relevant authorities, namely the United Kingdom's National Fraud Intelligence Bureau on 6 November 2018 (ref: NFRC181102613165) and the Dubai Police, Fraud Division on 28 November 2018 (ref: 218100011317).

be deemed to involve provision of an "*incorrect unique identifier*" under Reg. 90.  The FCA stated in its December 2018 guidance that:[4]

> In some cases of 'authorised push payment (APP) fraud' the payer intends to transfer the funds to a legitimate payee, but is deceived into providing the account number and sort code of an account held by a different person, and so transfers the funds to a fraudster.  In our view, this is also provision of an incorrect unique identifier and PSPs must cooperate and *make reasonable efforts to assist the payer in recovering the funds* as required under regulation 90 of the PSRs 2017.

Reg. 90 provides, in relevant part, that:

> (2) Where the unique identifier provided by the payment service user is incorrect, . . . . the payment service provider—
>
> > (a) must make reasonable efforts to recover the funds involved in the payment transaction; and
> >
> > (b) may, if agreed in the framework contract, charge the payment service user for any such recovery.
>
> (3) The payee's payment service provider must co-operate with the payer's payment service provider in its efforts to recover the funds, in particular by providing to the payer's payment service provider all relevant information for the collection of funds.

Barclays must therefore "*make reasonable efforts to recover the funds involved in the payment transaction*" and provide "*all relevant information for the collection of funds*".[5]  Despite the fact that Arempa and its representatives, including Habib, have made a number of requests for information concerning the payee and/or the status of the funds, no information has been forthcoming from Barclays. This information is **urgently** required.

Accordingly, we hereby request that Barclays provide us the following information and documentation without further delay:

1.   The identity of the holder or holders of the Barclays Account;

2.   All due diligence (i.e., "know-your-customer") information held in relation to the Barclays Account, including individual ID documents, proof of address, and all company records, if the Barclays Account is in the name of a company;

3.   The dates on which the Barclays Account was opened and closed;

4.   The location in which the Barclays Account was opened;

---

[4]   *See* <https://www.fca.org.uk/publication/finalised-guidance/fca-approach-payment-services-electronic-money-2017.pdf>

[5]   For the avoidance of doubt, Habib joins Arempa in seeking the information requests listed in this letter.

5.  The date on which Barclays became aware that the Transfer was unauthorized or otherwise procured as a result of fraudulent activity;

6.  The dates on which Barclays placed a block on the Barclays Account and/or otherwise took action to freeze the Barclays Account;

7.  All bank statements for the Barclays Account;

8.  The date on which Arempa's funds were received into and transferred out of the Barclays Account and all available particulars of the account to which the funds were transferred, including how it was transferred and whether strong customer authentication was applied by Barclays in effecting that transfer as required under Reg. 100 of the PSRs;

9.  Copies of any correspondence, including any SWIFT messages, between Barclays and Habib about the Transfer and the fraud;

10. Copies of any correspondence, including any SWIFT messages, between Barclays and Deutsche Bank Trust Company Americas about the Transfer and the fraud;

11. Copies of any internal policies or procedures of Barclays in relation to incoming SWIFT payments, and specifically the matching of account names with account numbers, sort codes and IBANs, including any guidance or policy to reject or deny any transfers containing account names and account numbers that do not correspond or otherwise match;

12. Copies of any internal "know-your-customer" policies or procedures;

13. The date on which Barclays notified the Financial Conduct Authority and any other regulator or authority about the fraud; and

14. Any other information or material that will assist us in identifying the persons responsible for the fraud and/or the whereabouts of the funds.

*Next Steps*

Reg. 101 of the PSRs require Barclays to reply "*within an adequate timeframe*". We therefore request that Barclays respond substantively to this letter on that basis and, in light of the urgency of the requests for information and documentation, by no later than 5:00 pm GMT on **Friday, 8 March 2019**.

All of our client's rights are fully reserved.

Yours faithfully,


**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

*Encl.*

4

# EXHIBIT 14



Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

8 March 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
By email only: lieslfichardt@quinnemanuel.com;
              lucasbento@quinnemauel.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated 25 February 2019 which has been passed to this team to respond to.  Please ensure all future correspondence in this matter is marked for the attention of the writer and sent to the above address.

Your letter seeks to request that Barclays provide information pursuant to Regulation 90 of the Payment Services Regulations 2017 (the "PSRs").  You have also made reference to the FCA's guidance note of December 2018 which we note was published post the initial contact by Habib to Barclays.

**Background**

By way of brief background, you say that:

- on 16 October 2018 Arempa International Limited, FZC ("Arempa") became the victim of an elaborate fraud pursuant to which it made a payment of $1,816,500 (the "Payment") to an account held with Barclays (the "Beneficiary Account").  The Payment was made through Arempa's bank, Habib Bank AG Zurich ("Habib").

- On or around 5 November 2018, some 20 days after the Payment was made, Arempa through Habib sought to recover the funds from the Beneficiary Account with Barclays' assistance.

- On 23 November 2018, Barclays sent a letter to Arempa explaining that the Beneficiary Account had been closed and no funds were remaining at the time Barclays had been notified of Arempa's situation.

**Request under the PSRs**

Whilst we can sympathise with your client's position, Barclays owes duties of confidentiality to its customers.

We do not agree that your client is entitled to the information pursuant to Regulation 90 of the PSRs.

Finally, we reiterate the information set out in our letter of 23 November 2018; at the time Habib contacted Barclays in respect of recalling the Payment, no funds remained on the Beneficiary Account.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 15

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom  TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
+44 20 7653 2015

WRITER'S INTERNET ADDRESS
khaledkhatoun@quinnemanuel.com

22 March 2019

<u>VIA EMAIL</u>

Barclays Bank plc
Litigation, Investigations and Enforcement, EME
Level 29, One Churchill Place, London,
United Kingdom, E14 5HP

Attention: Jigna Bhanderi, Legal Counsel
jigna.bhanderi@barclays.com

Your ref: JJB/D1012795
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC**

We refer to your letter dated 8 March 2019.

Our letter dated 25 February 2019 requested certain information and documents on behalf of our client, acting with the consent of its bank, Habib Bank AG Zurich, pursuant to Regulation 90 of The Payment Services Regulations 2017 ("PSRs"). However, in a fashion which is emblematic of its correspondence with our client and Habib Bank to date, Barclays' response to our letter is cursory and unsatisfactory.

Your letter states that "*Barclays owes duties of confidentiality to its clients*" and, without explanation or citation, baldly asserts that Barclays does not agree that our client is entitled to any of the information and documents requested pursuant to Regulation 90. We do not understand Barclays to be advancing the self-evidently misconceived proposition that contractual duties of confidentiality trump compliance with its statutory obligations, including relevantly the PSRs. Accordingly, and absent any other reason, there is no credible basis upon which Barclays can maintain its refusal of our request for information and documents pursuant to Regulation 90.

In the circumstances, we invite Barclays to provide the information and documents referred to in our letter dated 25 February 2019 by **Wednesday, 27 March 2019.** In the absence of a satisfactory response to this

quinn emanuel urquhart & sullivan uk llp
LOS ANGELES  NEW YORK  SAN FRANCISCO  SILICON VALLEY  CHICAGO  WASHINGTON, DC  HOUSTON  SEATTLE
LONDON  TOKYO  MANNHEIM  HAMBURG  PARIS  MUNICH  SYDNEY  HONG KONG  BRUSSELS  ZURICH  SHANGHAI  PERTH  STUTTGART

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales with registered number OC352549 and is authorised and regulated by the Solicitors Regulation Authority. A list of members and their professional qualifications is open to inspection at our registered office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

letter, we have now been instructed to seek appropriate relief from the courts, without further reference to Barclays.

Our client's rights are fully reserved.

Yours faithfully,

*Quinn Emanuel Urquhart & Sullivan Uk LLP*

**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

# EXHIBIT 16

 **BARCLAYS**

Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

27 March 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
By email only: khaledkhatoun@quinnemanuel.com

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated (Friday) 22 March 2019 (sent by email at 7.20pm and seeking a response by Wednesday 27 March 2019) which is a response to our letter of 8 March 2019.

Regulation 90(3) of the Payment Services Regulations 2017 (the "PSRs") requires a payee's payment service provider to co-operate with the payer's (being your client) payment service provider (being Habib Bank) in its efforts to recover funds which have incorrectly been paid into the payee's account, and provide information for the collection of funds. There is no obligation on Barclays to provide any information to the payer directly.

We note that you do not act for Habib Bank. Accordingly, we suggest that your client liaises with Habib Bank to obtain information that can validly be requested under the PSRs (we have not seen evidence of this being done in the documents attached to your letter of 25 February and note that some of the annexures are very unclear). In parallel, we would point out some of the information being sought in your letter of 25 February goes beyond what Barclays is obliged to provide under the PSRs.

Barclays reserves all its rights in this matter.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 17

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom | TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
**+44 20 7653 2015**

WRITER'S INTERNET ADDRESS
**khaledkhatoun@quinnemanuel.com**

9 April 2019

<u>VIA EMAIL</u>

Barclays Bank plc
Litigation, Investigations and Enforcement, EME
Level 29, One Churchill Place, London,
United Kingdom, E14 5HP

Attention: Jigna Bhanderi, Legal Counsel
jigna.bhanderi@barclays.com

Your ref: JJB/D1012795
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC**

We refer to your letter dated 27 March 2019.

Our client is not satisfied by the explanations given in your letter and is disappointed by your refusal to answer many of the questions we raised.  The purpose of this letter is to explain in further detail why our client has legitimate concerns about Barclays' involvement in the process by which our client's money came to be paid out of the Barclays Account.  In an attempt to be cooperative and without prejudice to our rights, we have also narrowed our request for information and documents, which we invite you to provide without delay.

**Background**

We understand from your letter that Barclays' position is that, whilst Barclays is required under Regulation 90(3) of the PSRs to disclose at least some of the information requested in our letter dated 25 February 2019, our client may only obtain such information via Habib Bank, and not directly from Barclays.

This is a surprising position to adopt, not least because Habib Bank has itself previously (in SWIFT messages) requested information from Barclays about the beneficiary.  It has also joined our client in its

**quinn emanuel urquhart & sullivan uk llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | SHANGHAI | PERTH | STUTTGART

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales (with registered number OC 411768) and is authorised and regulated by the Solicitors Regulation Authority. A list of members and their professional qualifications is open to inspection at our registered office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

information request. We understand that Habib Bank does not intend to continue to correspond with Barclays in relation to this matter. Thus, the consequence of the position that Barclays has adopted is likely to be that our client is unable to obtain the requested information via Habib Bank, even though Barclays accepts that it is required in principle to provide some of that information under the PSRs.

That is obviously unsatisfactory. Indeed, as matters stand, absent any further information or documents from Barclays, the factual circumstances surrounding the fraud perpetrated on our client remain opaque and deeply troubling to our client. In that context, we would emphasise the following:

a.  Barclays sent only one substantive SWIFT message to Habib Bank in response to its repeated messages. That SWIFT message was sent on 10 January 2019, i.e., over 65 days after Barclays was notified of the fraud by Habib Bank and almost 90 days after the fraud occurred. In the intervening period, it sent three "holding responses" to Habib Bank. This is a significant (and troubling) delay which has gone entirely unexplained by Barclays, despite Habib Bank having directly raised the matter with Barclays.

b.  Our client received a letter from Barclays on 18 February 2019, which was dated 23 November 2018, stating that "*Barclays had no knowledge or suspicions that this was anything other than a legitimate account*" and that "*no funds were remaining at the time that we were made aware of your situation*". These assertions are of limited weight because no explanation has been provided for why Barclays asserts it had "*no knowledge or suspicions*" that this was not a "*legitimate account*". Nor does Barclays indicate the date on which it claims it was "*made aware*" of our client's "*situation*".

c.  None of Barclays' correspondence with Habib Bank or with our firm:

    i.  discloses the identity of the fraudsters or the accounts to the which the funds were transferred from the Barclays Account;

    ii.  explains how the fraudsters were able successfully to open and operate the Barclays Account;

    iii.  establishes that Barclays followed appropriate "know-your-customer" policies and procedures in relation to the Barclays Account, including in accordance with the Money Laundering Regulations;

    iv.  demonstrates that the Barclays Account was operated normally and without irregularities (apart from this fraud);

    v.  indicates that Barclays was monitoring the Barclays Account or that it raised any concerns or took any action in relation to the transfer of USD 1,816,500 from an overseas payer into the Barclays Account with a beneficiary name that was apparently incorrect; or

    vi.  confirms the dates on which Barclays alleges that it was made aware of the fraud by Habib Bank or the dates on which the funds were withdrawn and the Barclays Account closed.

In the interests of enabling us to resolve this dispute in the most cost-effective and proportionate manner, we would invite you to reconsider your refusal to provide our client with any of the information requested in our previous letter.

2

In a final attempt to resolve this dispute swiftly and without Court intervention, we have narrowed the requests made in our previous letter for information and documents to the following (the "**Documents**"):

    a.   Copies of all bank statements issued for the Barclays Account on or after 1 September 2018, and of all incoming and outgoing payment instructions related to the Barclays Account received on or after 1 September 2018;

    b.   Copies of all due diligence or "know-your-customer" documents related to the Barclays Account, including any identification and proof of address documents;

    c.   Copies of any internal Barclays policies in relation to "know-your-customer" procedures and/or in relation to the processing of incoming SWIFT payments, particularly the matching of account names with account numbers, sort codes and IBANs; and

    d.   So far as not already disclosed pursuant to requests (a) to (c) above:

        i.   The identity of the holder or holders of the Barclays Account;

        ii.   The date on which the Barclays Account was opened and the date on which it was closed; and

        iii.   All available particulars of the account to which the funds received from our client were transferred.

If Barclays continues to refuse to provide us with these documents and information, or cooperate constructively with our client, our client will have no alternative other than to seek appropriate relief from the courts, as indicated in our letter dated 22 March 2019 and as set out in further detail below.

**Intended Applications**

Our client will apply for pre-action disclosure pursuant to CPR 31.16 and/or orders in accordance with the principles laid down in *Norwich Pharmacal Co v Customs and Excise Commissioners* [1974] AC 133 and *Bankers Trust v Shapira* [1980] 1 WLR 1274, in order to seek disclosure of the Documents.

The basis for our client's intended applications is two-fold, as follows.

*Prospective Claims against the Fraudsters*

First, our client has claims against the fraudsters, including (for example) a proprietary claim, knowing receipt, deceit and restitution for unjust enrichment. The Documents are likely to contain information as to the identity of the fraudsters that operated the Barclays Account and the whereabouts of the funds, which would enable our client to bring personal claims against the fraudsters or to trace the funds in aid of a proprietary claim. In the circumstances, the Documents fall squarely within *Norwich Pharmacal* and *Bankers Trust* principles.

*Prospective Claims against Barclays*

Second, our client is reasonably contemplating also asserting claims against Barclays, including (without limitation) a restitutionary claim for unjust enrichment and a claim in negligence. As to this:

3

a. In relation to the unjust enrichment claim, Barclays has been *prima facie* unjustly enriched at our client's expense as a result of the receipt of funds transferred by reason of our client's mistake as to the identity of the holder of the Barclays Account: *Jones v Churcher* [2009] EWHC 722 (QB). Whether Barclays was on notice of the circumstances giving rise to our client's right to restitution and whether Barclays acted in good faith are factual questions that may be resolved by disclosure of the Documents.

b. In relation to the negligence claim, Barclays owed specific tortious duties to our client, including (*inter alia*) a duty to reject payments where the name of the recipient did not match the sort code and account number and/or take appropriate steps if it knew or ought to have known that funds were, or were likely to be, received into the Barclays Account as a result of any fraudulent activity. Whether Barclays has breached its tortious duties is, again, a factual question that may be resolved by disclosure of the Documents.

Barclays' duty by way of standard disclosure would plainly extend to the Documents should proceedings be issued. Disclosure of the Documents at the pre-action stage is necessary or desirable to dispose fairly of these anticipated proceedings or assist the dispute to be resolved without proceedings. In particular, we expect pre-action disclosure to be granted because the Documents will assist in enabling our client to properly plead and particularise claims against Barclays, as well as to determine whether to bring any claims in the first place, thus saving time and costs. For example, the Documents are likely to show whether appropriate "know-your-customer" procedures were adopted, whether the Barclays Account was used in a suspicious or irregular manner prior to the fraud that was perpetrated upon our client, and the circumstances of Barclays' awareness of the fraud.

**Next Steps**

In light of the foregoing, we request that Barclays disclose the Documents by **5:00 pm** on **Monday, 15 April 2019**. If Barclays declines to do so: (a) we are instructed to proceed with the aforesaid applications without further reference to Barclays; and (b) we reserve the right to draw this correspondence to the attention of the Court and seek an order requiring Barclays to pay our client's costs of the applications and meet its own costs of complying with them.

Our client's rights are fully reserved.

Yours faithfully,

*Quinn Emanuel Urquhart & Sullivan UK LLP*

**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

4

# EXHIBIT 18

 **BARCLAYS**

Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

15 April 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
**By email only:** khaledkhatoun@quinnemanuel.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated 9 April 2019.

For the sake of ease, we have adopted the defined terms used in our previous correspondence.

We see little merit in entering into protracted correspondence on this matter. Notwithstanding, we wish to reiterate the following points:

- **Barclays' Role:** It has been explicitly explained both to your client and to yourselves directly that at the time that Barclays was initially contacted on or around 5 November 2019 to recover funds paid to the Beneficiary Account, the funds had already been withdrawn. It is therefore unclear why you would continue to assert that your client has "*legitimate concerns about Barclays' involvement in the process by which*" monies were paid out of the Beneficiary Account, or that you would seek to establish a meritless claim against Barclays.

- **Request for information under the PSRs:** You do not act for Habib Bank (although please confirm if this is incorrect). The PSRs oblige Barclays to provide information to the payer's bank and not the payer directly. With due respect, if Habib is unwilling to assist your client any further, (and whilst this is an unhelpful stance for them to take and we sympathise with your client), this is a matter for them and your client, and nothing to do with Barclays.

- **Correspondence to your client:** Barclays wrote to your client on 25 November 2018 setting out its position. We note that your client asserts that they did not receive this letter until February 2019 (a fact that we cannot comment on). In those circumstances, it is unclear how you can maintain that Barclays delayed in providing a response.

- **Document Request:** As has been rehearsed in previous correspondence, we are unable to provide the requested information to you. We would also point out that some of the information sought continues to be entirely irrelevant to assisting your client in recovering the Payment.

- **Intended Applications:** Given your primary concern we assume is to obtain information about the Beneficiary Account, it is unclear why your client has not already applied for a Norwich Pharmacol Order. Whilst we do not agree that your client would be entitled to all the Documents sought (as defined in your letter), a Court may be willing to grant an order in respect of the category a. and

part of the category d. Documents.  Subject to seeing a draft of your application and the order sought (and ensuring it is reasonable and proportionate), Barclays would give consideration to taking a neutral position by not consenting to nor opposing such an application.

- **Claims against Barclays:** We do not agree that your client has any grounds for a claim against Barclays and any claim as outlined in your letter or otherwise, or any application for pre-action disclosure, will be vigorously defended.

We reserve the right the right to bring all correspondence in this matter to the Court's attention on the matter of costs and Barclays reserves all its rights.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 4

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

IN RE APPLICATION OF AREMPA
INTERNATIONAL LTD FZC FOR AN
ORDER TO TAKE DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. § 1782

Case No. _____

### DECLARATION OF KHALED KHATOUN

1.      I, Khaled Khatoun, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of
perjury under the laws of the United States, as follows:

2.      I submit this declaration in support of Arempa International Ltd FZC ("Petitioner")'s
*Ex Parte* Application and Petition For An Order to Conduct Discovery For Use In Foreign
Proceedings Pursuant To 28 U.S.C. § 1782 (the "1782 Application").

3.      Unless otherwise indicated, all facts set forth in this declaration are based upon: (a)
my personal knowledge; (b) my review of relevant documents, including the proposed subpoena;
and (c) information supplied to me by Petitioner or professionals retained by Petitioner.

. **BACKGROUND**

4.      I am partner at the firm of Quinn Emanuel Urquhart & Sullivan UK LLP ("Quinn
Emanuel"), a global law firm focused on litigation and dispute resolution.  I am licensed to practice
law in England and Wales.  I graduated with a First Class Honours degree in Philosophy and
Politics from Edinburgh University, and completed the Graduate Diploma in Law and Legal
Practice Course (with Distinction) at BPP Law School.

1

5.      I am listed as a Recommended Individual by *Legal 500 UK 2019* for Civil Fraud,
Banking Litigation: Investment and Retail, and Commercial Litigation.

**THE CONTEMPLATED ENGLISH PROCEEDINGS**

6.      At the end of 2018, Arempa fell victim of a "phishing email scam" that caused it to
transfer USD 1,816,500 to one or more individuals who impersonated directors and employees of
an Arempa creditor to a Barclays Bank account ("Barclays Account") in the United Kingdom
("Barclays Account Fraud") and USD 202,000 to a OCBC Bank account ("OCBC Account") in
Hong Kong ("OCBC Account Fraud").

7.      On or around the same time period, the individuals who are believed to be those
responsible for the Barclays Account Fraud and the OCBC Account Fraud sought to deceive
Arempa into transferring USD 87,125 to a Wells Fargo account ("Wells Fargo Account")
established at a Wells Fargo branch located in Ocala, Florida.

8.      Upon learning of the Barclays Account Fraud, on November 5, 2018, Arempa,
through its banking representatives Habib Bank, notified Barclays and subsequently sent Barclays
multiple SWIFT messages requesting that the funds be recalled with immediate effect.  Barclays
only substantively responded to Arempa and Habib Bank on January 10, 2019, over 65 days after it
was first notified of the fraud, claiming that "at the time it became aware of the issue the account
was closed", and refused to provide any further information.

9.      On February 18, 2019, Arempa received a letter dated November 23, 2018 from
Barclays informing Arempa of the same.

10.     Subsequently, Quinn Emanuel sent three letters to Barclays requesting further
information about the fraud, including the identity of the fraudster and the account(s) to which

Arempa's funds were transferred out to.  Barclays has refused to provide this information.  *See* **Exhibits 1-6.**

11.     In its capacity as counsel to Arempa, Quinn Emanuel is currently preparing a pre-action disclosure application against Barclays in relation to the Barclays Account Fraud, the purpose of which is to obtain documents relating to, *inter alia*, the identity of the fraudsters, the location of the funds, and Barclays' compliance with its internal policies and statutory obligations in relation to the opening of the Barclays Account and the fraudulent transaction.  Arempa contemplates using the documents, *inter alia*, to bring an action against Barclays on the basis of unjust enrichment and negligence ("Barclays Litigation").  To that end, on April 9, 2019, Arempa sent Barclays a letter providing it with notice that Arempa will be seeking judicial relief in the English courts.  *See* **Exhibit 5.**

12.     Arempa also contemplates pursuing asset tracing claims against the fraudsters ("Asset Tracing Claims," and together with the Barclays Litigation, the "English Proceedings") once their identities and location are uncovered pursuant to, *inter alia*, this Section 1782 Application.  Such Asset Tracing Claims would, subject to applicable law, seek the recovery of Arempa's funds, as well as damages and costs.  Arempa is prepared to pursue these claims in the Courts of England and Wales should the fraudsters and/or their assets be capable of identification.  *See* **Exhibit 5.**

### THE DISCOVERY SOUGHT BY THE 1782 APPLICATION

13.     I am lead counsel in charge of the English Proceedings.  I consider that the discovery sought from Wells Fargo is likely to be relevant to both the Barclays Litigation and the Asset Tracing Claims, including for the reasons summarized below.

3

14.     First, in relation to the Barclays Litigation, the transactions arising out of the Wells Fargo Account are likely to be relevant to show any suspicious transactions related to the Barclays Account that Barclays ought properly to have investigated. In particular, it may prove possible to identify transactions between the Barclays Account and Wells Fargo Account, including but not limited to transactions associated with the Barclays Account Fraud, that Barclays ought to have identified as being of a suspicious nature and which, if it had conducted itself in a commercially reasonable manner, would have averted the loss to Arempa from the Barclays Account Fraud.

15.     Second, in relation to the Asset Tracing Claims, the documents used by the fraudsters to open the Wells Fargo Account are likely to be relevant to ascertaining the true identity and location of the fraudsters who perpetrated the Barclays Account Fraud, including because the Wells Fargo Account documents can be verified against the documents used to open the Barclays Account. Accordingly, this Section 1782 Application will enhance the prospect that Arempa will be able to prosecute the Asset Tracing Claims against the fraudsters in the Courts of England and Wales.

16.     Furthermore, the transactions arising out of the Wells Fargo Account may assist Arempa to trace the funds that were the subject of the Barclays Account Fraud for the purpose of the Asset Tracing Claims, or to identify other funds or assets which could be used to satisfy a claim for damages and costs against the fraudsters who perpetrated the Barclays Account Fraud.

## ENGLISH COURTS ACCEPT EVIDENCE OBTAINED THROUGH SECTION 1782

17.     I am not aware of any reason that the Courts of England and Wales will not be receptive to the judicial assistance requested in the 1782 Application.

18.     In fact, English Courts have declared their willingness to accept evidence obtained through Section 1782 applications. In *South Carolina Co v Assurantie N V.*, a true and correct copy

4

of which is attached as **Exhibit 7**, the House of Lords rejected a finding by the Court of Appeal that use of information obtained from a 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure. The House of Lords held that it did not consider that a party to English proceedings, "by seeking to exercise a right potentially available to them under the Federal law of the United States [*i.e.*, seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court."[1] "All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case."[2]

19.     A similar decision was reached in *Nokia Corporation v. Interdigital Technology Corp.* a true and correct copy of which is attached at **Exhibit 8**.  There the Court denied a request to restrain a party from making a 1782 application in the United States and stated that "it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings."[3]  The Court further stated that "the English court should not seek to circumscribe the discretion possessed by the [US] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand.  It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment."[4]

---

[1]   *South Carolina Co v Assurantie N V.* [1987] 1 A.C. 24 (HL) at 42.

[2]   *Id.*

[3]   *Nokia Corporation v. Interdigital Technology Corp.* [2004] EWHC 2920 at 8.

[4]   *Id.*

5

20.     In short, the 1782 Application does not seek to circumvent foreign proof-gathering restrictions or other policies of the Courts of England and Wales, and I believe that there is no basis under English law to assert otherwise.

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on this 29th day of April, 2019 in London, England.


_____
Khaled Khatoun

6

# EXHIBIT 1

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom · TEL +44 20 7653 2000 FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
**+44 20 7653 2040**
**+1 212 849 7552**

WRITER'S INTERNET ADDRESS
**lieslfichardt@quinnemanuel.com**
**lucasbento@quinnemanuel.com**

25 February 2019

**BY COURIER**

Barclays Bank PLC
1 Churchill Place, London,
United Kingdom, E14 5H

Attention: Mr. Bob Hoyt, Group General Counsel

Your ref: QMS 181105-004109
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC: Request for Information under The Payment Services Regulations 2017**

We are instructed by Arempa International Limited, FZC ("**Arempa**") to pursue legal claims in respect of a misappropriated sum of USD 1,816,500, which it was deceived into transferring into a bank account with Barclays Bank PLC ("**Barclays**") that was operated by fraudsters.

We write to request that Barclays, as the payee's payment service provider, urgently provide information pursuant to Reg. 90 of The Payment Services Regulations 2017 ("**PSRs**") to assist, *inter alia*, in the identification of those responsible for the fraud and/or recovery of the funds.  We request that Barclays treat this letter as it would a complaint to Barclays under Reg. 101 of the PSRs.[1]

*Background*

In October 2018, Arempa became the victim of an elaborate fraud in which persons purportedly acting on behalf of an Arempa creditor, Rapiscan Systems Limited ("**Rapiscan**"), instructed Arempa that the bank account to which it paid invoices had changed from an HSBC account to a Barclays account, and that Rapiscan's outstanding invoice of USD 1,816,500 should be paid into that Barclays account.[2]

---

[1]     Arempa does not waive its rights to pursue any other avenue of recovery.
[2]     The fraudsters also deceived Arempa into paying other invoices to another bank, which acted promptly to successfully recover the funds for Arempa.

**quinn emanuel urquhart & sullivan uk llp**

LOS ANGELES  NEW YORK  SAN FRANCISCO  SILICON VALLEY  CHICAGO  WASHINGTON, DC  HOUSTON  SEATTLE  BOSTON  SALT LAKE CITY
LONDON  TOKYO  MANNHEIM  HAMBURG  PARIS  MUNICH  SYDNEY  HONG KONG  BRUSSELS  ZURICH  SHANGHAI  PERTH  STUTTGART

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales (registered number OC 357273) and is
authorised and regulated by the Solicitors Regulation Authority.  A list of members and their professional qualifications is open to inspection at our registered
office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

The account information provided to Arempa by the fraudsters was as follows ("Barclays Account"):

| | |
|---|---|
| **Account Name:** | Rapiscan Systems Limited |
| **Currency:** | USD |
| **Account Number:** | ████8500 |
| **Sort Code:** | 20-24-61 |
| **IBAN:** | GB66BARC████████8500 |
| **SWIFT:** | BARCGB22 |
| **Bank:** | Barclays Bank PLC |
| **Bank Address:** | Leicester, Leicestershire, United Kingdom, LE87 2BB |

On 16 October 2018, Arempa, through its bank Habib Bank AG Zurich ("Habib"), executed a SWIFT transfer of USD 1,816,500 to the Barclays Account (the "Transfer") via its correspondent bank in New York, Deutsche Bank Trust Company Americas (enclosed at Annex A).

On or around 5 November 2018, Arempa discovered that the transfer had been procured by fraud. It then immediately instructed Habib to urgently seek to recover the funds from the payee. Habib sought Barclays' assistance. Between 5 November 2018 and 10 January 2019, Habib sent six SWIFT messages to Barclays seeking return of the funds and confirmation of the account details of the payee, including an explanation as to how the funds were credited to the payee if the account was not opened in the name of Rapiscan Systems Limited.

Barclays sent one substantive SWIFT message to Habib in response on 10 January 2019, over 65 days after it was notified of the fraud by Habib and almost 90 days after the fraud occurred.[3] That message stated, in relevant part, as follows (enclosed at Annex B):

> *Please be advised that we can confirm that the account into which you transferred money has now been closed, no funds were remaining at the time that we were made aware of your situation. For this reason we are unable to return any money to your good bank ...*

We are advised that Barclays has not provided Habib with any further information regarding the identity of the payee or the status of the funds. We are further advised that Habib approached Barclays by email and through its call centre in the United Kingdom, but that no other substantive assistance or information was provided, other than cursory statements that the matter is being "investigated".

On 18 February, 2019, Arempa belatedly received a letter from Barclays dated 23 November, 2018 reiterating, in cursory terms, the SWIFT message sent to Habib dated 10 January 2019 (enclosed as Annex C).

### *Request for Information under the PSRs*

Regulation 90 of the PSRs is applicable in this case because Arempa was deceived into transferring the funds into the fraudsters' Barclays Account, instead of the account of the intended recipient, Rapiscan Systems Limited. The Financial Conduct Authority ("FCA") has stated that such circumstances should

---

[3]     Arempa also reported the fraud to the relevant authorities, namely the United Kingdom's National Fraud Intelligence Bureau on 6 November 2018 (ref: NFRC181102613165) and the Dubai Police, Fraud Division on 28 November 2018 (ref: 218100011317).

be deemed to involve provision of an *"incorrect unique identifier"* under Reg. 90. The FCA stated in its December 2018 guidance that:[4]

> *In some cases of 'authorised push payment (APP) fraud' the payer intends to transfer the funds to a legitimate payee, but is deceived into providing the account number and sort code of an account held by a different person, and so transfers the funds to a fraudster. In our view, this is also provision of an incorrect unique identifier and PSPs must cooperate and make reasonable efforts to assist the payer in recovering the funds as required under regulation 90 of the PSRs 2017.*

Reg. 90 provides, in relevant part, that:

> *(2) Where the unique identifier provided by the payment service user is incorrect, .... the payment service provider—*
>
> > *(a) must make reasonable efforts to recover the funds involved in the payment transaction; and*
> >
> > *(b) may, if agreed in the framework contract, charge the payment service user for any such recovery.*
>
> *(3) The payee's payment service provider must co-operate with the payer's payment service provider in its efforts to recover the funds, in particular by providing to the payer's payment service provider all relevant information for the collection of funds.*

Barclays must therefore *"make reasonable efforts to recover the funds involved in the payment transaction"* and provide *"all relevant information for the collection of funds".*[5] Despite the fact that Arempa and its representatives, including Habib, have made a number of requests for information concerning the payee and/or the status of the funds, no information has been forthcoming from Barclays. This information is **urgently** required.

Accordingly, we hereby request that Barclays provide us the following information and documentation without further delay:

1. The identity of the holder or holders of the Barclays Account;

2. All due diligence (i.e., "know-your-customer") information held in relation to the Barclays Account, including individual ID documents, proof of address, and all company records, if the Barclays Account is in the name of a company;

3. The dates on which the Barclays Account was opened and closed;

4. The location in which the Barclays Account was opened;

---

[4]   *See* <https://www.fca.org.uk/publication/finalised-guidance/fca-approach-payment-services-electronic-money-2017.pdf>

[5]   For the avoidance of doubt, Habib joins Arempa in seeking the information requests listed in this letter.

5.   The date on which Barclays became aware that the Transfer was unauthorized or otherwise procured as a result of fraudulent activity;

6.   The dates on which Barclays placed a block on the Barclays Account and/or otherwise took action to freeze the Barclays Account;

7.   All bank statements for the Barclays Account;

8.   The date on which Arempa's funds were received into and transferred out of the Barclays Account and all available particulars of the account to which the funds were transferred, including how it was transferred and whether strong customer authentication was applied by Barclays in effecting that transfer as required under Reg. 100 of the PSRs;

9.   Copies of any correspondence, including any SWIFT messages, between Barclays and Habib about the Transfer and the fraud;

10.   Copies of any correspondence, including any SWIFT messages, between Barclays and Deutsche Bank Trust Company Americas about the Transfer and the fraud;

11.   Copies of any internal policies or procedures of Barclays in relation to incoming SWIFT payments, and specifically the matching of account names with account numbers, sort codes and IBANs, including any guidance or policy to reject or deny any transfers containing account names and account numbers that do not correspond or otherwise match;

12.   Copies of any internal "know-your-customer" policies or procedures;

13.   The date on which Barclays notified the Financial Conduct Authority and any other regulator or authority about the fraud; and

14.   Any other information or material that will assist us in identifying the persons responsible for the fraud and/or the whereabouts of the funds.

*Next Steps*

Reg. 101 of the PSRs require Barclays to reply "*within an adequate timeframe*". We therefore request that Barclays respond substantively to this letter on that basis and, in light of the urgency of the requests for information and documentation, by no later than 5:00 pm GMT on **Friday, 8 March 2019**.

All of our client's rights are fully reserved.

Yours faithfully,


**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

*Encl.*

4

# EXHIBIT 2


**BARCLAYS**

Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

8 March 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
By email only: lieslfichardt@quinnemanuel.com;
            lucasbento@quinnemauel.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated 25 February 2019 which has been passed to this team to respond to. Please ensure all future correspondence in this matter is marked for the attention of the writer and sent to the above address.

Your letter seeks to request that Barclays provide information pursuant to Regulation 90 of the Payment Services Regulations 2017 (the "PSRs"). You have also made reference to the FCA's guidance note of December 2018 which we note was published post the initial contact by Habib to Barclays.

**Background**

By way of brief background, you say that:

- on 16 October 2018 Arempa International Limited, FZC ("Arempa") became the victim of an elaborate fraud pursuant to which it made a payment of $1,816,500 (the "Payment") to an account held with Barclays (the "Beneficiary Account"). The Payment was made through Arempa's bank, Habib Bank AG Zurich ("Habib").

- On or around 5 November 2018, some 20 days after the Payment was made, Arempa through Habib sought to recover the funds from the Beneficiary Account with Barclays' assistance.

- On 23 November 2018, Barclays sent a letter to Arempa explaining that the Beneficiary Account had been closed and no funds were remaining at the time Barclays had been notified of Arempa's situation.

**Request under the PSRs**

Whilst we can sympathise with your client's position, Barclays owes duties of confidentiality to its customers.

We do not agree that your client is entitled to the information pursuant to Regulation 90 of the PSRs.

Finally, we reiterate the information set out in our letter of 23 November 2018; at the time Habib contacted Barclays in respect of recalling the Payment, no funds remained on the Beneficiary Account.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 3

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom    TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
**+44 20 7653 2015**

WRITER'S INTERNET ADDRESS
**khaledkhatoun@quinnemanuel.com**

22 March 2019

**VIA EMAIL**

Barclays Bank plc
Litigation, Investigations and Enforcement, EME
Level 29, One Churchill Place, London,
United Kingdom, E14 5HP

Attention: Jigna Bhanderi, Legal Counsel
jigna.bhanderi@barclays.com

Your ref: JJB/D1012795
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC**

We refer to your letter dated 8 March 2019.

Our letter dated 25 February 2019 requested certain information and documents on behalf of our client, acting with the consent of its bank, Habib Bank AG Zurich, pursuant to Regulation 90 of The Payment Services Regulations 2017 ("**PSRs**"). However, in a fashion which is emblematic of its correspondence with our client and Habib Bank to date, Barclays' response to our letter is cursory and unsatisfactory.

Your letter states that "*Barclays owes duties of confidentiality to its clients*" and, without explanation or citation, baldly asserts that Barclays does not agree that our client is entitled to any of the information and documents requested pursuant to Regulation 90. We do not understand Barclays to be advancing the self-evidently misconceived proposition that contractual duties of confidentiality trump compliance with its statutory obligations, including relevantly the PSRs. Accordingly, and absent any other reason, there is no credible basis upon which Barclays can maintain its refusal of our request for information and documents pursuant to Regulation 90.

In the circumstances, we invite Barclays to provide the information and documents referred to in our letter dated 25 February 2019 by **Wednesday, 27 March 2019**. In the absence of a satisfactory response to this

**quinn emanuel urquhart & sullivan uk llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, D.C. | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH | PERTH | STUTTGART | SHANGHAI

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales with registered number OC335077 and is authorised and regulated by the Solicitors Regulation Authority. A list of members and their professional qualifications is open to inspection at our registered office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

letter, we have now been instructed to seek appropriate relief from the courts, without further reference to Barclays.

Our client's rights are fully reserved.

Yours faithfully,

*Quinn Emanuel Urquhart & Sullivan UK LLP*

**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

# EXHIBIT 4

 **BARCLAYS**

Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

27 March 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
By email only: khaledkhatoun@quinnemanuel.com

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated (Friday) 22 March 2019 (sent by email at 7.20pm and seeking a response by Wednesday 27 March 2019) which is a response to our letter of 8 March 2019.

Regulation 90(3) of the Payment Services Regulations 2017 (the "PSRs") requires a payee's payment service provider to co-operate with the payer's (being your client) payment service provider (being Habib Bank) in its efforts to recover funds which have incorrectly been paid into the payee's account, and provide information for the collection of funds. There is no obligation on Barclays to provide any information to the payer directly.

We note that you do not act for Habib Bank. Accordingly, we suggest that your client liaises with Habib Bank to obtain information that can validly be requested under the PSRs (we have not seen evidence of this being done in the documents attached to your letter of 25 February and note that some of the annexures are very unclear). In parallel, we would point out some of the information being sought in your letter of 25 February goes beyond what Barclays is obliged to provide under the PSRs.

Barclays reserves all its rights in this matter.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 5

**quinn emanuel** trial lawyers | london

90 High Holborn, London WC1V 6LJ, United Kingdom   TEL +44 20 7653 2000  FAX +44 20 7653 2100

WRITER'S DIRECT DIAL NO.
**+44 20 7653 2015**

WRITER'S INTERNET ADDRESS
**khaledkhatoun@quinnemanuel.com**

9 April 2019

<u>VIA EMAIL</u>

Barclays Bank plc
Litigation, Investigations and Enforcement, EME
Level 29, One Churchill Place, London,
United Kingdom, E14 5HP

Attention: Jigna Bhanderi, Legal Counsel
       jigna.bhanderi@barclays.com

Your ref: JJB/D1012795
Our ref: 08123-00003

Dear Sirs,

**Arempa International Limited, FZC**

We refer to your letter dated 27 March 2019.

Our client is not satisfied by the explanations given in your letter and is disappointed by your refusal to answer many of the questions we raised.  The purpose of this letter is to explain in further detail why our client has legitimate concerns about Barclays' involvement in the process by which our client's money came to be paid out of the Barclays Account.  In an attempt to be cooperative and without prejudice to our rights, we have also narrowed our request for information and documents, which we invite you to provide without delay.

**Background**

We understand from your letter that Barclays' position is that, whilst Barclays is required under Regulation 90(3) of the PSRs to disclose at least some of the information requested in our letter dated 25 February 2019, our client may only obtain such information via Habib Bank, and not directly from Barclays.

This is a surprising position to adopt, not least because Habib Bank has itself previously (in SWIFT messages) requested information from Barclays about the beneficiary.  It has also joined our client in its

**quinn emanuel urquhart & sullivan uk llp**

LOS ANGELES  NEW YORK  SAN FRANCISCO  SILICON VALLEY  CHICAGO  WASHINGTON, DC  HOUSTON  SEATTLE
LONDON  TOKYO  MANNHEIM  HAMBURG  PARIS  MUNICH  SYDNEY  HONG KONG  BRUSSELS  ZURICH  SHANGHAI  PERTH  STUTTGART

Quinn Emanuel Urquhart & Sullivan UK LLP is a limited liability partnership registered in England and Wales (with registered number OC357963) and is
authorised and regulated by the Solicitors Regulation Authority.  A list of members and their professional qualifications is open to inspection at our registered
office, 90 High Holborn, London WC1V 6LJ, United Kingdom.

information request.  We understand that Habib Bank does not intend to continue to correspond with Barclays in relation to this matter.  Thus, the consequence of the position that Barclays has adopted is likely to be that our client is unable to obtain the requested information via Habib Bank, even though Barclays accepts that it is required in principle to provide some of that information under the PSRs.

That is obviously unsatisfactory.  Indeed, as matters stand, absent any further information or documents from Barclays, the factual circumstances surrounding the fraud perpetrated on our client remain opaque and deeply troubling to our client.  In that context, we would emphasise the following:

a.  Barclays sent only one substantive SWIFT message to Habib Bank in response to its repeated messages.  That SWIFT message was sent on 10 January 2019, i.e., over 65 days after Barclays was notified of the fraud by Habib Bank and almost 90 days after the fraud occurred.  In the intervening period, it sent three "holding responses" to Habib Bank.  This is a significant (and troubling) delay which has gone entirely unexplained by Barclays, despite Habib Bank having directly raised the matter with Barclays.

b.  Our client received a letter from Barclays on 18 February 2019, which was dated 23 November 2018, stating that "*Barclays had no knowledge or suspicions that this was anything other than a legitimate account*" and that "*no funds were remaining at the time that we were made aware of your situation*".  These assertions are of limited weight because no explanation has been provided for why Barclays asserts it had "*no knowledge or suspicions*" that this was not a "*legitimate account*".  Nor does Barclays indicate the date on which it claims it was "*made aware*" of our client's "*situation*".

c.  None of Barclays' correspondence with Habib Bank or with our firm:

    i.  discloses the identity of the fraudsters or the accounts to the which the funds were transferred from the Barclays Account;

    ii.  explains how the fraudsters were able successfully to open and operate the Barclays Account;

    iii.  establishes that Barclays followed appropriate "know-your-customer" policies and procedures in relation to the Barclays Account, including in accordance with the Money Laundering Regulations;

    iv.  demonstrates that the Barclays Account was operated normally and without irregularities (apart from this fraud);

    v.  indicates that Barclays was monitoring the Barclays Account or that it raised any concerns or took any action in relation to the transfer of USD 1,816,500 from an overseas payer into the Barclays Account with a beneficiary name that was apparently incorrect; or

    vi.  confirms the dates on which Barclays alleges that it was made aware of the fraud by Habib Bank or the dates on which the funds were withdrawn and the Barclays Account closed.

In the interests of enabling us to resolve this dispute in the most cost-effective and proportionate manner, we would invite you to reconsider your refusal to provide our client with any of the information requested in our previous letter.

In a final attempt to resolve this dispute swiftly and without Court intervention, we have narrowed the requests made in our previous letter for information and documents to the following (the "**Documents**"):

a. Copies of all bank statements issued for the Barclays Account on or after 1 September 2018, and of all incoming and outgoing payment instructions related to the Barclays Account received on or after 1 September 2018;

b. Copies of all due diligence or "know-your-customer" documents related to the Barclays Account, including any identification and proof of address documents;

c. Copies of any internal Barclays policies in relation to "know-your-customer" procedures and/or in relation to the processing of incoming SWIFT payments, particularly the matching of account names with account numbers, sort codes and IBANs; and

d. So far as not already disclosed pursuant to requests (a) to (c) above:

   i. The identity of the holder or holders of the Barclays Account;

   ii. The date on which the Barclays Account was opened and the date on which it was closed; and

   iii. All available particulars of the account to which the funds received from our client were transferred.

If Barclays continues to refuse to provide us with these documents and information, or cooperate constructively with our client, our client will have no alternative other than to seek appropriate relief from the courts, as indicated in our letter dated 22 March 2019 and as set out in further detail below.

**Intended Applications**

Our client will apply for pre-action disclosure pursuant to CPR 31.16 and/or orders in accordance with the principles laid down in *Norwich Pharmacal Co v Customs and Excise Commissioners* [1974] AC 133 and *Bankers Trust v Shapira* [1980] 1 WLR 1274, in order to seek disclosure of the Documents.

The basis for our client's intended applications is two-fold, as follows.

*Prospective Claims against the Fraudsters*

First, our client has claims against the fraudsters, including (for example) a proprietary claim, knowing receipt, deceit and restitution for unjust enrichment. The Documents are likely to contain information as to the identity of the fraudsters that operated the Barclays Account and the whereabouts of the funds, which would enable our client to bring personal claims against the fraudsters or to trace the funds in aid of a proprietary claim. In the circumstances, the Documents fall squarely within *Norwich Pharmacal* and *Bankers Trust* principles.

*Prospective Claims against Barclays*

Second, our client is reasonably contemplating also asserting claims against Barclays, including (without limitation) a restitutionary claim for unjust enrichment and a claim in negligence. As to this:

3

a.  In relation to the unjust enrichment claim, Barclays has been *prima facie* unjustly enriched at our client's expense as a result of the receipt of funds transferred by reason of our client's mistake as to the identity of the holder of the Barclays Account: *Jones v Churcher* [2009] EWHC 722 (QB). Whether Barclays was on notice of the circumstances giving rise to our client's right to restitution and whether Barclays acted in good faith are factual questions that may be resolved by disclosure of the Documents.

b.  In relation to the negligence claim, Barclays owed specific tortious duties to our client, including (*inter alia*) a duty to reject payments where the name of the recipient did not match the sort code and account number and/or take appropriate steps if it knew or ought to have known that funds were, or were likely to be, received into the Barclays Account as a result of any fraudulent activity. Whether Barclays has breached its tortious duties is, again, a factual question that may be resolved by disclosure of the Documents.

Barclays' duty by way of standard disclosure would plainly extend to the Documents should proceedings be issued. Disclosure of the Documents at the pre-action stage is necessary or desirable to dispose fairly of these anticipated proceedings or assist the dispute to be resolved without proceedings. In particular, we expect pre-action disclosure to be granted because the Documents will assist in enabling our client to properly plead and particularise claims against Barclays, as well as to determine whether to bring any claims in the first place, thus saving time and costs. For example, the Documents are likely to show whether appropriate "know-your-customer" procedures were adopted, whether the Barclays Account was used in a suspicious or irregular manner prior to the fraud that was perpetrated upon our client, and the circumstances of Barclays' awareness of the fraud.

**Next Steps**

In light of the foregoing, we request that Barclays disclose the Documents by **5:00 pm** on **Monday, 15 April 2019**. If Barclays declines to do so: (a) we are instructed to proceed with the aforesaid applications without further reference to Barclays; and (b) we reserve the right to draw this correspondence to the attention of the Court and seek an order requiring Barclays to pay our client's costs of the applications and meet its own costs of complying with them.

Our client's rights are fully reserved.

Yours faithfully,

*[signature]*

**QUINN EMANUEL URQUHART & SULLIVAN UK LLP**

# EXHIBIT 6



Litigation, Investigations &
Enforcement, EME
Level 29
One Churchill Place
Canary Wharf
London
E14 5HP

15 April 2019

Quinn Emanuel Urquhart & Sullivan UK LLP
90 High Holborn
London
WC1V 6LJ
**By email only:** khaledkhatoun@quinnemanuel.com

Direct line +44 (0)20 7116 5307
Email: jigna.bhanderi@barclays.com

Our ref: JJB/D1012795
Your ref: 08123-00003

Dear Sirs

**Arempa International Limited, FZC**

We refer to your letter dated 9 April 2019.

For the sake of ease, we have adopted the defined terms used in our previous correspondence.

We see little merit in entering into protracted correspondence on this matter.  Notwithstanding, we wish to reiterate the following points:

- **Barclays' Role:** It has been explicitly explained both to your client and to yourselves directly that at the time that Barclays was initially contacted on or around 5 November 2019 to recover funds paid to the Beneficiary Account, the funds had already been withdrawn. It is therefore unclear why you would continue to assert that your client has "*legitimate concerns about Barclays' involvement in the process by which*" monies were paid out of the Beneficiary Account, or that you would seek to establish a meritless claim against Barclays.

- **Request for information under the PSRs:** You do not act for Habib Bank (although please confirm if this is incorrect).  The PSRs oblige Barclays to provide information to the payer's bank and not the payer directly.  With due respect, if Habib is unwilling to assist your client any further, (and whilst this is an unhelpful stance for them to take and we sympathise with your client), this is a matter for them and your client, and nothing to do with Barclays.

- **Correspondence to your client:** Barclays wrote to your client on 25 November 2018 setting out its position.  We note that your client asserts that they did not receive this letter until February 2019 (a fact that we cannot comment on).  In those circumstances, it is unclear how you can maintain that Barclays delayed in providing a response.

- **Document Request:** As has been rehearsed in previous correspondence, we are unable to provide the requested information to you.  We would also point out that some of the information sought continues to be entirely irrelevant to assisting your client in recovering the Payment.

- **Intended Applications:** Given your primary concern we assume is to obtain information about the Beneficiary Account, it is unclear why your client has not already applied for a Norwich Pharmacol Order.  Whilst we do not agree that your client would be entitled to all the Documents sought (as defined in your letter), a Court may be willing to grant an order in respect of the category a. and

Barclays Services Limited. Registered in England. Registered No: 1767980. Registered Office: 1 Churchill Place, London E14 5HP.

1598 1P (08/17)

part of the category d. Documents.  Subject to seeing a draft of your application and the order sought (and ensuring it is reasonable and proportionate), Barclays would give consideration to taking a neutral position by not consenting to nor opposing such an application.

- **Claims against Barclays:** We do not agree that your client has any grounds for a claim against Barclays and any claim as outlined in your letter or otherwise, or any application for pre-action disclosure, will be vigorously defended.

We reserve the right the right to bring all correspondence in this matter to the Court's attention on the matter of costs and Barclays reserves all its rights.

Yours faithfully

Jigna Bhanderi
Legal Counsel
Litigation, Investigations & Enforcement, EME

# EXHIBIT 7

24

Lord Mackay
of Clashfern                    Reg. v. Shivpuri (H.L.(E.))                    [1987]

with the Lord Chancellor's view. Otherwise I agree with the reasons    A
given by my noble and learned friend, Lord Bridge.

*Appeal against conviction dismissed.*
*Costs of appellant and respondent to*
*be paid out of central funds.*

Solicitors: *Francis & Co., Cambridge; Solicitor, Customs and Excise.*    B

C. T. B.

——————

C

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.    .    .    . RESPONDENTS

AND    D

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN
    PROVINCIEN" N.V.    .    .    .    .    .    . APPELLANTS

SOUTH CAROLINA INSURANCE CO.    .    .    . RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER    .    . APPELLANTS    E

1986   May 6, 7;        Lord Bridge of Harwich, Lord Brandon of Oakbrook,
    July 29                    Lord Brightman, Lord Mackay of Clashfern and
                                              Lord Goff of Chieveley

   *Injunction—Jurisdiction    to    grant—Foreign    proceedings—Action*    F
      *brought in England—Defendants lodging petition in United States*
      *court for pre-trial discovery—Whether defendants to be restrained*
      *from proceeding with petition under court's inherent jurisdiction*

      The plaintiffs were an American insurance company, and,
   having reinsured the liability of another American insurance
   company, U.N.I., they reinsured the risk with the defendants in
   London. The plaintiffs claimed under the contract of reinsurance
   and, when the defendants disputed liability, they brought    G
   proceedings in the Commercial Court. Before the defence was
   served, the defendants lodged a petition in a United States
   district court seeking, inter alia, an order for pre-trial discovery
   of documents relevant to the claim and the plaintiffs' contract of
   reinsurance with U.N.I., against persons resident in the United
   States, who were not parties to the English action. On the
   plaintiffs' application in the Commercial Court, the judge made    H
   an order restraining the defendants from taking any further step
   in the American proceedings or enforcing any order made
   therein. On appeal by the defendants, the Court of Appeal
   dismissed the appeal.

1 A.C.                     South Carolina Co. v. Assurantie N.V. (H.L.(E.))

A          On appeal by the defendants:—
           *Held,* allowing the appeal, that although the power of the
           High Court to grant injunctions, which was a statutory power
           conferred by section 37(1) of the Supreme Court Act 1981, was
           very wide it was limited, save for two exceptions irrelevant to
           the present proceedings, to the situations (Lord Mackay of
           Clashfern and Lord Goff of Chieveley dubitante) (i) where one
           party to an action could show that the other party had either
B          invaded, or threatened to invade, a legal or equitable right of
           the former for the enforcement of which the latter was amenable
           to the jurisdiction of the court, and (ii) where one party to an
           action had behaved, or threatened to behave, in an unconscion-
           able manner; that in the circumstances the plaintiffs had failed
           to show either that the defendants' conduct towards the plaintiffs
           was amenable to the jurisdiction of the court, or that it was
C          unconscionable in the sense that it interfered with the due
           process of the High Court's jurisdiction, and that, accordingly,
           the injunctions granted would be discharged (post, pp. 31c–D,
           39H—40D, 41A–D, 44A–B, C–D, E, F).
               *Siskina (Owners of cargo lately laden on board) v. Distos
           Compania Naviera S.A.* [1979] A.C. 210, H.L.(E.); *Castanho v.
           Brown & Root (U.K.) Ltd.* [1981] A.C. 557, H.L.(E.) and
           *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,
D          H.L.(E.) applied.
               *Per* Lord Goff of Chieveley. I am reluctant to accept the
           proposition that the power of the court to grant injunctions is
           restricted to certain exclusive categories. That power is unfettered
           by statute and it is impossible at the present time to foresee
           every circumstance in which it may be thought right to make
           the remedy available (post, p. 44G).
               Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3
E          W.L.R. 739; [1985] 2 All E.R. 1046 reversed.


           The following cases are referred to in their Lordships' opinions:
           *Bank of Tokyo Ltd. v. Karoon (Note),* post, p. 45; [1986] 3 W.L.R. 414;
               [1986] 3 All E.R. 468, C.A.
           *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3
F              W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)
           *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R.
               991; [1981] 1 All E.R. 143, H.L.(E.)
           *Court of Commissioner of Patents for Republic of South Africa, In re* (1980)
               88 F.R.D. 75
           *Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d
               132
G          *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362;
               [1978] 1 All E.R. 625, H.L.(E.)
           *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera
               S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803,
               H.L.(E.)


           The following additional cases were cited in argument:
H          *Armstrong v. Armstrong* [1892] P. 98
           *Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.
           *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)*
               [1980] 2 Lloyd's Rep. 546, C.A.
           *North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

26

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                              [1987]

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262          A
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.*
    *Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
    81; [1978] 1 All E.R. 434, H.L.(E.)

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman,
Lord Templeman and Lord Mackay of Clashfern) dated 19 November    B
1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien"
N.V., in the first action, and by the first defendants, Al Ahlia Insurance
Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in
the second action brought by the plaintiffs, South Carolina Insurance
Co. from the judgment dated 23 May 1985 of the Court of Appeal
(Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25    C
April 1985 by Hobhouse J., the effect of which was to restrain the
defendants from taking any further steps in proceedings before a Federal
District Court of the United States for production and inspection of
documents against a number of companies and individuals not party to
the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.
                                                                        D

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the
defendants. The point raised by this appeal is novel. The question can
be stated in this way: in what circumstances (if any) may the English
courts restrain a party to an English action from availing himself of the
process of a foreign court for the purpose of obtaining evidence relevant
to the English action? The most authoritative decisions in this branch of   E
the law are those of this House in *Siskina (Owners of cargo lately laden
on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho
v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways
Board v. Laker Airways Ltd.* [1985] A.C. 58.

In the present case the defendants against whom injunctive relief is
sought availed themselves of a right open to them under the federal law    F
of the United States and applied to a United States district court for an
order requiring persons resident in the United States, but who were not
parties to the English proceedings, to give pre-trial discovery of
documents relevant to the English action. The particular issue, therefore,
in this appeal is whether in the present circumstances it is right for the
English court to restrain the defendants from prosecuting further the
proceedings in the United States district court.                            G

The rules of procedure in England provide a means whereby
discovery can be obtained between parties to an action and witnesses
can be subpoenaed to appear at the trial with relevant documents in
their possession. The rules of procedure do not provide an exhaustive or
exclusive code which prohibit a party from obtaining documents in any
way other than those provided by the rules. For example, if a stranger
to the action is prepared to give documents voluntarily to a party, that    H
party is entitled to receive them without obtaining a subpoena. Further,
a party may use the facilities of the courts of a friendly foreign state if
that state is willing for them so to do. The defendants concede that

**1 A.C.**          **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**

A   there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in

B   question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena

C   duces tecum. As to any suggestion that the defendants could have applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in

D   the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory

E   procedure of the United States district court.

28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United

F   States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

Reliance is placed on the following propositions: (i) In principle it is

G   open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any

H   foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

28

defendants dissent from the general approach of the Court of Appeal in    A
the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo
lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C.
210, 211c–D, 255F–G, 256E–257, *per* Lord Diplock. As to *Castanho v.
Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at
pp. 572F–G, and 574D. It is to be noted that that was a forum conveniens
case. In *British· Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,    B
the observations of Lord Diplock at pp. 80A–B et seq., and Lord
Scarman at p. 95c, show that the category of cases there under discussion
have no relevance to the issue in the present case. The defendants
would apply by analogy to the present case the observations of Dunn
L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The
Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.                                   C

On the facts of the present case it is not unreasonable or unjust for
the defendants to apply for the documents in question. It is said that the
documents would be obtained earlier than if they were obtained by
subpoena in the English proceedings. But this is only a quirk of English
procedure. The advantage of being able to obtain the documents at an
earlier stage of the proceedings is in no way unconscionable to the
plaintiffs. This is particularly so since otherwise they are not likely to be    D
obtained at all. The defendants do not accept that the procedure by way
of letters rogatory is open to them. Further, it is an expensive procedure.
It cannot be unjust or unconscionable for the defendants to take the
"direct route" for obtaining these documents.

As to the United States authorities cited by Griffiths L.J. [1986]
Q.B. 348, 357, those authorities are not contemplating the situation    E
which has arisen in the present case. The principles laid down by the
Court of Appeal here it may be said to act unconscionably against the
defendants rather than the plaintiffs. [Reference was also made to *In re
North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers &
Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v.
Karoon (Note)* [1987] A.C. 45.]

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman*    F
for the plaintiffs. Attention is drawn to the width of the inquiry
requested by the defendants in the United States proceedings. They are
seeking third party discovery which would not be allowed at all in
England. The United States court will not allow that which would not be
allowed by the court hearing the substantive issue between the parties.
The defendants are in effect seeking to take part of the English    G
proceedings out of the jurisdiction and control of the English court. The
difference between the disclosure of documents as a result of letters of
request and the present case is that the defendants here have first gone
to the foreign court and requested that court to make an order in
English proceedings.

*In re Westinghouse Electric Corporation Uranium Contract Litigation
M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis    H
of the present case. The House there held that an English court will not,
even when so requested by a foreign court, make an order in respect of
an English person or company requiring that person or company to give

A   documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9

B   specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by

C   the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v.*

D   *Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would

E   deny the defendants' request as being for third party discovery which is not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

The English court has jurisdiction to restrain a party to proceedings

F   pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has

G   a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D–F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord

H   Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

30

A

proceedings are only ancillary proceedings and therefore there is no reason why the English court should not have granted the injunction appealed against.

*The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that was a case where proceedings were started in Venice in order to obtain security if the action was subsequently instituted in Italy. That case cannot be described as one of a foreign court's interlocutory jurisdiction being invoked in English proceedings. It was not an interlocutory application for the purposes of English proceedings. The line of cases cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, is closer to the present case. The present case is one where it is proper to grant an injunction to protect the jurisdiction of the English court.

B

*Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach to the present problem; the principles stated there are applicable to the present case. The essential question is: who should have control over the present matter? The true answer is that it should be the English court which should have control.

C

Suppose that in the present case the plaintiffs had attempted in the United States Court to obtain pre-trial depositions from the defendants' employees. Such an application would surely be restrained because it would be so alien to English procedure. So also third-party discovery is alien to English procedure. The matter can be tested by the following example. If a party went to an English court and asked it to issue letters rogatory in relation to third parties' documents under Order 39, such an application would be dismissed. If the party then went to the United States court and requested it under 28 United States Code, section 1782, the English court should intervene on the ground that it was vexatious; the party having failed before the English court, it cannot obtain the evidence by utilising a foreign jurisdiction. But the answer cannot be any different merely because the party in question goes to the United States court first as in the present case.

D

E

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court will not grant letters rogatory except in relation to evidence which is directly relevant to the issues in the case. Wider "discovery" will not be made the subject of letters rogatory—let alone in respect of documents held by a third party.

F

In conclusion, it is the plaintiffs' contention that they have a legal or equitable right which it is appropriate for the English court to protect by injunction, namely the right, as parties to proceedings in the English court, to have those proceedings conducted in accordance with the procedural laws and practices of England, and of no other jurisdiction. Moreover, it is their contention that the defendants' application for interlocutory relief in the United States is unconscionable and unjust to the plaintiffs. If granted, it would allow the defendants to take advantage of procedural steps and remedies available under English procedural law, while at the same time avoiding some of the restrictions on those steps and remedies which would nevertheless continue to impinge upon the plaintiffs.

G

H

*Symons* followed.

A      *Alexander Q.C.* in reply. In the present case it is accepted that there
is an advantage under the foreign proceedings which cannot be obtained
in the English proceedings. It is this factor which distinguishes the
present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by
Robert Goff L.J. in the *Tokyo Bank* case *(Note)* [1987] A.C. 45. The
defendants rely on the principle on which they opened this appeal,
namely, that the plaintiffs can only succeed if they can show that the
B   defendants' application before the United States court is unconscionable.
As to the principle adumbrated by Griffiths L.J. below, the manner in
which a party gathers evidence is for that party. It may gather it
voluntarily or in pursuance of a contract. These methods do not deprive
the English court in any way of control of its own proceedings.

   [Reference was also made to *In re Westinghouse Electric Corporation
C   Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)*
[1978] A.C. 547, 562B–F.]

   Their Lordships took time for consideration.

   29 July. LORD BRIDGE OF HARWICH. My Lords, for the reasons
given in the speech of my noble and learned friend, Lord Brandon of
D   Oakbrook, with which I agree, I would allow this appeal.

   LORD BRANDON OF OAKBROOK. My Lords, the question for decision
in this appeal is a novel one and can be stated in this way. An action
between A and B is pending before an English court. While it is
pending B, exercising a statutory right potentially available to him under
E   the federal law of the United States, applies to a district court of the
United States for an order that persons resident in the United States,
who are not parties to the action before the English court, should give
him pre-trial discovery of documents relevant to the issues in that
action. In those circumstances, is it right for the English court, on the
application of A, to grant an injunction against B prohibiting him from
prosecuting further his proceedings in the United States district court?
F   Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade
and Lloyd L.JJ.) on appeal from him, have held that it is right for such
an injunction to be granted. The parties enjoined (for in the instant case
there are three of them) now bring a further appeal with the leave of
your Lordships' House.

   The background of the case is to be found in what can conveniently
G   be described as a three-tier insurance arrangement. The company which
first insured the relevant risks was a United States company, United
National Insurance Co. ("United National"). United National re-insured
the risks which it had insured with another United States company,
South Carolina Insurance Co. ("South Carolina"). South Carolina in
turn re-re-insured the risks which it had re-insured with a number of
other insurance companies in the London market. These other insurance
H   companies included a Dutch company, Assurantie Maatschappij "De
Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern
companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas
Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

32

Lord Brandon
of Oakbrook     **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**     [1987]

upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial   A
sums which South Carolina claimed to be due from them under the
contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and
Arabian Seas refused to make the payments asked for, denying that they
were liable to do so.

    As a result South Carolina brought two actions in the Commercial
Court here in order to recover the sums which they claimed to be
payable, together with interest on such sums. In the first action, which   B
was begun on 12 December 1984, Seven Provinces is the sole defendant.
In the second action, which was begun on 28 February 1985, Al Ahlia is
the first defendant and Arabian Seas is the second defendant. It was the
original intention of the solicitors acting for South Carolina to seek
summary judgment in both actions under R.S.C., Order 14. However,
at an application to fix a date for the hearing of the Order 14   C
proceedings against Seven Provinces, counsel for the latter indicated that
a number of substantial defences would be raised to South Carolina's
claim. These defences included (1) misrepresentation or non-disclosure
regarding the retention position on the part of South Carolina; (2) non-
disclosure of a previous bad loss record on the business concerned; (3)
excessive deductions from premiums; and (4) payment of claims outside
the limits of the relevant treaty.   D

    The underwriting agent for United National through whom business
was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss
adjusters who investigated the claims made against United National
were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The
principal place of business of both P.G.A. and Campbell-Husted is in
the State of Washington.   E

    My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-
insurers") are, by reasons of their position, remote from the facts in
dispute, and obliged to rely for detailed information about them on such
documents as they can obtain from South Carolina or P.G.A. and
Campbell-Husted. The latter two, however, were not the agents of
South Carolina in connection with the relevant transactions; it follows
that discovery of documents by South Carolina in the two actions in   F
England would not extend to relevant documents held by them. In this
situation, if the re-re-insurers are to achieve their legitimate object of
inspecting and copying where necessary, relevant documents held by
P.G.A. and Campbell-Husted, some other means have to be found to
enable them to do so.

    In November 1984, after South Carolina had put forward its claims   G
against the re-re-insurers, but before the two actions in England were
begun, the latter had asked P.G.A. if they could inspect the documents
in which they were interested at Seattle on 7 December 1984. P.G.A.
referred the request to their principal, United National, which in turn
consulted South Carolina. It appears that, on the advice of South
Carolina's English solicitors, the request for inspection was, in effect,
refused. The two actions in England were subsequently begun.   H

    My Lords, 28 United States Code, section 1782, provides:

    "Assistance to foreign and international tribunals and to litigants
    before such tribunals. (a) The district court of the district in

A    which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a

B    person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the

C    document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure."

    On 28 March 1985, before the re-re-insurers had served their points of defence and counterclaim in the two actions against them in England,

D    they applied by motion to the district court of the United States, Western District of Washington, at Seattle, for an order under section 1782 above. The motion, the title of which referred to the two actions in England, asked for an order against P.G.A. and Campbell-Husted involving two matters. The first matter was the production and inspection of numerous specified classes of documents of the kind which could

E    reasonably be expected to have come into being in the course of the transaction of the insurance business which had led to United National, having settled claims itself, to recover from South Carolina as its re-insurers, and to South Carolina then claiming to recover over from the re-re-insurers. The second matter was the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by deposition. The motion was supported by a memorandum and an

F    affidavit.
    Notice of the re-re-insurers' motion was served on P.G.A. and Campbell-Husted. South Carolina was also served with notice of the motion, or otherewise made aware of its having been lodged. Neither P.G.A. nor Campbell-Husted appeared before the district court to resist the application. South Carolina, however, did so appear, and having

G    indicated their objection to it, was given until 29 April 1985 to file its affidavit in opposition. It is to be inferred from the foregoing that neither P.G.A. nor Campbell-Husted objects to producing the documents listed in the motion for inspection, and where necessary for copying, by the re-re-insurers, and that it is only the objection of South Carolina that has stood in the way of their doing so.

H    On 24 April 1985, before the date fixed for filing its affidavit in opposition in the United States district court, South Carolina issued summonses in the two actions in England. By their summonses South Carolina sought (1) an order that the re-re-insurers should withdraw their application to the United States district court, (2) an injunction

34

restraining the re-re-insurers from proceeding further with such   A
application, and (3) a declaration that the application was an abuse of
the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April
1985. He declined to make the declaration asked for, but granted South
Carolina injunctions restraining the re-re-insurers until further order
from taking any further steps in their motion before the United States
district court and from enforcing any order made by that court on such   B
motion. The main ground on which Hobhouse J. decided to grant such
injunctions appears from pp. 10 and 11 in Appendix I to the printed
case. Having set out what he called the framework of the matter, he
said:

> "It involves a question of principle as to whether or not the English
> court should retain the control of its own procedure and the   C
> proceedings that are before it. I have no doubt that the answer to
> be given to that question is that the English court should retain that
> control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by
the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal
judgment, with which Slade and Lloyd L.JJ. both agreed. The main   D
reason which Griffiths L.J. gave for his decision was similar to that
relied on by Hobhouse J. He said, at p. 358:

> "Once the parties have chosen or accepted the court in which their
> dispute is to be tried they must abide by the procedure of that
> country and that court must be master of its own procedure.
> Litigation is expensive enough as it is, and if a party fighting a case   E
> in this country has to face the prospect of fighting procedural battles
> in whatever other jurisdiction his opponent may find a procedural
> advantage it may impose intolerable burdens, and encourage the
> worst and most oppressive form of procedural forum shopping. We
> should set our face against any such situation developing.
>
> "Severe dislocation to the timetable of the English litigation is a   F
> readily foreseeable consequence of unrestrained access to foreign
> procedural remedies. This is likely to cause hardship or inconvenience
> not only to the other party to that litigation but will also affect
> other litigants whose cases are listed upon forecasts dependent upon
> litigation being conducted in accordance with our own rules of
> procedure. As the judge said, the court will lose control of its own   G
> proceedings. Furthermore, one party might be able to gain a very
> unfair advantage in the English procedure if he was able to take the
> deposition of and cross-examine a witness whom he would never
> call on his own behalf at the trial, for example, the employees or
> business associates of his opponent. I think Mr. Sumption [counsel
> for the re-re-insurers] recognised this when he said he would be
> content to accept the stay in respect of his application to take the   H
> depositions of the witnesses from P.G.A. and Arthur Campbell-
> Husted & Co. I am therefore satisfied that as a matter of principle
> the court must have an inherent jurisdiction to make any necessary

1 A.C.              South Carolina Co. v. Assurantie N.V. (H.L.(E.))              Lord Brandon
                                                                                of Oakbrook

A    order to ensure that the litigation is conducted in accordance with
     its own procedures."

     My Lords, before examining the question whether Hobhouse J. and
     the Court of Appeal were right or wrong to grant the injunctions now
     appealed against, it is necessary to draw attention to a number of
     preliminary matters.

B    The first matter to which attention needs to be drawn is the existence
     of an essential difference between the civil procedures of the High Court
     in England on the one hand, and of courts of the United States on the
     other, with regard to what may be compendiously described as pre-trial
     discovery. Under the civil procedure of the High Court in England, pre-
     trial discovery may take two forms. The first form, which is far and
C    away the more common, is by way of disclosure and inspection of
     relevant documents under R.S.C., Ord. 24. The second form, which is
     comparatively rare, is by way of the asking and answering on oath of
     interrogatories under R.S.C., Ord. 26. Such discovery is, however,
     subject to two important limitations, one relating to its scope and the
     other to the stage of an action at which it normally takes place. So far as
     the scope of discovery is concerned, it is limited to the disclosure and
D    inspection of documents in the possession or power of the parties to the
     action, or to the asking and answering on oath of interrogatories as
     between such parties. So far as the stage of an action at which discovery
     normally takes place is concerned, it is the general rule that the two
     forms of discovery to which I have referred do not take place until the
     formal pleadings by both sides have been completed and the issues in
E    disputes thereby fully and clearly defined. In this connection, however,
     it is right to say that the court has power to order either form of
     discovery at any stage of an action, including a stage earlier than the
     completion of pleadings; but such power is rarely exercised and then
     only on special grounds, for instance when discovery is needed in order
     that justice may be done in interlocutory proceedings.

F    Because of the first limitation to which I have referred, there is no
     way in which a party to an action in the High Court in England can
     compel pre-trial discovery as against a person who is not a party to such
     action, either by way of the disclosure and inspection of documents in
     his possession or power, or by way of giving oral or written testimony. I
     would, however, stress the word "compel" which I have used in the
     preceding sentence, for there is nothing to prevent a person who is not a
G    party to an action from voluntarily giving to one or other or both parties
     to it either disclosure and inspection of documents in his possession or
     oral or written testimony.

     The procedure of the High Court in England, while not enabling
     parties to an action to compel pre-trial discovery as against a person
     who is not a party to such action, nevertheless affords ample means by
     which such a person, provided that he is within the jurisdiction of the
H    court, can be compelled either to give oral testimony, or to produce
     documents in his possession or power, at the trial of the action itself.
     Under R.S.C., Ord. 38, Part II, such a person may be compelled to give
     oral testimony at the trial by the issue and service on him of a subpoena

36

ad testificandum, or to produce documents in his power or possession   A
(so long as they are adequately described and defined) by the issue and
service on him of a subpoena duces tecum. The issue of such subpoenas
is in the first instance a ministerial rather than a judicial act, and a party
may therefore issue subpoenas of either kind as he thinks fit; the court,
however, has power to set aside any subpoena on proper grounds, for
instance, irregularity of form, irrelevance, oppressiveness or abuse of the
process.   B

The procedure of the High Court in England includes a further
power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order
any person to attend any proceedings in a cause or matter and produce
any document to be specified or described in the order, the production
of which appears to the court to be necessary for the purpose of that
proceeding. It has, however, long been established that this rule is not   C
intended to be used, and cannot properly be used, to enable a party to
an action to obtain pre-trial disclosure and inspection of documents in
the possession or power of a person who is not a party to such action. It
is a rule of limited application, involving the production of a document
or documents to the court itself rather than to either of the parties to an
action.

My Lords, the civil procedure of courts in the United States differs   D
essentially from that in the High Court in England in that under it
parties to an action can compel, as against persons who are not parties
to it, a full measure of pre-trial discovery, including both the disclosure
and production for inspection and copying of documents, and also the
giving of oral or written testimony. This power of compulsion can be,
and regularly is, used at an early stage of an action.   E

The second matter to which attention needs to be drawn is that 28
United States Code, section 1782, as appears from its terms which I set
out earlier, expressly provides that an order made under it may prescribe
the practice and procedure, which may be in whole or in part the
practice and procedure of the foreign country or the international
tribunal, for taking the testimony or statement or producing the
document or other thing; and that, to the extent that the order does not   F
prescribe otherwise, the testimony or statement shall be taken, and the
document or other thing produced, in accordance with the Federal Rules
of Procedure.

Reference was made in the two courts below and again in your
Lordships' House to certain United States authorities which bear on the
exercise of a district court's powers under section 1782. In a decision of   G
the United States District Court of Pennsylvania, *In re Court of the
Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D.
75, 77, Judge Newcomer said:

"[1, 2] It is of great concern to this court that counsel for opponent
has not been able to represent to this court that the documents and
testimony for which opponents request a discovery order are
discoverable under *South African law*. Indeed, *discussions with*   H
counsel lead this court to suspect that these materials would *not* be
available through South African procedures. Clearly, this court
should not by its exercise of the discretion allowed it under section

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                          of Oakbrook

A      1782 allow litigants to circumvent the restrictions imposed on
       discovery by foreign tribunals. Few actions could more significantly
       impede the development of international co-operation among courts
       than if the courts of the United States operated to give litigants in
       foreign cases processes of law to which they are not entitled in the
       appropriate foreign tribunals."

B      Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation*
       (1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the
       United States Court of Appeals for the Third Circuit, said:

           "As a co-operative measure, section 1782 cannot be said to ignore
           those considerations of comity and sovereignty that pervade
           international law. A grant of discovery that trenched upon the
C          clearly established procedures of a foreign tribunal would not be
           within section 1782."

       My Lords, it was contended for South Carolina, on the basis of these
       authorities, that the re-re-insurers' application to the district court of the
       United States was bound to fail. The ground relied on was that, since
       the procedure of the High Court in England did not enable parties to an
D      action to compel pre-trial discovery against persons not parties to it, the
       district court would not permit the re-re-insurers to circumvent that
       limitation by granting them an order for such discovery under section
       1782.
       It appears to me that there may well be considerable force in this
       contention. It is not possible, however, for your Lordships, on the
       limited material before you, to decide for yourselves in advance how the
E      United States district court would see fit to exercise the discretion
       conferred on it by section 1782, in the particular circumstances of this
       case, and having regard to the characteristics of civil procedure in the
       High Court in England which I endeavoured to summarise earlier.
       The third matter to which attention needs to be drawn concerns
       certain changes in the positions of the parties which have occurred since
       the original hearing of South Carolina's two summonses before
F      Hobhouse J. The first change of position relates to the memorandum
       lodged in support of the re-re-insurers' application to the United States
       district court, in which they asserted:

           "As evidenced by the attached affidavit of Francis Otley Mackie the
           petitioners herein are seeking this court's assistance in obtaining
           information and documentation which is necessary, material and
G          relevant to litigation pending in the courts of England for use in
           those proceedings. The affidavit further establishes that were all the
           parties residents of England, the requested discovery would be
           permitted pursuant to the rules of procedure and discovery in
           England. Accordingly, the petitioners' motion for taking of testimony
           and the production of documents should be granted."

H      Mr. Mackie, whose affidavit is referred to at the beginning of the
       above passage, is a partner in the firm of solicitors acting for the re-re-
       insurers in the two actions in England. The relevant part of that affidavit
       is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

38

Lord Brandon
of Oakbrook      **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**      **[1987]**

A

"Discovery of such documentation and testimony is permitted according to the English rules of procedure . . . . Petitioners would be able to obtain writs of subpoena duces tecum issued by the High Court of England . . . directing these entities to produce the documents requested and directing them individually to appear and give testimony at depositions."

B

These statements in the re-re-insurers' memorandum and Mr. Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in the Court of Appeal as giving such an incomplete and inaccurate account of the procedure of the High Court in England with regard to discovery as seriously to mislead the United States district court. Griffiths L.J., however, expressly acquitted Mr. Mackie of any deliberate intention to mislead. Before your Lordships Mr. Robert Alexander, who appeared as leading counsel for the appellant re-re-insurers, accepted unreservedly that the passages in question were incomplete and inaccurate, and as a consequence liable to mislead. The main error, as will be apparent, is the failure to distinguish clearly between compelling a person not a party to an action to give pre-trial discovery on the one hand, and compelling him to give oral evidence and produce documents at the trial itself on the other hand. I think that it is right for your Lordships to say that the criticisms of that error made by the two courts below were fully justified and that it is most unfortunate that it should ever have occurred. That said, however, having regard to the admission of such error freely made by Mr. Alexander for the re-re-insurers, and having regard further to the summary which I endeavoured to give earlier of the relevant procedure of the High Court in England, it seems to me that the error is no longer of significance in the consideration of this appeal.

C

D

E

The second change of position concerns the scope of the re-re-insurers' application to the United States district court. As I indicated earlier, that application as originally framed covered two distinct matters: first, the production and inspection of specified classes of documents; and, secondly, the appearance of three named persons from P.G.A. and Campbell-Husted to give testimony by depositions. On the face of the motion it appeared that what the re-re-insurers were seeking in relation to the second of these matters was the taking of oral evidence from the persons named relevant to the issues in the English actions, such evidence to be recorded in depositions. Before the Court of Appeal, however, Mr. Sumption for the re-re-insurers expressly abandoned any intention to achieve this end, and before your Lordships Mr. Alexander made it clear that the appearance of the named persons was only sought for the purpose of their producing and identifying the relevant documents held by P.G.A. and Campbell-Husted, and in no way for the purpose of their giving oral evidence to be recorded in depositions with regard to issues of fact arising in the English actions.

F

G

The third change of position arises from the stage which the two actions in England have now reached. At the time when South Carolina's applications first came before Hobhouse J. the re-re-insurers had not yet served their points of defence and counterclaim, so that the issues between the parties had not yet been defined by pleadings and no

H

1 A.C.    South Carolina Co. v. Assurantie N.V. (H.L.(E.))    Lord Brandon
of Oakbrook

A    discovery of documents as between the parties had yet taken place. Hobhouse J. regarded this as a significant matter in exercising the discretion to grant injunctions which he held that he had. During the hearing before the Court of Appeal, however, the re-re-insurers served points of defence and counterclaim, and since then discovery of documents as between the parties has taken place. The actions in England are, therefore, much further advanced than they were when

B    South Carolina's applications first came before the judge.

The fourth change of position is this. Following the decision of the Court of Appeal South Carolina arranged for the re-re-insurers to have controlled access to certain documents held by P.G.A. and Campbell-Husted. According to the re-re-insurers, however, substantial restrictions were imposed by South Carolina on the documents which they were

C    allowed to inspect under this arrangement. It is the re-re-insurers' case, therefore, that their application to the United States district court remains necessary in order to enable them to have inspection of other documents to which, by reason of the control exercised by South Carolina, they have not so far had access. Your Lordships were not asked to go into the details of these matters, which are in dispute between the parties, and it is right, I think, for the purposes of this

D    appeal for your Lordships to proceed on the basis that the re-re-insurers have at least an arguable case with regard to them.

The fifth and final matter to which attention should be drawn is that the judge of the United States district court before whom the re-re-insurers' application under section 1782 is pending has helpfully directed that further proceedings in that application should be stayed until the

E    determination first of the re-re-insurers' appeal to the Court of Appeal, and then of their further appeal to your Lordships' House.

My Lords, having drawn attention to these various preliminary matters, I turn to consider whether the injunctions granted by Hobhouse J. and affirmed by the Court of Appeal should be allowed to stand. I put the question in that form because of the various ways described by me above in which the positions of the parties have

F    changed since the original hearing before Hobhouse J.

As appears from the passages from the judgments of Hobhouse J. and Griffiths L.J. which I set out earlier, both courts below treated South Carolina's applications for injunctions as raising matters of principle for decision. I have no doubt that they were right so to treat them. Putting the point differently, the question which your Lordships

G    have to decide is whether the circumstances of the case are such as to give the court power to grant the injunctions at all, and not whether, there being such power, it was a proper exercise of discretion to grant them rather than to refuse them.

In considering the question which I have formulated, it will be helpful in the first place to state certain basic principles governing the grant of injunctions by the High Court. The first basic principle is that

H    the power of the High Court to grant injunctions is a statutory power conferred on it by section 37(1) of the Supreme Court Act 1981, which provides that "the High Court may by order (whether interlocutory or final) grant an injunction in all cases in which it appears to the court to

40
Lord Brandon
of Oakbrook         **South Carolina Co. v. Assurantie N.V. (H.L.(E.))**         [1987]

be just and convenient to do so." That provision is similar to earlier     A
provisions of which it is the successor, namely, section 45(1) of the
Supreme Court of Judicature (Consolidation) Act 1925 and section 25(8)
of the Supreme Court of Judicature Act 1873. The second basic principle
is that, although the terms of section 37(1) of the Act of 1981 and its
predecessors are very wide, the power conferred by them has been
circumscribed by judicial authority dating back many years. The nature
of the limitations to which the power is subject has been considered in a     B
number of recent cases in your Lordships' House: *Siskina (Owners of
cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979]
A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect
of these authorities, so far as material to the present case, can be
summarised by saying that the power of the High Court to grant     C
injunctions is, subject to two exceptions to which I shall refer shortly,
limited to two situations. Situation (1) is when one party to an action
can show that the other party has either invaded, or threatens to invade,
a legal or equitable right of the former for the enforcement of which the
latter is amenable to the jurisdiction of the court. Situation (2) is where
one party to an action has behaved, or threatens to behave, in a manner
which is unconscionable. The third basic principle is that, among the     D
forms of injunction which the High Court has power to grant, is an
injunction granted to one party to an action to restrain the other party
to it from beginning, or if he has begun from continuing, proceedings
against the former in a foreign court. Such jurisdiction is, however, to
be exercised with caution because it involves indirect interference with
the process of the foreign court concerned.     E
    The latter form of injunction may be granted in such circumstances
as to constitute an exception to the second basic principle stated above.
This may occur where one party has brought proceedings against another
party in a foreign court which is not the forum conveniens for the trial
of the dispute between them, as that expression was defined and applied
in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case
the party who has brought the proceedings in the foreign court may not,     F
by doing so, have invaded any legal or equitable right of the other
party, nor acted in an unconscionable manner. The court nevertheless
has power to restrain him from continuing his foreign proceedings on
the ground that there is another forum in which it is more appropriate,
in the interests of justice, that the dispute between the parties should be
tried. The present case, however, is not concerned with a choice     G
between two competing forums for the trial of a dispute, and the
exception to which I have just referred is therefore not relevant to it.
    The power of the court to grant *Mareva* injunctions may also, before
it was statutorily recognised, have been a further exception to the
second basic principle stated above. That power, however, has now
been expressly recognised by section 37(3) of the Supreme Court Act
1981, and again the present case is in no way concerned with it.     H
    Ignoring these exceptions, therefore, and applying the basic principles
which I have stated to the present case, the first question for
consideration is whether South Carolina has shown that what I have

41

A   described above as situation (1) exists. Has South Carolina shown that
the re-re-insurers, by beginning and intending to prosecute their
application to the United States district court, has invaded, or threatened
to invade, a legal or equitable right of South Carolina for the
enforcement of which the re-re-insurers are amenable to the jurisdiction
of the court? It was contended by Mr. Rokison on behalf of South
Carolina that South Carolina did indeed have such a legal or equitable
B   right, but it appeared to me that he had great difficulty in formulating
the legal or equitable right on which he relied. Neither of the courts
below decided as they did on the basis that the re-re-insurers had by
their conduct invaded a legal or equitable right of South Carolina, and I
cannot see how such a case can be made out. I would therefore hold
that South Carolina has not shown that situation (1) exists.

C   The second question for consideration is whether South Carolina has
shown that what I have described above as situation (2) exists. Has
South Carolina shown that the re-re-insurers, by beginning and intending
to prosecute their application to the United States district court, have
acted in a manner which is unconscionable? It is difficult, and would
probably be unwise, to seek to define the expression "unconscionable
conduct" in anything like an exhaustive manner. In my opinion, however,
D   it includes, at any rate, conduct which is oppressive or vexatious or
which interferes with the due process of the court.

    Although neither Hobhouse J. at first instance, nor Griffiths L.J. in
the Court of Appeal, stated in terms that they thought it right to grant
injunctions on the ground that the conduct of the re-re-insurers in
making their application to the United States district court was
E   unconscionable, it seems to me to be implicit in their reasons that they
regarded it as being so. Hobhouse J. based his decision expressly on the
need for the court to retain control of its own process, with the
necessary implication that the re-re-insurers' conduct was an interference
with such control and therefore an interference with the due process of
the court. Griffiths L.J. based his decision on three grounds: first (like
Hobhouse J.), that the court must retain control of its own process;
F   secondly, that the civil procedure of United States courts is significantly
different from that of English courts, and the parties, by submitting to
the jurisdiction of an English court, must be taken to have accepted its
procedure; and, thirdly, that unrestricted access to foreign procedural
remedies was liable to produce hardship in the form of increased costs
and inconvenience. I shall consider each of these grounds in turn.

G   I consider, first, the ground that the re-re-insurers' conduct was an
interference with the court's control of its own process. It is not clear to
me why this should be so. Under the civil procedure of the High Court
the court does not, in general, exercise any control over the manner in
which a party obtains the evidence which he needs to support his case.
The court may give him help, certainly; for instance by discovery of
documents inter partes under R.S.C., Ord. 24; by allowing evidence to
H   be obtained or presented at the trial in various ways under Orders 38
and 39; and by the issue of subpoenas under Part II of Order 38, to
which I referred earlier. Subject, however, to the help of the court in
these various ways, the basic principle underlying the preparation and

42

presentation of a party's case in the High Court in England is that it is
for that party to obtain and present the evidence which he needs by his
own means, provided always that such means are lawful in the country
in which they are used. It was not in dispute that, if P.G.A. and
Campbell-Husted, uninfluenced by the control exercised over them by
South Carolina on the advice of the latter's English solicitors, had freely
and voluntarily allowed the re-re-insurers to inspect, and where necessary
to copy, all the documents referred to in the latter's application, it could
not possibly have been said that there had been any interference with
the English court's control of its own process. That being so, I cannot
see why, since the Federal law of the United States authorises an
application of the kind made by the re-re-insurers in this case, the
making of such application, which may or may not succeed in whole or
in part, should be regarded as being such an interference either. I
cannot, therefore, agree with the first ground of decision relied on by
the Court of Appeal.

I consider, secondly, the ground that the procedure of United States
courts is significantly different from that of English courts, and the
parties, by submitting to the jurisdiction of an English court, must be
taken to have accepted its procedure. It is, no doubt, true that the re-re-
insurers, by entering unconditional appearances in the two English
actions, can be said in a certain sense to have accepted the procedure of
that court. Your Lordships were not, however, informed of any ground
on which the re-re-insurers could, with any prospect of success, have
contested the jurisdiction of the High Court in England in respect of the
disputes which are the subject matter of the two actions concerned. Be
that as it may, I cannot see that the re-re-insurers, by seeking to
exercise a right potentially available to them under the Federal law of
the United States, have in any way departed from, or interfered with,
the procedure of the English court. All they have done is what any party
preparing his case in the High Court here is entitled to do, namely to try
to obtain in a foreign country, by means lawful in that country,
documentary evidence which they believe that they need in order to
prepare and present their case. It was said that the re-re-insurers could
have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters
of request to issue to the proper judicial authorities in the United States.
But 28 United States Code, section 1782, allows an application to be
made either indirectly by the foreign court concerned or directly by an
interested party, and I can see no good reason why the re-re-insurers
should not have chosen whichever of these two alternatives they
preferred. It is, I think, of the utmost importance to appreciate that the
reason why English procedure does not permit pre-trial discovery of
documents against persons who are not parties to an action is for the
protection of those third parties, and not for the protection of either of
the persons who are parties to the action. I cannot, therefore, agree
with the second ground of decision relied on by the Court of Appeal.

I consider, thirdly, the ground that unrestrained access to foreign
procedural remedies was liable to cause hardship in the form of increased
costs and inconvenience. So far as increased costs are concerned,
Griffiths L.J. was referring to increased costs incurred or to be incurred

43

A  by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been

B  willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to

C  themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two

D  kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps

E  ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also

F  that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can,

G  solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the

H  conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

44

My Lords, the result of the views which I have expressed is that   A
there was, in my opinion, no such interference with the procedure of the
English High Court by the re-re-insurers as would amount to
unconscionable conduct on their part, and so justify, in accordance with
the basic principles which I stated earlier, the exercise of the court's
power to grant injunctions against them. It follows that I would allow
the appeal and set aside the orders of Hobhouse J. dated 25 April 1985
and of the Court of Appeal dated 23 May 1985. As regards costs in your   B
Lordships' House, I have no doubt that South Carolina should pay the
costs of the re-re-insurers. As regards costs in the two courts below,
different considerations may apply, first, because of the breadth of the
re-re-insurers' application to the United States district court as originally
framed, and, secondly, because of the misleading nature, in the respect
to which I referred earlier, of the memorandum and affidavit lodged in   C
support of such application. I therefore think it desirable that, in
relation to those costs, your Lordships should have the assistance of
further argument from counsel on either side.

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from
the conclusion reached by the Court of Appeal. I have had the privilege
of studying in advance the speech of my noble and learned friend, Lord   D
Brandon of Oakbrook, and I find myself wholly convinced by his
reasons for moving that this appeal should be allowed. I agree with the
orders that he proposes should be made.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage
of reading in draft the speeches prepared by my noble and learned   E
friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I
agree that it would be wise to make the reservation on the matter to
which Lord Goff of Chieveley has drawn attention but, like him, I agree
with the conclusion reached by Lord Brandon of Oakbrook and with the
reasons he has given for reaching that conclusion.

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful   F
agreement with the conclusion reached by my noble and learned friend,
Lord Brandon of Oakbrook, on this appeal, and with the reasons given
by him for reaching that conclusion. I wish, however, to draw attention
to one matter upon which I have certain reservations, and to which I
attach importance.

I am reluctant to accept the proposition that the power of the court   G
to grant injunctions is restricted to certain exclusive categories. That
power is unfettered by statute; and it is impossible for us now to foresee
every circumstance in which it may be thought right to make the remedy
available. In particular, I do not regard the exercise of the power to
restrain a person from commencing or continuing proceedings in a
foreign forum as constituting an exception to certain limited categories
of case in which it has been said that the power may alone be exercised.   H
In my opinion, restraint of proceedings in a foreign forum simply
provides one example of circumstances in which, in the interests of
justice, the power to grant an injunction may be exercised. I have

45

A  elsewhere explained in detail, for reasons which it is unnecessary for me
to repeat in the present case, why, on the basis of a line of established
authority, I am at present inclined to the opinion that an injunction has
generally been granted in such circumstances for the purpose of
protecting the English jurisdiction, and why I doubt, with all respect,
whether the speech of my noble and learned friend, Lord Scarman, in
*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the
B  last word on the subject. I refer, in this connection, to my judgment in
*Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.

Even so, I can see no basis for the grant of an injunction in the
present case. In particular, in agreement with my noble and learned
friend Lord Brandon of Oakbrook, and respectfully differing from
Hobhouse J. and the Court of Appeal, I do not consider that the grant
C  of the injunction can be justified as necessary to protect the English
jurisdiction on the facts of the present case. In this, I find myself
entirely in agreement with the reasons expressed in the speech of my
noble and learned friend, Lord Brandon of Oakbrook. I therefore agree
that the appeal should be allowed.

*Appeal allowed with costs.*

D

*Solicitors: Clyde & Co.; Herbert Smith & Co.*

J. A. G.

E

————

F

NOTE

[COURT OF APPEAL]

BANK OF TOKYO LTD. v. KAROON AND ANOTHER

1984  April 3, 4, 5;                         Ackner and Robert Goff L.JJ.
G        May 24

*Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader
proceedings to determine ownership of money held by bank in
England—Bank's subsidiary in New York providing information
concerning claimant and his accounts—Claimant bringing pro-
ceedings in New York against subsidiary—Whether bank entitled
to injunction to restrain proceedings in New York*

H
APPEAL from Bingham J.
In 1983 Mr. Majid Karoon started proceedings in New York against the
Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also
against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

# EXHIBIT 8

## Nokia Corporation (a company incorporated under the laws of Finland) v Interdigital Technology Corporation (a company incorporated under the laws of the State of Delaware, USA)

Case No: HC 04 C01952

High Court of Justice Chancery Division Patents Court

8 December 2004

### Neutral Citation Number: [2004] EWHC 2920 (Pat)

### 2004 WL 3111426

Before : The Honourable Mr. Justice Pumfrey

Date: Wednesday, 8th December 2004

### Representation

Mr. Michael Silverleaf QC , Mr. Henry Whittle and Mr. Brian Nicholson (instructed by Messrs. Bird & Bird ) for the Claimant.

Mr. Guy Burkill QC and Mr. Colin Birss (instructed by Messrs. Milbank, Tweed, Hadley & McCloy ) for the Defendant.

### APPROVED JUDGMENT

Mr. Justice Pumfrey:

1. In this action Nokia seek revocation of three United Kingdom patents owned by InterDigital Technology Corporation ("InterDigital"). InterDigital is a patent holding and licensing company for InterDigital Communications Corporation ("ICC"). The patents in suit are 2,174,571 ("571"), 2,208,774 ("774") and 2,224,114 ("414"). They relate to aspects of the transmission of telephony signals over a wireless loop using time-division multiplexing techniques.

2. The significance of these patents to Nokia is that at least two of them are alleged by InterDigital to be not only relevant but actually "essential" to the practice of the GSM standards for digital cellular mobile telephones and infrastructure. Nokia are leading manufacturers in this field. These are international standards with which all manufacturers of GSM mobile telephones and associated infrastructure must necessarily comply. ETSI (the European Telecommunication Standards Institute) requires notification to it of any patents believed to be essential for compliance with its standards or proposed standards. InterDigital notified the three patents in suit in 2001 (long after the standard was formulated) but had been asserting them to be essential from about 1993.

3. The three patents in suit have equivalents in numerous territories throughout the world, all of which have been notified by InterDigital to ETSI as essential to GSM. The claimants say that the patents in suit are representative of over 140 corresponding patents (or pending applications) worldwide, which are the core patents of those said to be essential to GSM.

4. There are before me two applications. The first is the case management conference sought by Nokia. The second is an application by InterDigital seeking four heads of relief as set out in the notice of application dated 27th October 2004. The relief sought is:

(a) an injunction to restrain Nokia from pursuing applications made in the US courts under 28 USC, section 1782 for documents and other evidence from Ericsson Inc. and Sony Ericsson Mobile Communications AB;

(b) a declaration that the discovery sought in the above applications is irrelevant to any issue in the present proceedings;

(c) an order striking out parts of the claimant's pleadings which relate to construction of the claims of the patents in suit;

(d) a stay of the proceedings until after the outcome of an ICC arbitration presently taking place between the parties to this action in New York.

5. The background to the action and the present applications may be briefly outlined as follows. As I have indicated, since the early 1990s, InterDigital have been representing to the mobile communications industry that they require licences under InterDigital's patent portfolio for GSM. InterDigital has pursued an aggressive licensing policy, threatening litigation if licences are not taken and making it clear that its portfolio of patents is so geographically and technically extensive that it is uneconomic to resist.

6. After several years of negotiation with InterDigital, Nokia took a lump sum licence in 1999, but is allowed by the terms of the licence to bring this action. The licence is split into two periods — 1 and 2. Period 1 ran up to the end of 2001 and Nokia paid a royalty of $31.5 million for that period. For period 2 (from the beginning of 2002, until the expiry of the licence) no royalty is payable unless certain conditions are satisfied. One of those is that a "major competitor" of Nokia has taken a licence. There is a dispute between the parties as too whether further royalties have become due for period 2 under the licence, and if so what royalties are payable. InterDigital relies, as I understand it, upon a licence taken by Ericsson and a joint venture company, Sony-Ericsson, in settlement of a ten-year long action originally commenced in 1993 between InterDigital and Ericsson in the United States for infringement of a number of InterDigital's patents. One of the terms of the settlement between InterDigital and Ericsson was that Ericsson and its joint venture company took a licence under InterDigital's patent portfolio. This dispute, that is to say the dispute between Nokia and InterDigital as to the payability of royalty, is the subject of an ICC arbitration in New York.

7. Some of InterDigital's patents have been the subject of litigation. Action was brought against Motorola who was largely successful in its resistance to the claims. Nokia's contention is that the basket of patents under which a licence is available contains a number that are either invalid or not infringed by a manufacturer who seeks to comply with the GSM standards. Part of the motive for these proceedings is to obtain a judgment on validity which can be deployed in the arbitration; although if the timetable for the arbitration remains as it is, then any use of a putative judgment on invalidity will be impossible. The arbitration is due to be heard in January 2005.

8. Surprisingly, perhaps, for patents of the age of those in suit that have been licensed, the patentee's response to this action is to apply to amend all three. Some of the amendments are not mere deletion of claims accepted to be invalid but involve the rewriting of new claims. Nokia plead a number of grounds they say would justify the court in holding that the amendments should not be allowed in the exercise of the court's discretion. They plead, inter alia, that the patents have been known by InterDigital to be invalid and that the licence with Ericsson (which is, with all the negotiations leading up to it, entirely secret until disclosure in this action) was entered into at least in part in bad faith and with a view to putting Nokia at a disadvantage in the setting of the period 2 royalties which InterDigital publicly estimate to be about $130 million year on the basis of the Ericsson settlement.

## The application for a stay

9. With that brief introduction, I can turn to InterDigital's application for a stay. I can discern no basis for a stay of these proceedings whatever. It is not suggested that these proceedings are subject to a mandatory stay under the Arbitration Act 1996 . It is also accepted that by section 72 of the Patents Act 1977 , any person may bring proceedings to revoke a patent. But it is said that the underlying motive of these proceedings is to produce what InterDigital call an advisory opinion on the validity of the patents, that the court should encourage alternative dispute resolution, and that the arbitration already on foot involves alternative resolution of this dispute without a disproportionately expensive recourse to the court, whose decision cannot much affect the outcome of what is said to be the "real"

or "commercial" dispute between the parties. InterDigital rely also upon the fact that Nokia decided to take a licence in 1999, albeit one which permitted them to challenge the validity of the patents.

10. There is no dispute that there is a wide power to stay proceedings whenever the court thinks fit. Of course, an action which is an abuse of process will be stayed or struck out. Multiplicity of proceedings will be discouraged if possible and there are numerous specific statutory provisions providing for the staying of proceedings in certain defined circumstances. There is also a long list of specific circumstances in which the CPR provide for a staying of proceedings.

11. The case management powers contained in CPR 3.1(1)(f) apply generally, and these powers must be exercised with a view to achieving the so-called overriding objective. However, when in a properly-constituted action the claimant seeks appropriate relief, the dispute is not the subject to an arbitration agreement and the action itself cannot be said to be an abuse of process, it seems to me that the primary duty of the court is to bring it on for trial as fairly and as quickly as the circumstances permit and not to stay it.

12. Validity and infringement of the three patents in suit were removed from purview of the arbitrators by the agreement of Nokia and InterDigital. Indeed, this appears to have been the result of an objection by InterDigital (see clause 4(vi) of the terms of reference in the arbitration.

13. Having objected to the issues of infringement and validity being considered by the arbitrators in the existing arbitration, InterDigital could not, before me, identify any form of alternative dispute resolution that could even dispose of the issues of infringement and validity inter partes. It goes without saying that in the absence of an agreement to surrender a patent or consent to its revocation, no private dispute resolution could result in revocation of one or more of the patents if it were found to be invalid. There is no offer of any such agreement; so the arguments relating to proportionality and alternative dispute resolution have no foundation and must fail. There is no other basis advanced for a stay.

### The Section 1782 application

14. The application which is made in the appropriate district court in the United States is said to relate to these proceedings. It seeks both evidence on deposition and discovery of documents in specified classes as follows. The application after formal matters proceeds as follows:

"Nokia is a party to a court proceeding in England before the High Court of Justice, Chancery Division, Patents Court, in which Nokia seeks to revoke certain United Kingdom patents that have been granted to InterDigital Technology Corporation ('InterDigital'). These UK patents are the counterparts of certain US patents that are presently at issue in an arbitration between InterDigital and Nokia in the United States. Nokia believes that Ericsson, a Delaware corporation that is found in this district [the East District of Texas, Sherman Division] has evidence relevant to the validity and scope of the patents that are at issue in the English patent proceeding. Nokia submits this application to obtain this evidence from Ericsson by means of an order for discovery from this Court."

15. Without reading through the whole of the application, it is difficult to give a proper flavour of the basis upon which the application is brought, but it is necessary to pay attention first to the description of the Ericsson and InterDigital lawsuit on printed page 3, which is as follows:

"The Ericsson/InterDigital lawsuit continued following the Motorola verdict. Ericsson and InterDigital eventually settled their dispute, but only after ten years of litigation. During the course of the litigation, the parties extensively litigated the scope of InterDigital's US patents and exchanged evidence regarding the prior art."

16. On printed page 4:

"InterDigital's patent portfolio includes patents granted by the United Kingdom Patent Office, of which two are counterparts of the US patents involved in the

Ericsson/InterDigital litigation. On June 14, 2004, Nokia initiated a proceeding before the High Court of Justice, Chancery Division, Patents Court, to revoke these UK patents, together with a third InterDigital patent, the Swedish equivalent of which Ericsson opposed in the Swedish Patent Office. The UK proceeding will address many of the same issues addressed in the litigation and opposition between Ericsson and InterDigital, and in the licensing discussions between Ericsson and InterDigital, namely the scope and validity of InterDigital's patents. InterDigital may try to place some reliance upon the fact that other companies have taken licenses to its patents."

17. Then the application seeks to justify the request on the basis of the terms of section 1782 . On page 12 it says this:

"Allowing Nokia to obtain discovery from Ericsson would equitably and efficiently assist Nokia's efforts in the English proceeding. Nokia seeks to revoke certain of InterDigital's patents that InterDigital contends covered Nokia's technology. During the course of Ericsson's ten years of United States litigation with InterDigital over the validity and scope of InterDigital's US patents together with many years of opposing InterDigital's Swedish patents, and during the licensing discussions with InterDigital, it amassed a universe of knowledge and evidence relevant to the validity and scope of InterDigital's patents. It is undisputable that during the protracted litigation, opposition and licensing discussions with InterDigital, Ericsson either provided or received evidence pertinent to the scope and validity of InterDigital's patents. The patents that were at issue in the Ericsson/InterDigital litigation are the counterparts of the patents Nokia seeks to revoke in the UK revocation proceeding. The third patent at issue in the UK revocation proceeding was opposed by Ericsson in Sweden. Moreover, when the litigation ended in early 2003, Ericsson agreed to licence InterDigital's entire patent portfolio. Ericsson's decision to take a licence to InterDigital's portfolio is, and of itself, a source of evidence material to Nokia's revocation proceeding. Therefore, for all these reasons, Nokia believes that Ericsson has evidence that can assist Nokia.

Nokia's discovery of this evidence will assist Nokia's efforts in the United Kingdom proceeding. Many of the same issues present in the Ericsson/InterDigital lawsuit, or close corollaries, may arise in the context of the UK proceeding. Allowing Nokia's requested discovery will allow the English court, and the parties to that proceeding, to benefit from the ten year effort spent in resolving such issues in the US litigation, the Swedish opposition and from any evidence arising in connection with the licensing discussions. This request also obviates the need for letters rogatory, or other lengthy and cumbersome procedures, to obtain this evidence from Ericsson, a US resident and a non-participant to the UK proceeding."

18. The relief sought in the district court against Ericsson is set out in two exhibits to the application, exhibit A and exhibit B. Exhibit A seeks depositions on certain specified deposition topics in a manner which I understand to be usual in the ordinary United States litigation. As always, it is necessary to read what is already a very broad order with regard to exhibit C, which contains the definitions which render terms which, on their face, are broad into terms which are very wide indeed. The order is to Ericsson to designate one or more officers, directors, or managing agents, or other persons who consent to testify on Ericsson's behalf, with respect to the following matters. Four classes of matter are set out.

"1. Prior art to UK Patent No. 2,174,571, UK Patent No. 2,208,774 or UK Patent 2,224,414 or any prior art to any counterparts within the same patent families of these patents in other jurisdictions, including information concerning the publication date of the said prior art.

2. Ericsson's claim construction and invalidity contentions in the Ericsson/InterDigital lawsuit and any oppositions carried out by Ericsson against the counterparts of the UK Patents referred to in paragraph 1 above, and the identity of relevant prior art and factual support for all those contentions.

3. The negotiation of the 2003 Patent Licences including efforts by Ericsson, Sony-Ericsson, or InterDigital to negotiate, execute, or structure any agreements that were made in connection with, at the time of, or as part of, the resolution of the Ericsson/InterDigital Lawsuit or the execution of the 2003 Patent Licences.

4. The performance under the 2003 Patent Licences, including of any amendments or modifications (whether oral, written or by conduct) to the 2003 Patent Licences, to the agreements resolving the Ericsson/InterDigital Lawsuit, or to any other agreements within the scope of topic 3 above."

19. The request for documents, which is contained in exhibit B, is that upon which the discussion before me principally turned, but in fact the documents are complimentary to the depositions which are sought in exhibit A. I need not read paragraph 1, which again seeks prior art in relation to the patents in suit, counterparts of the patents in suit within the same patent families and documents relative to publication dates. Then paragraph 2 specifies certain classes of documents in relation to the Ericsson/InterDigital lawsuit, including witness expert reports and declarations, affidavits or witness statements relating to construction. Paragraph 3 relates to the negotiation and execution of the Ericsson settlement agreement, and paragraph 4 relates to any amendments or modifications, rather surprisingly, whether, oral, written or by conduct, which were made to the patents licences and the agreements resolving the Ericsson lawsuit.

20. I am asked to restrain the claimants from further continuing with this application against Ericsson and Sony Ericsson, or in the alternative for the declaratory relief, which I have already set out, indicating that the classes of documents in question are irrelevant in this action. There is no doubt that I have jurisdiction to restrain the section 1782 proceedings and this jurisdiction is described in the decision of the *House of Lords in South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien NV" [1987] AC 24* . The speech of Lord Brandon, with whom the remainder of their Lordships largely concurred, sets out the principles upon which the English court will interfere by injunction with an application made under the United States provision by a party to litigation in this country, and I am bound by it. Before turning to the principles established by this decision, however, I should briefly refer both to Title 28 section 1782 and to the leading case on the exercise of power arising under section 1782 , the recent decision of the *United States Supreme Court in a case called Intel Corporation v. AMD* .

21. In its present form, what I will call subsection (a) of section 1782 , which has the cross-head "Assistance to foreign and international tribunals and to litigants before such tribunals" is as follows:

"The district court of the district in which a person resides are is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure ".

22. *Intel v. AMD* itself concerned an application under section 1782 for documents with a view to providing them to the European Commission for the purpose of a complaint under Articles 81 and 82 of the EC Treaty . Justice Ginsburg delivered the majority opinion. I believe that the following propositions may be derived from that opinion that are directly relevant to the issues which arise before me today.

(a) Section 1782 authorizes but does not require the federal district court to grant discovery in aid of the foreign proceedings.

(b) The proceeding in question must be within reasonable contemplation, but need not be pending or imminent. I infer from this that the provision may be used to obtain evidence prior to issue of proceedings in this country.

(c) There is no requirement that the discovery sought in section 1782 proceedings be discoverable in the foreign jurisdiction if located there.

(d) Considerations of comity between jurisdictions and parity between litigants may be legitimate touchstones for the district court's exercise of discretion in a particular case, but that is no reason for imposing a general foreign-discoverability rule. For example, a foreign court's reluctance to order discovery of particular documents may be no indication at all of a reluctance to receive them in evidence — the example given by Justice Ginsburg is the South Carolina case itself. The foreign tribunal may itself place such limitations as it thinks appropriate on the admission of material obtained pursuant to section 1782 .

(e) In exercising the discretion, a number of factors need to be borne in mind:

(i) Where the parties to the section 1782 proceedings are the same as those in the foreign proceedings, the need for aid is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence.

(ii) The stature of the foreign tribunal, the character of the proceedings underway abroad and the receptivity of the foreign court to federal court judicial assistance must also be considered.

(iii) Whether the section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or of the United States is also relevant.

(iv) (iv) Unduly burdensome requests may be rejected or trimmed.

23. It is clear that the jurisdiction will be exercised having regard to the attitude that the foreign court will take to the material produced by the section 1782 request. As is well known, the attitude of this court, that is to say the English court, towards disclosure is regulated by the CPR and the scope of disclosure is essentially circumscribed by the pleaded issues. At the same time, the court is generally indifferent as to the source of admissible material. Let me give a simple example. In a patent action, the validity of the patent is challenged on the grounds of anticipation or obviousness on the basis of a single prior publication. The scope of disclosure is limited to documents advancing the parties' respective cases, including their attacks on the other's case, within the time window of four years around the priority date: see paragraph 5.1(2) of the Practice Direction under Part 63 of the CPR .

24. This means there will be no disclosure relating to other grounds of invalidity, for example, prior use by the patentee, and the defendant must himself uncover at least the possible existence of such prior uses by the patentee for himself before he can obtain the court's assistance in compelling disclosure from the patentee. On the other hand, if he does obtain evidence of prior use by the patentee, the court is not generally concerned as to how that evidence was obtained. As I understand the decision of the House of Lords in the South Carolina case, to which I now turn, one possible route is by way of a section 1782 request.

25. Mr. Silverleaf QC, who appears on behalf of Nokia, submits that the following propositions may be derived from Lord Brandon's speech in the South Carolina case.

(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case: See *[1987] AC 41 G–H* .

(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process. (Page 42 A).

(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English court. (Page 42 C).

(d) Accordingly, a party should normally be permitted to exercise its rights under Title 28 of the US Code section 1782 .

(e) It is for the US court hearing the section 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court.

(f) Before the court should restrain a party's use of the section 1782 procedure, it has to be satisfied that the use being made is either a breach of some legal or equitable right of the objecting party (page 41, B to C) or is vexatious or oppressive or is in some other way unconscionable. (Page 41 D).

26. This summary seems to me to be correct and it shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by *Banker's Trust international PLC v PT Dharmala (unreported, 1st December 1995* , Mance J, as he then was) and *Omega v Viktor Kozeny [2002] CLC 132* (Mr. Peter Gross QC, as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance J appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross QC was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings.

27. Mr. Burkill's submission on behalf of InterDigital is that the depositions sought on the present application and the classes of documents sought are of undue width and purely fishing. The definitions of the classes make no attempt to distinguish that which is relevant from that which is not, and are for that reason objectionable. The fact that the second, third and fourth classes closely mirror the terms of a subpoena issued by the arbitrators against Ericsson reveals, he submits, that the real purpose of the section 1782 application is to produce documents in aid of the arbitration and that this is confirmed by the unwillingness of Nokia's advisers to agree to protective orders preventing the employment of the documents in the arbitration.

28. Accordingly, he says that the application is oppressive and is an abuse of process and should be restrained by this court.

29. It is necessary to make a number of elementary observations before turning to Mr. Burkill's contentions. First, the issues in the English proceedings are defined by the pleadings. Second, documents and other evidence are not admissible unless either relevant to an issue so defined or (although relevant to the issues in the case) as tending to go impugn the credit of a witness. The court will not compel production of documents going only to credit. Third, disclosure will only be ordered on the basis set out in the CPR , which is to say, that a party will only be required to make a search ultimately as is reasonable and proportionate.

30. I agree with Mr. Burkill that the classes of documents as drawn would not be ordered by way of disclosure in the present proceedings. As he correctly observes, the first class (all prior art to the three patents) covers prior art that has not pleaded and this class is, from the perspective of this

court, too broad. I am equally satisfied, however, that any new prior art discovered could, in principle, be introduced by amendment of the pleadings into the action.

31. If any document obtained in the second, third and fourth categories could be relevant to these proceedings, in the sense that it would be disclosable if in the possession, custody or power of InterDigital, it could only be because it related to Nokia's contention that the court should not exercise its discretion to permit the amendments sought to the three patents in suit. InterDigital is under a duty to disclose documents in its power (a term defined in the relevant provisions of the CPR ) that are disclosable in the light of the pleaded case. While I might be privately sceptical as to the likelihood that the discovery by Ericsson will turn up material in addition to that which must be disclosed in these proceedings in any event, I certainly cannot say that it will not do so.

32. It follows that it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings. This approach, which is quite different from the approach which I would take to a request for specific disclosure of class of documents in the context of English proceedings, is appropriate for the following reasons:

> (a) Subject to the restrictions placed on the jurisdiction by Federal law, the request is not circumscribed by the issues at stake in the foreign proceedings. There do not even have to be any proceedings on foot for the request to be considered. It is therefore in part investigatory in nature.

> (b) It follows that the English court should not seek to circumscribe the discretion possessed by the district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment.

> (c) The question of the extent to which the district court should accede to the request is a matter for it alone, on the evidence made available, and the English court should only interfere if the invocation of the jurisdiction is either contrary to some legal or equitable right of the other party to the English litigation or is otherwise oppressive or vexatious or tends to interfere with the due process of the English court. In my judgment it should also, if possible, express a view as to the likely deployability of the documents sought if that is possible and if such an expression will be of assistance to the district court.

> (d) The final decision on admissibility will be in any event for the English court, in the light of the issues as defined in the pleadings, and the English court should not, subject to the caveat set out above, concern itself with the manner in which the material sought matters sought to be admitted is obtained.

> (e) This is a different problem from the problem of ordering disclosure of a class of documents of which it can be said that a substantial proportion are irrelevant. The court will not order disclosure of such a class because the English court will not exercise its coercive powers to compel the production of material irrelevant on the pleadings as they stand. But it is for the district court to form its own view in the United States, having regard to the nature of the jurisdiction and to the fact that it is not circumscribed by the pleaded issues in pending litigation, as to the material the production of which should be compelled.

33. The position in respect of the depositions is more difficult. Experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all. Again, it is possible, but the possibility is a remote one. In this connection I say nothing about depositions ancillary to the document request whose only purpose is to locate relevant documents.

Case 5:19-mc-00008-JSM-PRL   Document 2   Filed 05/01/19   Page 208 of 210 PageID 210

34. On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded. If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely an of doubtful utility but an abuse of process. If it were the case that the request would be automatically complied with by the district court in the United States, then I would be prepared to confer a wide ambit on the term "abuse of process". But it is clear from the Intel case that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35. Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings. This I cannot do. In this connection, I have not overlooked the question whether the real purpose of the request is to assist in the arbitration. This, it seems to me, is preeminently a matter for the district court. The extent to which a collateral purpose is an objection to a section 1782 request is a matter for the district court in the light of the guidance provided to it by Intel and other cases. It is not a matter for me.

36. Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought.

37. Finally, I should mention the question of costs of the section 1782 request. Dr. Laakkonen from Nokia suggests in his evidence (for some reason) that if successful Nokia will seek its costs of the section 1782 proceedings from InterDigital. I cannot pre-empt the exercise of this discretion by the judge who ultimately deals with the question, and for present purposes I should only say that this risk is not of itself oppressive of InterDigital and is not enough to justify me in restraining the section 1782 application by injunction.

## Declaratory relief

38. While pressing his application for injunctive relief, Mr. Burkill QC submits that in the alternative I should declare that the classes of documents specified in the 1782 request are irrelevant to the action as presently constituted. For the reasons that I have set out, I agree that the great majority of the documents falling within the second, third and fourth classes are, or are likely to be, irrelevant. But for the reasons I have also stated, I cannot say that they all are. For this reason, I cannot make a declaration in the categorical terms that Mr. Burkill requests. I accept that, as I have indicated, I would not have made an order for disclosure in the current proceedings on the present state of the pleadings of the classes of documents which are specified in the request under section 1782 , but for the reasons that I have also stated, that consideration seems to me to be irrelevant to the present question.

## Amendment

39. I turn, finally, to an application to amend the pleadings which is made by Nokia. As pleaded, it is clear that Nokia's case on invalidity of the patents is in part contingent on the allegation that lies at the commercial heart of this dispute, which is that use of the inventions of the patents in suit, among others, is essential at least to G2 and G2.5 mobile digital cellular telephony. The patents have been notified to ETSI on the basis that the "proprietor believes that the [patents] may be considered essential" to the specified standards. InterDigital say most emphatically that a notification is not an assertion of essentiality, but only of possible or potential essentiality. In my view, something is only possibly or potentially essential to compliance with the standard during the period before the question of essentiality has been determined, whereafter it is either optional or essential.

40. Before me, InterDigital were initially unwilling to state whether they considered that use of any of the inventions the subject matter of the patents in suit was in fact essential to compliance with the relevant standards. In response to a direct question from me, Mr. Burkill QC took instructions and then informed me that essentiality was not asserted in relation to 571, use of which was therefore optional, but was asserted in relation to 774 and 414.

41. Once the assertion of essentiality is made, it seems to me that it is open to Nokia to argue that the

contents of the standard will force a particular construction of the claims on the patentee if the invention is to be essential to compliance. Whether the argument is compelling is not for me to say at this stage, but it is clearly possible without the need for examination of any particular embodiment. Where the employment of the invention is alleged to be optional, then if there is an assertion of infringement sufficient to support a prayer for a declaration of non-infringement under the inherent jurisdiction of the court, that may also be sufficient. It depends upon the terms of the assertion

42. Conscious of the difficulties of merely applying to revoke the patents on the basis of a construction which may be disputed in respect of a standard which may or may not be relevant, Nokia seek to amend their claim by adding a declaration of non-infringement in respect (put shortly) of equipment complying with the standards. InterDigital object on the basis that the claims relate to apparatus; that the specifications do not describe apparatus; and that to grant a declaration of non-infringement (or, I suppose, non-essentiality) in respect of the standard is potentially embarrassing

43. The draft pleading is as follows. Passing over the matters which are merely common form, I can pick it up as amended at paragraph 4.

> "4. The Defendant's publicly stated position is that the manufacturer of and commercial dealing in mobile telephone equipment which complies with GSM standards infringes the Patents (and corresponding patents worldwide). 'GSM standards' refers to the standards issued by the European Telecommunications Standards Institute (ETSI) relating to the European digital cellular telecommunications systems, known as Global System for Mobile Communications (GSM).
>
> (i) The Defendant has notified ETSI in accordance with the ETSI IPR Policy, that the Patents are 'Essential IPR' in respect of the GSM standards. A copy of the relevant entries in the database maintained and published by ETSI is attached hereto as Annex 1.
>
> (ii) The Defendant has licensed the Patents (and corresponding patents elsewhere in the world) to manufacturers of equipment falling within the GSM standards, on the basis that such licences are necessary for compliance with those standards. The Claimant, amongst others, has entered into such a licence.
>
> (iii) 'Essential IPR' under the ETSI IPR Policy, a copy of which is attached as Annex 2 hereto, is defined by clause 15(6) thereof in the following terms:
>
> 'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standards without infringing that IPR. For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPR, all such IPRs shall be considered ESSENTIAL.'"

44. The particular (iii) under paragraph 4 which is sought to be added by amendment pleads the meaning of the word "essential" upon which Nokia rely, and paragraph 6, which is added by amendment, seeks in the alternative, or in any event, a declaration of non-infringement in relation to all Nokia equipment complying with the relevant standards. It is claimed that InterDigital have made a general assertion of infringement in relation to all three patents in relation to the handsets and other infrastructure manufactured by Nokia, and it is sought to add to the prayer for relief a declaration that importation, manufacture, sales, supply, offer for sale or supply, and keeping of the relevant hardware in compliance with the specified standards without the consent of the defendant, InterDigital does not require infringement of the identified patents and that the patents in each of them are not essential

IPR for GSM Release 4.

45. That in terms is not a declaration of non-infringement: it is a declaration of non-essentiality. What Nokia are seeking to do is to keep open the possibility which I think Mr. Silverleaf articulated by saying if they are not saying it is essential, we are not worried.

46. I have been in two minds as to whether this is a possible approach to a patent action. However, having regard to the assertion of essentiality which was made to me by Mr. Burkill, I am satisfied, for the reasons that I have endeavoured to express, that the court should, if at all possible, resolve the commercial issue in the terms that it is understood by the parties. The position is far more difficult in relation to the patent whose use is said to be optional. It does seem to me that on ordinary principles the question of non-infringement becomes an entirely theoretical one. Non-essentiality is accepted, and in those circumstances it seems to me that either there must be a clear assertion of infringement identified or a specimen hardware in respect of which InterDigital seek royalty should be identified.

47. It is not clear to me, as at present, whether that has happened and for this reason I will hear further submissions in the light of these observations in relation to the patent whose use is said to be optional. Subject as aforesaid, however, InterDigital's applications fail.

Crown copyright

© 2018 Thomson Reuters

Westlaw UK